**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| American Airlines, Inc., a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **Civil Action No.:** _____ |
| Travelport Limited, a foreign corporation and Travelport, LP, a Delaware limited partnership, d/b/a Travelport; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Orbitz Worldwide, LLC, a Delaware limited liability company, d/b/a Orbitz, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

### INTRODUCTION AND SUMMARY

1.      Plaintiff American Airlines, Inc. ("American") brings this suit to stop and recover the damages it has suffered as a result of the anticompetitive conduct of defendants Travelport Limited and Travelport, LP (hereinafter collectively referred to as "Travelport").  As this Complaint describes, Travelport effectively controls the distribution of airline tickets to a large number of business travelers.  American also brings suit against defendant Orbitz Worldwide, LLC, which operates an online travel agency and benefits from Travelport's monopoly.  Travelport has engaged in exclusionary conduct, and Travelport and Orbitz have entered into

agreements with one another and with others to exclude competition and maintain Travelport's monopoly power.

2.      Travelport operates global distribution systems ("GDSs").  GDSs distribute airline fare, flight, and availability information provided by American and other airlines to travel agents, and enable those travel agents to make reservations and issue tickets on the airlines' flights (hereinafter referred to as "the provision of airline booking services").  Travel agents rely almost exclusively on GDSs to sell airline tickets, and a majority of American's passenger revenues come from tickets sold by travel agents.  As such, GDSs are the gatekeepers between American (and other network or "hub-and-spoke" airlines) and travel agents and their customers.

3.      Five GDSs operate in the United States:  Sabre, Galileo, Apollo, Worldspan, and Amadeus.  Travelport controls three of the five GDSs—Galileo, Apollo, and Worldspan—which together account for over 30% of all airline ticket sales made by U.S.-based travel agencies.  In the past year, over $2.7 billion of American's sales were booked through Travelport's GDSs. Travelport effectively controls the ability of American and other network airlines to distribute fare, schedule, and availability information to Travelport's travel agency subscribers, including defendant Orbitz, and to obtain reservations and sell tickets through those travel agencies.  Many business travelers will only purchase tickets through the travel agency with which their company has a contract.  Because Travelport provides virtually 100% of the bookings for a large number of corporate customers whose travel agents subscribe to one of Travelport's GDSs, it has monopoly power over American.

4.      Travel agents do not pay to use the services of the GDSs.  Rather, the GDSs charge the airlines a supracompetitive "booking fee" for each reservation that a travel agent makes through a GDS.  American annually pays tens of millions in booking fees to Travelport.

5.      The GDSs frequently share with the travel agents that use their systems a portion of the supracompetitive booking fees they charge the airlines for reservations made by the agents.  Thus, when travel agents decide what GDS to use, they often have an incentive to choose the GDS that charges the highest, not the lowest, booking fees.

6.     In recent years, American has developed an alternative method of providing airline booking services to travel agents—called AA Direct Connect—that is based on modern, efficient, flexible, and less costly technology than the technology that the GDSs use.  AA Direct Connect allows American to provide its own flight, fare and other ticketing information directly to travel agencies and compensate them directly for any bookings they make.  Travelport recognizes that AA Direct Connect poses a significant competitive threat to its power to charge supracompetitive booking fees and its ability to impede technological investment and change.

7.     Recognizing that American's AA Direct Connect could undermine the GDS providers' dominance in the provision of airline booking services to travel agencies, Travelport, Orbitz, and other industry participants with an interest in preserving the GDSs' dominant market positions have engaged in a broad and unlawful multi-part anticompetitive scheme.

8.     Specifically, Travelport has engaged in various forms of unlawful exclusionary conduct intended to significantly limit the incentive and ability of its travel agent subscribers to shift bookings among different providers of airline booking services in response to ordinary market forces.  In doing so, Travelport has ensured that American and other network airlines that rely on travel agents to distribute tickets are dependent upon Travelport to access the critical group of travel agents that subscribe to Travelport's GDSs.  In this way, Travelport has obtained and maintained monopoly power over American and other network airlines.  Travelport's exclusionary acts and practices include:

   (i)     Imposing anticompetitive contract terms in their agreements with participating airlines that severely limit the airlines' ability to develop, promote, or use competing distribution channels;

   (ii)    Entering into long-term restrictive agreements with travel agent subscribers that require or incentivize travel agents to use Travelport's GDS exclusively, or nearly exclusively;

(iii)    Entering into long-term restrictive agreements with travel agents that give those agents a shared financial interest in maintaining the Travelport GDSs' market power vis-à-vis American and other airlines;

(iv)    Unreasonably refusing to deal with technology companies whose products threaten to erode barriers to entry in the distribution of airline services to travel agents; and

(v)    Retaliating against American and other companies that take action that potentially threatens the GDS monopoly position.

9.    Further, because they recognize that a threat to the control of any one GDS over access to its travel agency subscribers constitutes a threat to the current GDS airline ticket distribution model, including the anticompetitive benefits this model generates for its non-airline participants, Travelport, Orbitz, and other industry participants have, individually and collectively, retaliated against American in an unprecedented manner in response to American's direct connect technology initiative.  Defendants and other industry participants recognize that if American is successful in its effort to increase the prevalence of direct connect technology, increased competitive pressure on the GDSs will have a negative impact on companies that have a financial interest in preserving the dominance of that model.  Similarly, there is a common recognition that other network airlines may pursue similar strategies if American's competitive efforts meet with any success.  Therefore, Travelport, Orbitz, and other industry participants have undertaken attacks against American that have been swift and punitive.

10.    Among other things, Travelport *doubled* American's booking fees for reservations made outside the United States, and subsequently intentionally misrepresented American's fares in a manner that made them appear more expensive than they actually were to consumers outside the United States.  Additionally, Travelport caused American's flights to be displayed less frequently relative to other airlines' flights, thereby causing American to sell fewer airline tickets to customers traveling to and from the United States.

11.     Defendants and other industry participants have also retaliated against American by altering their displays to disfavor American's flights, refusing to deal with American, or encouraging consumers not to purchase tickets on American, among other retaliatory actions.

12.     As described below, defendants have undertaken this course of exclusionary conduct and concerted behavior to force American to provide airline booking services to travel agencies within the confines of the GDS distribution model.  American's agreements with the Travelport GDSs expire later this year, and in anticipation of that expiration American has approached travel agents about implementing AA Direct Connect.  In advance of negotiations with American over continued participation in its GDSs, Travelport has sought to convey a message to American:  Stop trying to innovate and inject more competition into the provision of airline booking services or Travelport will continue to punish American and, ultimately, cut off American's access to a critical group of corporate customers.  Travelport's conduct has harmed not only American, but also U.S. consumers, in violation of the federal antitrust laws, specifically Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, as well as provisions of Texas law.

13.     As a result of defendants' anticompetitive conduct, American has suffered significant harm in the form of exorbitant booking fees, outdated and inflexible technology, lost sales, and loss of goodwill with the travel agency community, corporate customers, and consumers.  Unless these practices are enjoined, American will continue to suffer harm, including in the form of an inefficient system for the distribution of airline services, lost goodwill, and excessive distribution costs.

14.     Airline passengers have also been and continue to be harmed because defendants' unlawful conduct has deprived them of the benefits of competitive distribution of airline tickets and product innovation.

15.     Unless the Court acts to enjoin this unlawful conduct, defendants and other industry participants will continue to take actions to thwart initiatives designed to introduce

competition into the distribution of travel services, and both American and the traveling public will continue to suffer the anticompetitive consequences.

## THE PARTIES

16.     Plaintiff American Airlines, Inc. is a domestic and international airline that operates approximately 3,500 daily departures.  American is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 4333 Amon Carter Boulevard, Fort Worth, Texas.

17.     Defendant Travelport Limited ("Travelport LTD") is a Bermuda corporation with its principal place of business at 405 Lexington Avenue, #57, New York, NY 10174.  According to Travelport LTD, it owns, controls and/or operates, either directly or indirectly, three GDSs — Apollo, Galileo and Worldspan — used for the provision of airline booking services to travel agencies.  As such, Travelport LTD transacts substantial business in this District.

18.     Defendant Travelport, LP is a Delaware limited partnership with executive offices located at 300 Galleria Parkway, N.W., Atlanta, Georgia 30339.  Travelport, LP is an indirect subsidiary of Travelport LTD.  Travelport, LP says it is the successor in interest to two contracts relevant here:  the Preferred Fares Amendment to the Galileo International Global Airline Distribution Agreement with American, and the Subscriber Services Agreement with Orbitz.  Travelport, LP transacts substantial business in this District.  Its agent for service of process is Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

19.     Defendant Orbitz Worldwide, LLC ("Orbitz") is a Delaware limited liability company with its principal place of business located at 500 West Madison Avenue, Suite 1000, Chicago, Illinois 60606.  Orbitz is a party to the Subscriber Services Agreement with Travelport that requires it to use Travelport "exclusively" as its GDS provider for North American air travel bookings.  Additionally, Orbitz is party to an agreement with Travelport that provides payment contingent on its refusal to adopt a direct connect relationship with American for booking airline tickets.  Orbitz transacts substantial business in this District.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over all claims asserted against defendants pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), 28 U.S.C. § 1367(a), 15 U.S.C. § 4, 15 U.S.C. § 15, and 15 U.S.C. § 26.

21.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b) and (c).  For venue purposes, defendants can be found in and transact business in this District.

## INTERSTATE COMMERCE

22.     The provision of airline booking services occurs in interstate commerce.

## FACTUAL BACKGROUND

**A.     American Is Dependent Upon Travel Agencies to Distribute Airline Tickets**

23.     Network airlines like American are dependent upon travel agencies to sell airline tickets to consumers.  Although these airlines do sell tickets directly to consumers through their websites, call centers, and ticket offices, the majority of airline passenger revenues are generated by tickets sold through travel agencies.  These travel agencies include both traditional "brick and mortar" agencies, including major agencies such as American Express or Carlson Wagonlit Travel, and online travel agencies such as Orbitz.  Approximately 51% of American's revenue is generated by brick and mortar travel agencies, and another 10-15% is generated by online agencies.

24.     Business travelers are particularly dependent upon travel agents.  As is true for most network airlines, business travelers account for a disproportionately high share of American's total passenger revenue.

25.     According to a recent report by the National Business Travel Association, less than 10% of corporate travel is booked through the Internet.  Instead, many businesses contract with a travel agency to manage their employees' business travel, and require that employees use that travel agency when they purchase airline tickets for business travel, even if the traveler

locates a less expensive fare on a website.  Businesses prefer travel agencies because they offer a variety of services, such as ensuring compliance with corporate travel policies, negotiating and implementing corporate contracts for discounted airfares, and accounting and other data management services.  Because of the additional services offered by travel agencies, these business customers would not substitute purchases of tickets directly from individual airlines in response to an increase in the price of services charged by travel agents.

**B.      American Has No Alternative But to Participate in Travelport's GDSs in Order to Sell Tickets through the Travel Agents That Subscribe To Those GDSs**

26.      GDSs, or computerized reservations systems ("CRSs") as they are sometimes called, connect airlines and other travel suppliers with travel agents.  GDSs enable travel agents to search for flights, fares and seat availability on airlines that participate in the GDS, and to make reservations and issue tickets for airline travel.

27.      Originally, GDSs were created and owned by airlines, and beginning in the early 1980s, they were regulated by the US Department of Transportation ("DOT") (or its predecessor, the Civil Aeronautics Board).  The regulations promulgated by the DOT were intended to address the fact that the GDSs had significant market power that could be abused to restrict competition, both among GDSs and in airline markets.  By 2004, the GDSs were no longer owned by airlines, and the DOT decided that it should deregulate GDSs.  In doing so, however, it cautioned that "the systems continue to have market power over airlines, as argued by the Justice Department; that there is some potential for conduct by the systems that could prejudice airline competition (most notably the sale of display bias); and that systems could engage in practices that could unreasonably preserve their market power."  However, the DOT concluded that "[v]igorous enforcement of antitrust policy" rather than regulation was the better way to prevent anticompetitive conduct.

28.      Travel agents today have no commercially reasonable alternatives to using a GDS to sell air travel.  Even a travel agent that elects to use AA Direct Connect is still dependent upon

a GDS to obtain information and make bookings on other airlines' flights.  Although it is technologically feasible for travel agents to use alternative distribution channels such as airline websites to obtain information, for several reasons travel agents do not perceive this as a commercially reasonable alternative.

29.     First, airlines rather than travel agents pay when travel agents make reservations or issue airline tickets through a GDS.  The GDS charges participating airlines a booking fee for each "segment" (each point-to-point flight in a traveler's itinerary) booked through the GDS.  Pursuant to long-term subscriber agreements between the travel agents and their GDS suppliers, travel agents receive a share of the supracompetitive booking fees that the airline pays to the GDS when the travel agents make reservations.  Thus, travel agents generally have an incentive to make as many reservations as possible through the GDS, rather than directly with the airline.

30.     Second, GDSs enable travel agents to conduct a single search for flights, fares and availability on multiple airlines and to review the search results in a single integrated display.  As explained below, although there are alternative technologies available that would enable travel agents to search and aggregate information obtained from multiple airlines in a single display without using a GDS, the GDSs have engaged in exclusionary acts and practices that have made it nearly impossible for many travel agents to use these technologies.

31.     Third, most travel agents rely on software applications for accounting, contract management, customer relations, user interfaces, and online booking tools.  When a travel agent sells a ticket through a GDS, it needs to be able to share information about that ticket sale with these applications.  Consequently, these software applications often must be able to interoperate with the travel agent's GDS.  As explained below, Travelport has engaged in exclusionary acts and practices that make it more costly and difficult for these software applications to function properly if a travel agent uses an alternative to the GDS to sell an airline ticket.

32.     Although some travel agencies subscribe to more than one GDS, most rely on a single GDS in any particular location or for any given corporate customer.  Using multiple GDSs imposes additional costs on the travel agent because of the additional time, effort, and expense

needed to enter a search in more than one GDS, because using multiple GDSs requires additional training costs, and because the travel agent's accounting, billing, and recordkeeping systems typically are designed to interoperate with a particular GDS. As a result, even if a travel agent subscribes to more than one GDS, it cannot easily switch from using one GDS to using another for any given corporate customer. Technologies exist that would mitigate these costs and make it easier for travel agents to shift bookings among different providers of airline booking services, but as explained below, Travelport has erected barriers to use of these technologies.

33.    In addition, subscriber agreements between travel agents and GDSs often include anticompetitive provisions that discourage travel agents from shifting airline bookings among different providers of booking services. As noted above, a travel agent typically receives a portion of the supracompetitive booking fees that the airlines pay to the GDS when the travel agent makes a reservation. Those payments are tied to "productivity commitments" by the travel agent, i.e., a commitment to use the GDS service for a specified volume of bookings, coupled with financial penalties or disincentives if those commitments are not reached. A travel agent that shifts some of its bookings to an alternative provider of airline booking services would risk losing those payments with respect to *all* of its bookings.

34.    Moreover, most subscriber agreements between travel agents and GDSs involve multi-year commitments, with contractual provisions such as incentive payments or liquidated damages clauses that discourage travel agents from terminating their agreements prior to contract expiration.

## C.    Travelport Possesses Monopoly Power over American

35.    Because travel agents continue to be the dominant channel for selling airline tickets, especially to business travelers, and because travel agents continue to rely almost entirely on a single GDS to serve specific corporate customers, from the standpoint of airlines such as American, different GDSs are not substitutes for one another. As a practical matter, each GDS controls the ability of network airlines to access a discrete, but critical, group of travelers whose

business is essential to those airlines' competitive and financial viability.  If American wants to sell tickets to business travelers who rely on a travel agent that subscribes to one of Travelport's GDSs, it has no choice but to participate in that GDS or risk losing a substantial number of those ticket sales.

36.    In theory, American could encourage the GDSs to compete with respect to booking fees by withholding its participation in a particular GDS since, over time, a GDS that does not provide airline ticketing services for an airline like American would be less valuable to consumers and thus to travel agents.  In reality, however, any such action would cause the airline to suffer immediate and significant harm from the loss of ticket sales by travel agent subscribers to the GDS.  The GDS, on the other hand, would suffer only future, and uncertain, costs due to its inability to sell American's tickets because it is protected from immediate harm by high switching costs and long-term contracts with travel agents.  The loss of a significant number of ticket sales is a sacrifice that neither American, nor any other network airline, can afford to make and remain a viable airline competitor.

37.    For these very reasons, both the Antitrust Division of the U.S. Department of Justice ("DOJ") and the DOT repeatedly have concluded that GDSs are not substitutes for one another from the perspective of the airlines and that each GDS individually possesses market power over participating airlines.  As the DOJ stated in comments filed with the DOT:

> Each CRS provides access to a large, discrete group of travel agents, and unless a carrier is willing to forego access to those travel agents, it must participate in every CRS.  Thus, from an airline's perspective, each CRS constitutes a separate market and each system possesses market power over any carrier that wants travel agents subscribing to that CRS to sell its airline tickets.

Comments of the Department of Justice to Notice of Proposed Rulemaking, Computer Reservation System Regulations, Department of Transportation (Docket No. OST-96-1145) September 19, 1996 (*available at* http://www.justice.gov/atr/public/comments/0881.htm).

38.    The DOJ reached the same conclusion in 2003, when it noted that although a growing number of price-sensitive leisure travelers are purchasing tickets using the Internet

rather than brick-and-mortar travel agents, airlines remain reliant on GDSs and travel agents—in large part because the vast majority of business travelers still book tickets through travel agents. The DOJ wrote:

> CRS market power over airlines derives primarily from the inability of most airlines to withdraw from any CRS. For most airlines, travel agents continue to be a critical distribution outlet. Travel agents, in turn, rely heavily on CRSs, even though almost all travel agencies have Internet access. Further, most travel agents rely primarily on one CRS. It is often costly and inefficient for agents to use multiple CRSs because it requires agencies to incur additional training costs and to implement accounting, billing and recordkeeping systems that consolidate all of the CRS transactions.

Reply Comments of the Department of Justice to Notice of Proposed Rulemaking, Computer Reservation System (CRS) Regulations, Department of Transportation (Docket Nos. OST-97-2881, OST-97-3014, OST-98-4775, OST-99-5888), June 9, 2003 (*available at* http://www.justice.gov/atr/public/comments/201081.htm).

39.     Similarly, at the time it deregulated the GDSs, the DOT concluded that GDSs have monopoly power, noting that "the systems' [GDS] fees exceed competitive levels for the reasons set forth in the notice of proposed rulemaking. We have not seen evidence that the systems' fees generally respond to market forces . . . ." Final Rule, Computer Reservation System (CRS) Regulations, Department of Transportation (Docket Nos. OST-97-2881, OST-97-3014, OST-98-4775, OST-99-5888), January 7, 2004 (available at http://edocket.access.gpo.gov/2004/pdf/03-32338.pdf).

40.     In fact, the booking fees that American pays have increased over the last decade, even though analogous electronic and data input expenses have declined or remained flat over that same period. American believes that, were it not for the anticompetitive conduct of the defendants and other industry participants, it could distribute tickets using AA Direct Connect at an average cost of less than half what it currently pays for bookings made through a GDS.

41.     Travelport possesses monopoly power over American in the provision of booking services to its travel agency subscribers and has exercised that monopoly power by charging

American excessive booking fees and by engaging in exclusionary conduct to prevent competition from alternative distribution systems such as AA Direct Connect.  In addition, because Travelport is not subject to competitive discipline from other providers of booking services to travel agents, it has failed to innovate and modernize its technology.  As a result, American and its customers have been forced to rely on aging, inefficient, and inflexible technology for the distribution of airline tickets and services.

42.     That Travelport has monopoly power with respect to American and other network airlines is powerfully demonstrated by recent actions it has taken to punish American for trying to foster competition in airline ticket distribution.  As discussed below, Travelport has imposed astronomical price increases on American—doubling the booking fees it charges for ticket sales made outside the United States.  Notwithstanding this dramatic and anticompetitive increase in prices, American had no choice but to continue to participate in Travelport's GDSs or risk losing a significant number of ticket sales to its airline competitors.

**D.      Defendants' Anticompetitive Agreements and Exclusionary Acts and Practices**

   **(i)      *Exclusionary Provisions in Participating Carrier Agreements***

43.     Travelport has used its monopoly power to impose anticompetitive terms and conditions on airlines that participate in Travelport's GDSs.  These restrictions have the purpose and effect of foreclosing the few avenues available to the airlines to promote and encourage competition between different GDSs, as well as competition between GDSs and emerging distribution channels.

44.     Because travel agents share in the supracompetitive booking fees that a GDS charges airlines, they have a financial incentive to use the GDS that generates the highest booking fees.  In the past, participating airlines have offered unique content, such as special discounted fares, through certain alternative distribution channels that are less costly for the airline as a way to encourage travel agents to use that distribution channel instead of the more costly GDS.  Travelport has responded to these attempts to generate competition first, by

imposing contract terms on the airlines that effectively protect the GDSs from this type of competitive discipline, and second, by retaliating against airlines that have engaged in this type of effort, including American.

45.     Specifically, Travelport makes widespread use of most-favored nation ("MFN") provisions in the form of "full content" or "content parity" provisions in its participating carrier agreements that limit participating airlines' ability to encourage the use of one GDS over another or the use of alternative providers of airline booking services other than GDSs.

46.     For example, Section 2.1 of the "Preferred Fares Amendment" to the agreement between American and Travelport relating to Travelport's Galileo GDS, provides:

> "American will provide Full Content to Galileo for distribution by Galileo via its GDS to Galileo Agencies in the Territory, at no additional charge to Galileo, and *at levels and amounts that are at least as favorable to Galileo as those upon which American makes the same or substantially the same types of Full Content available through any other GDS or distribution channel in the Territory*."

47.     Travelport's MFN clauses effectively require participating airlines such as American to offer each GDS the same content on equivalent terms as those offered to any other GDS or through alternate distribution channels such as an airline's website or through a direct connection.  In this way, they prevent participating airlines from encouraging travel agents or consumers to use alternative, less-costly distribution channels by making certain content available only through those channels.  For example, a participating airline that has signed an agreement that contains a full content provision cannot offer special discounted fares only through the airline's website.  Similarly, an airline cannot make certain fares available only on a GDS that charges lower booking fees as a way to encourage travel agents to use that GDS rather than a GDS that charges the airline a higher booking fee.

48.     Travelport contends that it offers "discounts" on its booking fees in exchange for participating airlines' agreement to the anticompetitive MFN provisions.  However, these "discounted" booking fees are still well above competitive levels.  In reality, an airline has no economically reasonable alternative but to accept the MFN clause because refusal to accept

would result in even higher, uncompetitive, booking fees, impeding the airline's ability to compete with other airlines with respect to their fares.

49.     Travelport and other GDS providers have staggered the termination dates of their agreements with participating airlines, which maximizes their bargaining leverage against each carrier. An airline negotiating with a GDS knows that its competitors have signed agreements that contain an MFN. If the airline does not agree to the MFN, it knows it will be placed at a significant competitive disadvantage relative to other airlines that are paying "discounted," albeit supracompetitive, booking fees to the GDS.

50.     Given the dominance of the GDS distribution channel and the cost structure of the airline industry, American could not survive if excluded from or materially disadvantaged in the Travelport GDSs or any other significant GDS.

51.     Because of their potential to exclude competition, MFN provisions in GDS contracts were historically prohibited by government regulation. While these prohibitions were lifted by the DOT in 2004, both the DOT and DOJ recognized their potential for abuse by the GDSs to foreclose the development of alternate distribution channels. For example, the DOJ stated:

> [MFN clauses] may reinforce CRS market power over airlines, particularly if they discourage the development of alternative distribution channels. For example, a low-cost distribution channel on the Internet may not offer the same level of functionality as a CRS, but may nonetheless be able to attract usage if it has preferential access to desirable fares and inventory from a significant number of airlines. By negotiating [MFN clauses] with a sufficient number of airlines, a CRS may be able to prevent the growth of this alternative, effectively imposing a barrier to entry into the air travel distribution marketplace.

Reply Comments of the Department of Justice to Notice of Proposed Rulemaking, Computer Reservation System Regulations, Department of Transportation (Docket Nos. OST-97-2881, OST-97-3014, OST-98-4775, OST-99-5888), June 9, 2003 (available at http://www.usdoj.gov/atr/public/comments/201081.htm).

52.     Similarly, in its 2004 comments accompanying the final order that deregulated the GDS market, the DOT stated:

> [C]lauses requiring participating airlines to provide all fares as a condition to participation may similarly constitute unfair methods of competition because they unreasonably limit each airline's ability to choose how to market its services. That would buttress the system's market power…a system's contract clause requiring an airline to provide access to all fares as a condition to any participation would also be analogous to an unlawful tying arrangement.

Computer Reservations Systems (CRS) Regulations; Final Rule, 69 Fed. Reg. 999 (January 7, 2004) (to be codified at 14 C.F.R. pt. 255).

**(ii)     *Exclusionary Terms in Travel Agency Subscriber Agreements***

53.     Travelport and other GDS providers enter into long term contracts with travel agents, typically three years but sometimes longer.  Most of these contracts include some type of provision that either requires or provides financial incentives for the travel agent to use one GDS exclusively, or nearly exclusively.

54.     These provisions help to ensure that airlines have no choice but to participate in each GDS if they want to be able to sell tickets through travel agents that subscribe to that GDS.

55.     Some agreements between Travelport and its subscribers contain an express provision that requires the travel agent to use one GDS, or only Travelport-owned GDSs, exclusively, either for all its bookings or for bookings at particular locations or for particular corporate customers.  Other subscriber agreements reward travel agents that meet certain booking volume targets with rebates, sometimes called "incentive payments."  With these payments, Travelport effectively shares with travel agents some of the supracompetitive booking fees it receives from the airline.  Moreover, if the travel agent does not meet the minimum volumes, it must compensate the GDS for the shortfall in booking fees.  The payment of incentive fees under the GDS-travel agent contracts, and penalty fees for missing minimum volume commitments, creates a powerful disincentive for a travel agency to shift bookings from one GDS provider to another or to less costly non-GDS alternatives.

56.     Thus, to encourage travel agents to change to a less expensive GDS or alternative distribution channel, an airline would have to compensate the travel agent for the loss of incentive payments the travel agent would receive not only for ticket sales on that airline but for all the travel agent's ticket sales on competing airlines as well.

57.     Some Travelport subscriber agreements include provisions that prohibit travel agents from aggregating information obtained from a Travelport GDS with information obtained from any other source, such as AA Direct Connect.  Anticompetitive prohibitions such as these have the effect of significantly impeding the introduction of an effective competitor to GDSs, which in turn allows Travelport and other GDS providers to maintain monopoly power.

58.     These provisions preserve Travelport's control over access to valuable business customers, impede the introduction and growth of new, more efficient and lower-cost forms of distribution, and have the purpose and effect of unreasonably restraining competition in order to maintain Travelport's monopoly power in the provision of airline booking services to its subscribers.

**(iii)    *Exclusionary Agreements Between Travelport and Orbitz***

59.     Orbitz has an agreement with Travelport, called the Subscriber Services Agreement ("SSA"), that requires it to use Travelport "exclusively" as its GDS provider for North American air travel bookings through 2014.  In exchange for this exclusivity commitment, Travelport provides Orbitz with a "segment incentive" rebate per booking, which is a substantial portion of the booking fee that American provides to Travelport.

60.     The SSA requires Orbitz to meet domestic annual minimum segment commitments.  For example, Orbitz' 2009 minimum requirements were 36 million domestic segments booked through Travelport GDSs.  Additionally, Orbitz was contractually obligated to book at least 95% of its European segments through Travelport GDSs.  Failure to meet these minimum commitments is costly: Orbitz must pay Travelport "shortfall fees" to account for any deficit in segment bookings.

61.     In addition to the use of powerful financial incentives to discourage Orbitz from using alternatives to the Travelport GDS, the Travelport SSA prohibits Orbitz from entering into new direct connect relationships with any airline and from expanding or renewing any existing direct connect agreement with any airline, including American, that would bypass the Travelport GDS.  With respect to those direct connect relationships that already exist, Orbitz is contractually required to ensure that they are "terminated as soon as commercially practicable."  These provisions are plainly intended to restrict Orbitz from entering into a direct connect-style arrangement with any airline.

62.     As Orbitz itself describes this provision in its 2010 10-K filing:

> [O]ur GDS service agreement with Travelport limits our ability to modify the terms of our agreements with existing suppliers or to pursue direct connections with new or existing suppliers during the term of the agreement, which expires on December 31, 2014.  These contractual obligations may reduce our flexibility to implement changes to our business in response to changing economic conditions, industry trends, or technological developments.  As a result, the limitations imposed by the GDS service agreement could place us at a competitive disadvantage and negatively impact our business and results of operations, particularly in the current economic environment where our suppliers are under increased pressure to reduce their overall distribution costs.

63.     As explained below, American and Orbitz were parties to agreements that required Orbitz to maximize its use of an older direct connect technology, and to cooperate with American to develop and implement newer direct connect technologies.  When Orbitz' failure to fulfill its direct connect obligations with American caused American to terminate Orbitz' authority to book travel on American flights, Travelport agreed to make financial contributions to Orbitz to help make up for that lost business, rather than risk an expansion of the Orbitz-American direct connect relationship that would compete with the GDS distribution model.

**(iv)     *Exclusionary Acts and Agreements Targeting Applications Developers***

64.     When a travel agent sells a ticket through a GDS, it needs to be able to share information about that ticket sale with various other software applications, such as accounting, and quality control.  Consequently, these software applications often must be able to exchange

information—or "interoperate"—with the travel agent's GDS.  The GDS thus sits at the center of most travel agency IT systems, serving as a platform for the agency's front, mid, and back office applications.

65.    A typical agent's IT system is illustrated below:



66.    For an alternative provider of airline booking services such as AA Direct Connect to be a practical substitute for use of a GDS from the perspective of a travel agent, the travel agent needs to be able to transfer information about tickets sold through that service to its front, mid, and back office applications.  Thus, in order for AA Direct Connect and similar offerings by other airlines to provide more effective competition with GDSs, travel agencies must have the ability to exchange information with the other software applications used by the travel agencies.

67.    In addition, for many travel agents, an alternative distribution channel such as direct connect will be attractive only if the travel agent has a means by which to aggregate and compare the content that it obtains from multiple suppliers, whether through multiple direct connections or through a direct connection and a GDS.   There are various technologies and technology providers capable of performing this function for travel agencies.

68.     Some travel agencies, especially the online travel agencies that are themselves technology companies, but also some larger brick and mortar agencies, have their own technology capable of aggregating content from multiple sources.  Indeed, Orbitz currently receives some content via direct connections that it aggregates and displays to customers in a single integrated display.  Other travel agencies may rely on technology companies to provide this service, whether through the purchase of a turn key operation or by licensing technologies that would enable the agents to implement their own content aggregation system.

69.     Numerous companies have the technological capability to efficiently and cost-effectively aggregate travel content from multiple sources, including direct connections to the airlines and other service providers, as well as the GDSs, so that travel agents can search for, compare, and book flights of all the major airlines using one user-friendly interface.  However, Travelport has engaged in exclusionary practices that make it difficult or impossible for these companies to interoperate with its GDSs.

70.     Travelport allows only authorized third-party applications developers to obtain access to its GDSs' applications programming interfaces or "APIs."  These APIs allow applications to interoperate with the GDS.

71.     Travelport has refused to authorize applications developers to access its APIs, or has terminated developers from its program, if the developer works with or promotes alternative distribution channels to the GDSs.

72.     For example, Farelogix is a third-party technology provider and content aggregator that helped American develop its AA Direct Connect technology and that offers content aggregation and related services to travel agents that want to establish a direct connection with American or other service providers.  On December 28,  2010, after American terminated Orbitz' ticketing authority, Travelport terminated its third-party developer agreements with Farelogix because it concluded that Farelogix was not "aligned" with Travelport, presumably due to its cooperation with AA Direct Connect.

73.    Other software developers have been told that under their agreements with Travelport they are not permitted to work with Farelogix or AA Direct Connect.

74.    Travelport's refusal to deal with Farelogix, or with any other applications developer that is working with Farelogix, makes it harder for travel agencies interested in establishing a direct connection with American to use Farelogix technology to create an integrated display that aggregates content from non-GDS sources such as AA Direct Connect with information obtained from the GDS.

75.    Ironically, Travelport has used the fact that it makes it difficult for travel agents to integrate content from multiple sources to disparage American's direct connect initiative, alleging in various public statements that AA Direct Connect could create fragmentation and does not allow comparisons between different airlines' offerings.  That irony has not gone unnoticed by Travelport's travel agency customers.  On January 5, 2010, the Association of Retail Travel Agents (ARTA) and its Canadian affiliate issued a press release in part responding to the GDS providers' criticism of AA Direct Connect, noting:

> It does seem quite disingenuous for GDSs to use the "what's good for the travel agent and consumers" argument when some of these very GDSs have for years maintained restrictive covenants in their agent/GDS contracts preventing the use of agency tools which blended GDS airline inventory with non-GDS airline inventory—all in a monopolistic attempt by the GDSs to prevent comparative displays and non-GDS bookings—no matter how good the schedule or fare information may have been for the consumer.  Let's be honest, this is all about GDSs protecting their segment fee earnings and keeping those fees as high as possible.

76.    Through these various exclusionary acts, Travelport has been successful in its quest to impede the development and adoption of non-GDS distribution models.  As the DOT observed when it deregulated GDSs, despite the "development of sources of airline information and booking capabilities on the Internet [that] has created additional resources that travel agents can use…[travel agents] continue to make most of their bookings through a [GDS] system ....."  As indicated by the January 5, 2010 statement by ARTA, travel agencies' stated

"preferences" for using their GDS systems are not simply because the GDSs offer a superior product or service.

   **(v)**   ***Defendants' Retaliatory Attacks Upon American***

77.   Travelport, Orbitz and other industry participants recognize that AA Direct Connect poses a significant competitive threat of eroding the GDSs' power to charge excessive booking fees and their ability to impede technological investment and change.  One industry commentator has observed, "[y]ou can expect … Travelport [and others] to stand shoulder to shoulder in an effort to spank American Airlines for having the audacity to break with what it views as a broken GDS model."  Dennis Schaal, Behind Expedia Action Against American Airlines and Supply Chain Wrath, Tnooz.com, Jan 3, 2011, http://www.tnooz.com/2011/01/03/news/behind-expedia-action-against-american-airlines-and-supply-chain-wrath/.  Travelport, Orbitz, and other industry participants have, in fact, stood "shoulder to shoulder" in punishing American for promoting the use of technology that could disrupt their monopolistic distribution system.

   (a)   <u>Orbitz' Dispute With American Over Direct Connect Technology</u>

78.   American's dispute with Orbitz, the third largest online agency in the U.S., was the triggering event for defendants' most recent retaliations.  In 2001, Orbitz was established as a direct-connect-centered agency by its then airline owners, using a system called "Supplier Link" to search for and make bookings without using a GDS.  American and Orbitz entered into an agreement called the Orbitz Supplier Link Agreement (the "OSLA"), effective February 3, 2004.  Under the OSLA, Orbitz could book eligible tickets through the Supplier Link interface.  American was not required to (and did not) pay a booking fee to any of Travelport's GDSs for travel booked through Supplier Link.

79.   Orbitz and American also entered into the Second Amended and Restated Airline Charter Associate Agreement, effective December 19, 2003 (the "ACAA").  Like the OSLA, the ACAA required Orbitz to display American's flight data in an unbiased manner.  In section 3.6 of the ACAA, Orbitz also agreed to use "commercially reasonable efforts to develop and

implement distribution technologies that lower the cost of distributing [American's] products and services through the [Orbitz website]."  Based largely on the terms of the OSLA and the ACAA, prior to mid-2006, Orbitz booked over 70% of its American tickets through the Supplier Link, as opposed to through Travelport's GDSs.

80.    In 2006, a Travelport affiliate acquired a controlling interest in Orbitz.  As a result of a subsequent partial divestiture, Travelport retains a 48% equity interest in Orbitz. For purposes of the antitrust laws Orbitz is a separate legal and economic entity.

81.    After it became affiliated with Travelport, and in contravention of its contractual obligations to American, Orbitz began increasing its use of GDSs to distribute American's product by reducing the number of bookings processed by "Supplier Link."  As a result, Orbitz became a particularly high-cost distributor of American's tickets.

82.    In mid-2010, American was in negotiations with Orbitz to return Orbitz to its roots as a cost-effective, direct-connect agency by, among other things, establishing a new AA Direct Connect link between the two companies.  As negotiations progressed, it became clear that Orbitz was unwilling or unable to implement AA Direct Connect.  Unbeknownst to American at that time, Travelport, intending to replace Orbitz' direct-connect bookings with more expensive Travelport GDS bookings, had entered into a contract with Orbitz — the Travelport SSA — that *expressly prohibited* Orbitz from using an American direct connection system.  In late 2010, Orbitz announced that it would not implement a new direct connection system with American.  As a result, on November 1, 2010, American notified Orbitz that it was terminating their relationship.

83.    American's termination of its relationship with Orbitz due to Orbitz' refusal to abide by its contractual direct connect obligations set off a series of retaliatory acts against American.

84.    As set forth below, the attacks launched by the defendants against American were part of a coordinated campaign to isolate and punish American for supporting a direct connect distribution alternative to the anticompetitive GDS system.

(b)   <u>Travelport Retaliates Against American</u>

85.     On November 1, 2010, the very same day American terminated its relationship with Orbitz, Travelport notified American that it would double the booking fees it charged American for bookings made by travel agents outside the United States.  Travelport's actions were purely punitive and coercive, and lacked any legitimate business justification.

86.     In an effort to offset Travelport's retaliatory booking fees, and to encourage travel agents to shift bookings to other less costly distribution channels, American introduced a recovery fee — a "Booking Source Premium" — for Travelport subscribers who booked American flights from outside the United States using a Travelport GDS.  American informed travel agents that alternative distribution platforms, including the Sabre and Amadeus GDSs and AA Direct Connect, would not require a Booking Source Premium.

87.     In response to the Booking Source Premium, Travelport took further action to place American at a competitive disadvantage vis-à-vis its airline competitors.  Travelport added the premium to American's fares as if it were a tax on consumers, effectively mandating that travel agents pass along the Booking Source Premium to their customers.  This had the effect of making American's fares appear on subscribers' computer screens, and in turn to consumers, higher than they actually were.  In this way, Travelport was falsely and fraudulently misrepresenting American's fares to travel agents and to the public.  It also effectively biased its display to disfavor American's flights because the "higher fare" resulted in American's flights being displayed after its competitors' flights.

88.     Display bias is a powerful tool that GDSs can use to disadvantage disfavored airlines.  It has been condemned by the federal courts.  In *In re Air Passenger Computer Reservations Systems Antitrust Litigation*, 694 F. Supp. 1443 (C.D. Cal. 1988), where a GDS that was then owned by an airline biased its displays against competing airlines, the court declared:

> "Display biasing is unreasonably restrictive of competition in that it restricts competition on the merits in the air transportation business.  When consumers attempt to purchase a ticket on the best available flight their final decision is not solely based upon the

merits of the particular flight (flight time, price, service, etc.).  The consumer bears the brunt of this practice by getting a less than optimal flight, and the airline with the better flight has lost a sale it should have otherwise made.  This type of competitive advantage depends upon the perpetration of a fraud upon the consumer.  It is unreasonable and therefore an unwarranted competitive advantage because it inhibits competition on the merits."

89.     Travelport's display bias had the desired effect.  Because American's fares were made to appear higher than they actually were, American began to lose sales at agencies using Travelport's GDS, which forced American to abandon the Booking Source Premium.

(c)     Travelport and Orbitz Agree to Stand Together Against American

90.     Travelport also entered into an express agreement to ensure that Orbitz would stand firm in its refusal to work with AA Direct Connect.  Travelport agreed to pay Orbitz significant monetary consideration to offset any lost profits that resulted from American's termination of Orbitz' ticketing authority — *conditioned only on Orbitz' continued refusal to adopt AA Direct Connect.*

(d)     Contemporaneous Actions by Sabre

91.     On January 5, 2011, Sabre gave public notice that, effective immediately, it would more than double the fees it charged to American for bookings made by Sabre subscribers of American's flights in the United States, Puerto Rico and the Caribbean, and effective on February 4, 2011, it would significantly increase the fees it charged American for bookings made in Canada, Mexico, Europe, the South Pacific, Asia, Latin America, the Middle East and Africa.

92.     At the same time, Sabre gave public notice that it would no longer display in a non-biased manner American's flight and fare content within the Sabre GDS.  Rather, Sabre made changes in its GDS "that alter the order in which some of American Airlines' flights appear in availability and shopping displays."  Biasing the display of American information meant that Sabre subscribers could no longer rely on the accuracy of flight and fare displays in the Sabre GDS.

93.     For example, American is a primary provider of non-stop service between two of its hubs, Chicago and Dallas.  Yet, on the flight display, Sabre placed the first non-stop

American flight at the end of the third display screen, behind fourteen connecting flights on other carriers.  Similarly, between New York and Los Angeles, the first non-stop American flight appeared at the eighth display screen, behind forty-five flights on other carriers.

94.     Display bias is a practice that Sabre had contractually agreed not to use.  To justify its actions, Sabre claimed that its anti-bias obligation was terminated because American publicly had "marketed" a direct connect program to GDS subscribers in violation of a provision in American's Amended Sabre Participating Carrier Agreement.

95.     Sabre took this action despite the fact that it had already doubled American's booking fees, and thus would earn greater revenue on bookings with American than with other participating airlines.

96.     On January 10, 2011, American filed a lawsuit in the district court in Tarrant County, Texas alleging that Sabre's retaliatory conduct was a breach of its obligations under the Amended Sabre Participating Carrier Agreement.  That same day, the Texas state court issued a temporary restraining order prohibiting Sabre from continuing to bias its displays against American.  American and Sabre thereafter reached an agreement to stay litigation between the parties until June 1, 2011.

(e)     Effects on American's Direct Connect Initiative

97.     In implementing this retaliatory campaign against American, Travelport, Orbitz, and other industry participants intended to do more than merely punish and coerce American.  Their attacks sought to send a message to other airlines, travel agents, and technology providers that efforts intended to erode the power of the GDS distribution model and/or to introduce more competition into the provision of airline booking services will be met with a quick, collective, and harsh response.

98.     After observing defendants' unlawful conduct, travel agencies that either had agreed or were in active negotiations with American to implement AA Direct Connect informed American that they feared retaliation from Travelport or other GDSs if they continued to work

with American.  As a result, defendants have significantly impeded American's ability to compete in the provision of airline booking services to travel agents.

## HARM TO AMERICAN AND
## HARM TO COMPETITION

99.     Supracompetitive GDS booking fees constitute a significant component of American's costs.  These costs reduce the competitiveness of American and harm airline passengers who are deprived of the benefits of competition that otherwise would exist.

100.     Travelport has been able to maintain its per segment booking fees at monopolistic levels, and American is entitled to recover the resulting overcharges.

101.     As a result of defendants' anticompetitive conduct, absent relief from this Court, American will be forced to continue paying monopoly prices for access to Travelport's GDSs, and Travelport will continue to block price competition among GDSs as well as competition from newer technology and more efficient means of distribution of airline services to travel agents.

102.     Further, Travelport's retaliatory manipulation of American's fare displays has deprived American of sales that it otherwise would have made through Travelport-automated travel agents.  American is entitled to recover these damages and all other losses caused by Travelport's conduct.

103.     Because the GDSs are not subject to competitive discipline from other distribution channels and have effectively foreclosed alternative distribution technologies from the market, they have failed to innovate and modernize their own technology.  As a result, airlines and consumers are forced to rely on aging, inefficient, and inflexible technology for the distribution of airline tickets and services.

## MARKET DEFINITION

104.     The distribution of airline fare, flight, and availability information and the provision of reservations and ticketing capability to travel agents ("the provision of airline

booking services") is a relevant product market.  The overwhelming majority of business travelers rely on travel agents to identify flights and fares and to purchase tickets for travel on network airlines.  These travelers do not view other ways of purchasing airline travel, such as purchasing through an airline website, as a reasonable substitute for purchasing tickets through a travel agency.  Because an airline that does not distribute its tickets through travel agencies would lose a significant number of ticket sales for business travel to competing airlines, American does not consider the use of other distribution channels, such as an airline's website, to be a reasonable substitute for the provision of airline booking services to travel agents.

105.    The provision of airline booking services to Travelport subscribers is a relevant product submarket.  As explained above, due in substantial part to the anticompetitive and exclusionary conduct at issue in this case, American has little ability to shift bookings from customers of Travelport's subscribers to other GDSs, direct connect, or other distribution channels when Travelport increases its booking fees or degrades the quality of its displays.  Thus, other providers of airline booking services do not serve as a competitive check on Travelport's ability to raise prices or reduce the services it provides to American.  If American and other network airlines want to sell tickets to travelers that use a Travelport travel agency, they have no practical alternative but to participate in the Travelport GDSs.

106.    Each country served by American in which Travelport accounts for a substantial percentage of airline bookings is a relevant geographic market, including the United States, the United Kingdom, Belgium, and Switzerland.  Travelport accounted for 34% of all airline bookings made by U.S.-based travel agencies in 2010.  Travelport accounted for 55% of all bookings made in Switzerland, 48% of all bookings made in the United Kingdom, and 34% of all bookings made in Belgium in 2010.  Because most travelers purchase airline tickets from travel agents located where they work or reside, the provision of airline booking services in one country is not a substitute for the provision of such services in another country.

## BARRIERS TO ENTRY

107.    The relevant markets defined above are characterized by durable barriers to entry by new GDSs that protect the monopoly power of the incumbent GDS providers.  Since 2004, at least three companies, ITA, G2 Switchworks, and Farelogix, have attempted to launch a new GDS, and all have failed.  There has been no successful entry of a new GDS in the U.S. in over twenty-five years.  Travelport's anticompetitive conduct and agreements have reinforced these barriers to entry by rival GDSs.

108.    Newer, more efficient technologies such as AA's Direct Connect do not face the same entry barriers from fixed costs and network effects as a GDS entrant.  However, Travelport's anticompetitive conduct and agreements have erected substantial barriers to entry by alternative methods of providing airline booking services, and have effectively foreclosed AA Direct Connect from the market.

## MONOPOLY POWER

109.    The market for the provision of airline booking services in the United States and other geographic markets is highly concentrated, with only a few market participants.  Travelport possesses substantial market power in this market in the United States, the United Kingdom, Belgium, and Switzerland, and numerous other countries.

110.    Travelport possesses monopoly power in numerous submarkets, including the markets for the provision of airline booking services to Travelport subscribers in each of the United States, the United Kingdom, Belgium, and Switzerland.  In each of these submarkets, Travelport possesses a dominant market share.

111.    Travelport's monopoly power in these markets is dramatically demonstrated by recent events.  Travelport was able to double American's booking fees in certain regions, while at the same time biasing its displays to make American flights appear less attractive to consumers.  Travelport was not constrained in its ability to raise price and reduce the quality of its services by the threat of competition from competing providers of airline booking services.

American could not shift bookings from Travelport's GDSs to other providers of airline booking services.

### FIRST CLAIM FOR RELIEF:  MONOPOLIZATION OF THE DISTRIBUTION OF AIRLINE TICKETS TO TRAVELPORT'S GDS SUBSCRIBERS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

112.    American incorporates the material fact allegations of paragraphs 1 through 111.

113.    Travelport possesses monopoly power in the market for the provision of airline booking services to travel agencies that subscribe to its GDSs.  Through the anticompetitive and exclusionary acts and practices described herein, Travelport has willfully maintained, and unless restrained by this Court, will continue to maintain and abuse, that monopoly power.  Travelport has acted with intent to illegally maintain its monopoly over the provision of airline booking services to its subscribers and its illegal conduct has enabled it to do so in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

114.    Travelport's illegal conduct has directly and proximately caused injury to American's business and property.  Specifically, American will be forced to continue paying monopoly prices for access to Travelport's GDSs, and Travelport will continue to block price competition among GDSs as well as competition from newer technology and more efficient means of distribution of airline services to travel agents.  These injuries, in the form of higher prices and less innovation, are of the type the antitrust laws are intended to prohibit and thus constitute antitrust injuries.

### SECOND CLAIM FOR RELIEF:  CONSPIRACY TO MONOPOLIZE THE DISTRIBUTION OF AIRLINE TICKETS THROUGH TRAVEL AGENTS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

115.    American incorporates the material fact allegations of paragraphs 1 through 111.

116.    Travelport, Orbitz, and other unnamed industry participants have entered into agreements with one another and engaged in concerted activities intended to punish and retaliate against American for its direct connect initiative, with the specific intent of preserving defendant

Travelport's monopoly over the provision of airline booking services to its travel agency subscribers in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

117.    Defendants' agreements have unreasonably restrained competition and harmed consumers, and they have directly and proximately caused injury to American's business and property.  Specifically, American will be forced to continue paying monopoly prices for access to Travelport's GDSs, and Travelport will continue to block price competition among GDSs as well as competition from newer technology and more efficient means of distribution of airline services to travel agents.  These injuries, in the form of higher prices and less innovation, are of the type the antitrust laws are intended to prohibit and thus constitute antitrust injuries.

**THIRD CLAIM FOR RELIEF: TRAVELPORT'S AGREEMENTS WITH PARTICIPATING AIRLINES AND TRAVEL AGENT SUBSCRIBERS UNREASONABLY RESTRAIN COMPETITION IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

118.    American incorporates the material fact allegations of paragraphs 1 through 111.

119.    The restrictive provisions in Travelport's contracts with travel agency subscribers, including provisions in its agreements with Orbitz, constitute agreements in unreasonable restraint of interstate commerce in violation of Section 1 of the Sherman Act.

120.    The restrictive provisions in Travelport's long-term contracts with participating airline carriers constitute agreements in unreasonable restraint of interstate commerce in violation of Section 1 of the Sherman Act.

121.    Travelport's anticompetitive agreements with travel agency subscribers and with participating airlines have harmed competition in the market for the provision of airline booking services to travel agents, and have directly and proximately caused injury to American's business and property.  Specifically, American will be forced to continue paying monopoly prices for access to Travelport's GDSs, and Travelport will continue to block price competition among GDSs as well as competition from newer technology and more efficient means of distribution of airline services to travel agents.  These injuries, in the form of higher prices and

less innovation, are of the type the antitrust laws are intended to prohibit and thus constitute antitrust injuries.

### FOURTH CLAIM FOR RELIEF: TORTIOUS INTERFERENCE BY TRAVELPORT WITH EXISTING AND PROSPECTIVE CONTRACTUAL REALTIONSHIPS

122.    American incorporates the material fact allegations of paragraphs 1 through 111.

123.    Travelport had actual knowledge of American's contractual relationship with Orbitz and the negotiations between American and Orbitz related to new contracts.

124.    Travelport willfully and intentionally interfered with American's previously existing contractual relationship with Orbitz by, among other things, entering into exclusionary contracts with Orbitz on terms that required and induced Orbitz to breach its contracts with American, including the OSLA and the ACAA.  Specifically, Travelport's exclusionary agreement with Orbitz prevented Orbitz from selling American tickets via direct connect technology when tickets were eligible for purchase through Supplier Link, in violation of the OSLA.  Likewise, the exclusionary agreement prevented Orbitz from working with American in good faith to develop and implement AA Direct Connect, in violation of the ACAA's terms.

125.    Travelport acted with a conscious desire to interfere with American's existing contractual relationship with Orbitz, and absent Travelport's interference, Orbitz would not have breached the OSLA and the ACAA in the manner described in this Complaint.

126.    Moreover, Travelport engaged in independently tortious and unlawful acts to prevent American from continuing in its previous contractual relationship with Orbitz or entering into new contracts with Orbitz.  Specifically, Travelport acted in unlawful retaliation against American, including by:

a.    Doubling the fees for the majority of bookings made through Travelport's GDSs in violation of Travelport's contracts with American;

b.    Using display bias to skew American's fare and flight information in violation of Travelport's contracts with American;

c.      Disparaging American by making false or misleading representations of fact regarding American's services and business;

d.      Causing confusion or misunderstanding regarding the source or sponsorship of goods or services in violation of the Texas Deceptive Trade Practices-Consumer Protection Act;

e.      Engaging in unlawful conduct, as stated herein, in violation of federal antitrust laws; and

f.      Misrepresenting and displaying the Booking Source Premium—the recovery fee introduced by American to offset Travelport's retaliatory and drastic increase in its booking fees — as part of American's fares in violation of the Texas Deceptive Trade Practices-Consumer Protection Act, including provisions thereof that prohibit:

- passing off goods or services as those of another;
- representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;
- disparaging the goods, services, or business of another by false or misleading representation of facts;
- making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions (by falsely inflating American's prices to make it appear that other airlines' tickets include price reductions);
- representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and
- failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed (by making the

Booking Source Premium appear to be part of American's airfare so that consumers would not buy tickets on American).

127.    But for Travelport's tortious and unlawful conduct, there is a reasonable probability that American and Orbitz would have continued their contractual relationship or entered into new contracts, including with regard to AA Direct Connect.

128.    Travelport knew (and, indeed, intended that) its conduct would result in Orbitz breaching its contracts with American and severing its direct connect relationship with American.  Travelport also knew and intended that its conduct would interfere with any prospective AA Direct Connect contract between American and Orbitz.

129.    Travelport's conduct has proximately caused harm to American by causing American to lose, among other things, (i) higher costs in terms of having to pay Travelport excessive booking fees when such flights should have been booked through the Supplier Link, (ii) ticket sales that would have resulted from Orbitz booking tickets on American flights absent the interference by Travelport, (iii) lost revenue resulting from continuing under the OSLA, and (iv) lost profits that would have resulted from the prospective AA Direct Connect contract. Travelport's conduct also has caused a significant amount of unwarranted confusion, frustration, and anger among the air traveling public in general and American's corporate customers in particular.  Consequently, American's goodwill and its relationships with corporate customers – which took years for American to develop – have been damaged.

130.    Because Travelport acted with actual malice to interfere with American's existing contractual and prospective relationship with Orbitz, American seeks and is entitled to recover exemplary damages.

## FIFTH CLAIM FOR RELIEF: TORTIOUS INTERFERENCE BY TRAVELPORT WITH EXISTING CONTRACTUAL RELATIONSHIPS

131.    American incorporates the material fact allegations of paragraphs 1 through 111.

132.    In order to sell tickets to the general air traveling public on American's flights, all travel agents must be granted written permission to do so by American, such as, by way of

example, American's execution of the ARC Reporting Agreement and the American Addendum thereto with Orbitz. Consequently, American has existing contractual relationships with numerous travel agents, including both brick and mortar travel agencies and online travel agencies, such as Orbitz, Priceline, and Travelocity (collectively, the "Travel Agent Subscribers"). Additionally, American has existing contractual relations with numerous corporate partners to grant them written permission to sell tickets on American flights, including to their employees (collectively, the "Corporate Subscribers").

133. By virtue of its position as one of the largest GDS operators in the United States, its specific knowledge of the industry in general, and its contractual relationships with the travel agents and entities using their GDSs, including the Travel Agent and Corporate Subscribers, Travelport had actual knowledge of the existing contracts between American and the Travel Agent and Corporate Subscribers.

134. As heretofore alleged, Travelport willfully and intentionally interfered with American's contracts with the Travel Agent and Corporate Subscribers. Travelport's retaliatory actions have misled and confused the Travel Agent and Corporate Subscribers regarding American's fares and have thwarted the ability of the Travel Agent and Corporate Subscribers to make reservations for and otherwise sell airline tickets for flights on American.

135. American has suffered actual damage as a direct and proximate result of Travelport's interference. Specifically, American has suffered, among other things, a decrease in ticket sales, an undermining of American's goodwill and its positive corporate customer relationships with the Travel Agent and Corporate Subscribers, and unwarranted confusion among the Travel Agent and Corporate Subscribers.

136. Travelport knew (and, indeed, intended that) its conduct would result in significant harm to American. Because Travelport acted with actual malice in interfering with these existing contractual relationships, American seeks and is entitled to exemplary damages.

**RELIEF REQUESTED**

137.     American requests that the Court declare that the conduct of Travelport as specified in this Complaint violates Section 1 and 2 of the Sherman Act, as well as other provisions of Texas law.

138.     American further requests that the Court issue a permanent injunction forbidding Travelport from threatening or engaging in unlawful retaliatory conduct against American.

139.     American further requests that the Court issue such other permanent injunctive relief, as the Court deems appropriate, designed to create market conditions capable of dissipating Travelport's unlawfully maintained monopoly power.

140.     American requests that the Court require Travelport to pay American treble the amount of damages American has suffered as a result of Travelport's illegal conduct.

141.     American requests that the Court require Travelport to pay punitive damages in the amount to be determined at trial as a result of Travelport's willful and intentional interference with American's contractual relationships with the Travel Agent Subscribers, Corporate Subscribers, and Orbitz, and for its willful and intentional interference with American's prospective contractual relations with Orbitz.

142.     American further requests its costs for bringing this action, including reasonable attorneys' fees.

143.     American also requests such other relief as the Court may deem just and proper.

DATED: April 12, 2011

Respectfully submitted,

/s/  R. Paul Yetter_____

Of Counsel:

DEWEY & LEBOEUF LLP
M.J. Moltenbrey
mmoltenbrey@dl.com
1101 New York Ave. NW
Washington, D.C. 20005
202.346.8738
202.346.8102 (Fax)

WEIL, GOTSHAL & MANGES
Richard A. Rothman
richard.rothman@weil.com
James W. Quinn
james.quinn@weil.com
767 Fifth Avenue
New York, New York 10153
212.310.8426
212.310.8285 (Fax)

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Anna Rotman
State Bar No. 24046761
arotman@yettercoleman.com
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
713.632.8000
713.632.8002 (Fax)

Bill Bogle
State Bar No. 02561000
bbogle@hfblaw.com
Roland K. Johnson
State Bar No. 00000084
rolandjohnson@hfblaw.com
HARRIS, FINLEY & BOGLE, P.C.
777 Main Street, Suite 3600
Fort Worth, Texas 76102
817.870.8700
817.332.6121 (Fax)

Michelle Hartmann
State Bar No. 24032402
michelle.hartmann@weil.com
WEIL, GOTSHAL & MANGES
200 Crescent Court, Suite 300
Dallas, Texas 75201-6950
214.746.7700
214.746.7777  (Fax)

ATTORNEYS FOR PLAINTIFF
AMERICAN AIRLINES, INC.