IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| AMERICAN AIRLINES, INC., )<br><br>        Plaintiff, )<br><br>TRAVELPORT LIMITED, a foreign<br>corporation, and TRAVELPORT, LP, a<br>Delaware limited partnership, d/b/a<br>TRAVELPORT; )<br><br>And )<br><br>ORBITZ WORLDWIDE, LLC,<br>a Delaware limited liability company,<br>d/b/a ORBITZ, )<br><br>        Defendants. ) | Civil Action No. 4:11-cv-00244-Y |

**MEMORANDUM IN SUPPORT OF TRAVELPORT'S
RULE 12(b)(6) MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 4

I.     AA FAILS TO ALLEGE FACTS ESTABLISHING TRAVELPORT'S
       DOMINANCE OF THE U.S. GDS MARKET ...................................... 5

II.    AA FAILS TO ALLEGE FACTS ESTABLISHING A SINGLE-BRAND
       MARKET ................................................................................................ 8

       1.     The Travelport-Only Market Is Implausible ............................. 8

       2.     The Complaint Does Not Allege Facts Fitting Within the *Kodak*
              Exception ................................................................................. 10

       3.     Bargaining Leverage Allegations Do Not Justify A Single-Brand
              Market ...................................................................................... 12

       4.     Parroting Outdated Marketplace Descriptions Cannot Justify a
              Single-Brand Monopolization Case in 2011 ........................... 14

III.   THE COURT LACKS SUBJECT MATTER JURISDICTION OVER
       THE ALLEGED SWITZERLAND, UK, AND BELGIUM MARKETS ......... 15

       1.     Foreign Travel Agency Service Is Not U.S. Import Commerce .............. 15

       2.     Foreign Travel Agency Services Do Not Have a Direct and
              Substantial U.S. Effect .......................................................... 16

IV.    AA'S FAILURE TO ALLEGE FACTS ESTABLISHING
       EXCLUSIONARY CONDUCT ALSO WARRANTS DISMISSAL ................. 16

       1.     The Allegations that Travelport Foreclosed Travel Agents or
              Software Developers Are Deficient ......................................... 17

       2.     The Alleged "Retaliatory" Foreign Pricing Is Irrelevant and
              Outside the Scope of U.S. Antitrust Law ................................. 18

       3.     The Contractual MFN Allegations Are Time Barred ............... 20

       4.     Allegations Regarding "Applications Developers" Do Not State a
              Cognizable Antitrust Claim .................................................... 22

V.     AA HAS FAILED TO ALLEGE AN ILLEGAL CONSPIRACY ................. 22

       1.     Under Common Control, Travelport and Orbitz Are Incapable of
              an Illegal Conspiracy .............................................................. 22

       2.     The Conspiracy Allegations Concerning "Unnamed Industry
              Participants" Fail the *Twombly* Standard ................................. 23

VI.    THE AIRLINE DEREGULATION ACT PREEMPTS THE TORTIOUS
       INTERFERENCE CLAIMS ..................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

CASES

*Apani Southwest, Inc. v. Coca-Cola Enter., Inc.*,
  300 F.3d 620 (5th Cir. 2002) ...................................................................................12

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)................................................................................................5

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................4, 5, 23

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
  140 F.3d 494 (3rd Cir. 1998) ...................................................................................13

*Cliff Food Stores, Inc. v. Kroger, Inc.*,
  417 F.2d 203 (5th Cir. 1969) .....................................................................................6

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) ...................................................................................21

*Continental Orthopedic Appliances, Inc. v. Health Insur. of Greater New York, Inc.*,
  994 F. Supp. 133 (E.D. N.Y. 1998) ....................................................................11, 13

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984).................................................................................................22

*Den Norske Stats Oljeselskap AS v. Heeremac Vof*,
  241 F.3d 420 (5th Cir. 2001) ...................................................................................16

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
  73 F.3d 756 (7th Cir. 1996) ................................................................................7, 11

*Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*,
  679 F.2d 516 (5th Cir. 1982) .....................................................................................6

*Donald B. Rice Tire Co. v. Michelin Tire Corp.*,
  483 F. Supp. 750 (D. Md. 1980) ................................................................................7

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
  504 U.S. 451 (1992)......................................................................................... passim

*Exxon Corp. v. Berwick Bay Real Estate Partners*,
  748 F.2d 937 (5th Cir. 1984) .....................................................................................6

*Flegel v. Christian Hosp., Northeast-Northwest,*
  4 F.3d 682 (8th Cir. 1993) ........................................................................7

*Forsyth v. Humana, Inc.,*
  114 F.3d 1467 (9th Cir. 1997) ................................................................13

*Frontier Airlines, Inc. v. United Airlines,*
  758 F. Supp. 1399 (D. Col. 1989)............................................................25

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.,*
  789 F. Supp. 760 (S.D. Miss. 1992).........................................................7

*Galileo Int'l v. Ryanair,*
  No. 01 C 2210, 2002 U.S. Dist. LEXIS 3317 (N.D. Ill. Feb. 21, 2002).....................24

*Globespanvirata v. Texas Instruments,*
  No. 03-2854, 2006 U.S. Dist. LEXIS 8860 (D. N.J. Mar. 3, 2006).............................6

*Hodges v. Delta Airlines, Inc.,*
  44 F.3d 334 (5th Cir. 1995) ....................................................................24

*Imperial Point Colonnades Condominium, Inc. v. Mangurian,*
  549 F.2d 1029 (5th Cir. 1977) ................................................................21

*In re Southeastern Milk Antitrust Litig.,*
  555 F. Supp. 2d 934 (E.D. Tenn. 2008).....................................................23

*Insignia Systems, Inc. v. News Corp.,*
  No. 04-4213, 2005 U.S. Dist. LEXIS 42851 (D. Minn. Aug. 25, 2005) ....................18

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
  466 U.S. 2 (1984) (O'Connor, J., concurring)............................................17

*Lee v. Life Ins. Co. of North America,*
  23 F.3d 14 (1st Cir. 1994)........................................................................11

*Lyn-Lea Travel Corp. v. American Airlines, Inc.,*
  No. 96-CV-2068-BC, 1997 U.S. Dist. LEXIS 21119 (N.D. Tex. Dec. 2, 1997).........24

*Manassas Travel, Inc. v. Worldspan, L.P.,*
  Case No. 2:07-CV-701-TC, 2008 U.S. Dist. LEXIS 35217 (D. Utah Apr. 30, 2008) ........................................................................................25

*North Texas Producers Ass'n v. Young,*
  308 F.2d 235 (5th Cir. 1962) ....................................................................6

*Nw. Power Prods., Inc. v. Omark Indus., Inc.*
  576 F.2d 83 (5th Cir. 1978) ......................................................................7

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
   104 F.3d 811 (6th Cir. 1997) .................................................................11

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
   615 F.3d 412 (5th Cir. 2010) ............................................................ passim

*Rick-Mik Enters. Inc. v. Equilon Enters., LLC*,
   532 F.3d 963 (9th Cir. 2008) ...............................................................7, 18

*Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*,
   802 F. Supp. 1544 (S.D. Tex. 1991) ....................................................6, 18

*Rohlfing v. Manor Care*,
   172 F.R.D. 330 (N.D. Ill. 1997) ............................................................11

*Rx.com v. Medco Health Solutions, Inc.*,
   2009 U.S. App. LEXIS 8469 (5th Cir. Apr. 22, 2009) ...............................21

*Sabre Inc. v. Northwest Airlines*,
   Civil Action No. 4:04-CV-612-Y (N.D. Tex. Jan. 13, 2005) ..................2, 14

*Tampa Electric. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ..........................................................................17, 18

*Turicentro S.A. v. American Airlines, Inc.*,
   303 F.3d 293 (3rd Cir. 2002) ......................................................15, 16, 19

*Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ...............................................................................22

**STATUTES**

Airline Deregulation Act, 49 U.S.C. § 41713(b)(1) ......................................4, 24

Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ...........................15

**OTHER AUTHORITIES**

Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and
   Their Application ¶ 533 (3d ed. 2007).........................................................8

Hovenkamp, Janis & Lemley, An Analysis of Antitrust Principles Applied to
   Intellectual Property Law § 21.04 (2002 and 2006 Supp.).........................11

## INTRODUCTION

American Airlines, Inc.'s ("AA's") Complaint is unabashedly an effort to secure a more favorable position *vis-à-vis* Travelport Limited and Travelport, LP ("Travelport") before the current round of contracts between the parties expires later this year.  Compl. at ¶ 12. Preliminary contract negotiations have stalled, and AA has made good on its threat to file a lawsuit such as this one if Travelport did not yield on certain commercial terms.  This is not a genuine antitrust action brought by consumers suffering from excessive or artificial price increases.  It is an opportunistic lawsuit brought by a large and powerful company seeking to enhance its already substantial commercial bargaining leverage.

AA's power was recently demonstrated when it withdrew ticketing authority for AA tickets from Orbitz.com late last year after negotiations concerning AA's direct connect offering failed.  This bullying by AA has caused substantial harm to Orbitz with Orbitz losing more than half its market capitalization since AA pulled its ticketing authority.  AA also demonstrated its power during the prior round of negotiations with Travelport when AA threatened to withdraw AA content from the global distribution system ("GDS") unless Travelport provided AA with significant discounts.  Travelport had no choice but to provide these discounts despite the fact that GDS burdens have skyrocketed as more consumers search and compare fares using the GDS.

Aside from the disruption in recent negotiations, nothing new or different in the marketplace gives rise to this antitrust lawsuit.  In fact, AA must and does reach far back in time in an attempt to unearth some marketplace portrayal that might support an antitrust lawsuit.  In doing so, AA relies entirely on outdated descriptions of the marketplace when airlines themselves owned and operated the GDSs under comprehensive federal regulation.

For example, AA's market definition, on which its entire Complaint rests, comes from a 1996 regulatory filing. *Id.* at ¶ 37. At that time, leading online travel agencies such as Orbitz and Priceline did not exist. Nor did Google or Kayak, both of which primarily drive traffic directly to airline websites and not through the GDSs. Southwest was a small airline that had just started an online booking site. AA even highlights a federal court decision from the 1980s, preceding the commercial advent of the Internet, to describe marketplace dynamics in the GDS industry. *Id*. at ¶ 88.

If AA's effort to dress up a commercial dispute in antitrust garb sounds familiar, it is. Airlines have occasionally sought to secure a negotiating advantage with GDSs by making monopolization claims. Indeed, in 2004, Northwest Airlines filed a suit making similar allegations against Sabre, one of Travelport's competitors. Northwest's case was transferred to this District and before Your Honor, where a motion to dismiss was fully briefed with Sabre pointing out many of the flaws in Northwest's allegations.[1]

Remarkably, it appears that AA's *2011* Complaint has lifted allegations about the state of the travel services industry from Northwest's *2004* Complaint, while passing them off as reflecting current marketplace conditions.[2] In turn, Northwest's seven-year-old Complaint relied on pronouncements from the period of comprehensive federal regulation, going back to 1996 and even earlier.

In short, the Complaint describes a world that no longer exists. The federal government long ago deregulated the industry, and not a single one of AA's cited sources describes the

---

[1] *See Sabre Inc. v. Northwest Airlines*, Civil Action No. 4:04-CV-612-Y (N.D. Tex. Jan. 13, 2005) (Dkt. Nos. 65, 82, 105).

[2] Compare AA's Complaint with Northwest's First Amended Complaint, *Sabre Inc. v. Northwest Airlines*, Civil Action No. 4:04-CV-612-Y (N.D. Tex. Jan. 13, 2005) (Dkt. No. 66, at APP. 009-39) (Appendix to Sabre's Motion to Dismiss) (hereafter, "Northwest Compl.") (attached as TP APX 1).

industry post-deregulation.  Over half of airline ticket sales in the United States are now made directly from airlines rather than through a GDS.  The largest airline in the United States, Southwest, primarily built its business through direct distribution and without significant use of GDSs.  What is missing from AA's Complaint is any reliance on facts portraying these or any other modern business realities.  AA seeks instead to advance costly antitrust litigation without plausible, specific factual allegations describing how the industry now operates.

Stripped of its antitrust pretext, AA's real complaint is that the marketplace has not embraced AA's unproven and inefficient direct connect technology and that GDSs remain highly valued by many airlines and travel agencies.  GDSs continue to offer proven, cost effective distribution services for AA and many other airlines, and compete intensely with each other on price, quality, and content to encourage both airlines and travel agents to continue using their services.  GDSs also vigorously compete with other distribution channels that now account for a majority of air ticket distribution in the United States.  Contrived market definitions cannot mask these contemporary business realities.

AA's Complaint should be dismissed in full for failure to allege facts establishing a plausible market in which Travelport dominates.  This failure infects each antitrust claim – Counts 1-3.  AA first tries a GDS-only product market, consisting of GDS services for all U.S. travel agents.  Even this narrowly drawn market, which ignores direct airline distribution, does not work.  Travelport is too small, far smaller than the current GDS leader, Sabre.  As alleged, Travelport's share of the GDS-only market in the U.S. is just 34%.  As a matter of law, that is not nearly enough to state a claim of monopolization.

Searching for a higher Travelport market share, AA travels outside the United States and lands in Europe, alleging monopolization of Switzerland, the UK, and Belgium.  *Id*. at ¶ 106.

But U.S. courts lack subject matter jurisdiction to decide whether Travelport has illegally monopolized markets in European nations.

This leaves AA to propose, and depend upon, a market where Travelport is a monopolist *by definition*:  Travelport services for travel agents who have decided to use Travelport.  This "single brand" market conveniently excludes, for example, travel agents who chose to use one of Travelport's *competitors*.  Of course, virtually every company would be a monopolist in markets defined so as to exclude sales of products by competitors.  Given the potential for opportunistic litigation, however, courts will not allow plaintiffs to plead a single-brand product market except in the rarest of circumstances.  A well developed body of law, including Supreme Court and Fifth Circuit law, delineates the limited circumstances in which plaintiffs can open the door to expensive monopolization litigation using an alleged single-brand product market.  The alleged product market consisting of Travelport services for travel agents using Travelport does not fit this exception.

AA's inability to allege a plausible market dominated by Travelport compels dismissal of the antitrust claims, Counts 1-3.  Separately and independently, these claims must also be dismissed because this court lacks subject matter jurisdiction over the alleged Switzerland, UK, and Belgium markets, AA has failed to allege facts establishing exclusionary conduct, and AA has failed to allege an illegal conspiracy.   Finally, the state law claims (Counts 4-5) must be dismissed because they are preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1).

## ARGUMENT

The Supreme Court has stressed the necessity of requiring plausible, non-conclusory allegations establishing each element of an antitrust complaint.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  "[L]abels and conclusions" do not suffice.  *Id.* at 555.  In evaluating the plausibility of allegations, courts must consider whether the allegations comport

with context and common sense realities. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Such scrutiny is required at the motion to dismiss stage because antitrust cases are usually extremely expensive, putting considerable pressure on companies to settle cases with questionable or dubious merit. *See Twombly*, 550 U.S. at 546. In this case, for example, there is little doubt that AA would seek extremely costly and far-reaching discovery—perhaps from all over the globe—about a host of contractual relationships and a course of conduct over a period of many years.

Applying *Twombly*, courts are not tolerant of antitrust complaints that contain conclusory or implausible market definitions. *See, e.g., PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417-18 (5th Cir. 2010) (granting motion to dismiss without chance to amend for failure to allege relevant market). Where antitrust claims rest upon implausible or insufficiently alleged relevant markets, they must be dismissed. *See id.*

## I.     AA Fails to Allege Facts Establishing Travelport's Dominance of the U.S. GDS Market

AA alleges a product market consisting of GDS distribution of airfare to U.S. travel agents. Compl. at ¶ 104. In this alleged product market, direct sales by airlines through their websites, call centers, and ticket counters, now larger than all travel agency sales in the United States, do not count. But the Court need not address the plausibility of a travel agency product market that fails to include all airline direct distribution because, even in the narrower alleged market, Travelport's absence of monopoly power is obvious. Travelport's alleged market share in this market is only 34%. *Id.* at ¶ 106 ("Travelport accounted for 34% of all airline bookings

made by U.S.-based travel agencies in 2010."); *id*. at ¶ 3 (alleging that Travelport has "over 30%").

As the Fifth Circuit has explained, liability under Sherman Act § 2 is "an impossibility as a matter of law" when the defendant has a low market share. *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc*., 679 F.2d 516, 529 (5th Cir. 1982). Market shares significantly below 50% will not support liability under Sherman Act § 2. *See id*. at 528. (Plaintiff "cannot cite us to any case in which monopolization was found . . . despite undisputed proof of market shares significantly below 50 percent."). In fact, "monopolization is rarely found when the defendant's share of the relevant market is below 70%." *Exxon Corp. v. Berwick Bay Real Estate Partners*, 748 F.2d 937, 940 (5th Cir. 1984). This requirement to establish that the defendant holds monopoly power applies equally to a claim of conspiracy to monopolize (Count 2). *See North Texas Producers Ass'n v. Young*, 308 F.2d 235, 240 (5th Cir. 1962).

The claim that Travelport has achieved an illegal monopoly in the alleged travel agents market with a 34% U.S. share should be dismissed on the pleadings. The Southern District of Texas dismissed on the pleadings a monopolization claim based on defendant's alleged 35% market share because "as a matter of law, this allegation is insufficient to support a claim of monopolization in this circuit." *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc*., 802 F. Supp. 1544, 1551 (S.D. Tex. 1991); *see also Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 206-208 (5th Cir. 1969) (dismissing complaint for failure to plead monopoly power); *Globespanvirata v. Texas Instruments*, No. 03-2854, 2006 U.S. Dist. LEXIS 8860 at *11 (D. N.J. Mar. 3, 2006) (granting motion to dismiss Sherman Act § 2 claim for failure to allege monopoly share).

Likewise, a "market power screen" applies to Sherman Act § 1 rule of reason claims (Count 3).  *Leegin*, 615 F.3d at 418 n.5 ("'[S]ubstantial market power is an indispensable ingredient of every claim under the Rule of Reason.'") (quoting *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 761 (7th Cir. 1996)).  This screen prevents Section 1 claims from going forward where, as in this case, the market power allegations are insufficient to raise genuine concerns about exclusionary conduct.

The allegation that Travelport holds a 34% share of the U.S. travel agents market does not meet the "market power screen."  *See Nw. Power Prods., Inc. v. Omark Indus., Inc.* 576 F.2d 83, 90-91 (5th Cir. 1978) (defendant conspicuously lacked market power when it had a 25% share and competed with at least one larger competitor); *Flegel v. Christian Hosp., Northeast-Northwest*, 4 F.3d 682, 689 (8th Cir. 1993) (plaintiff must show a "*dominant* market share" to satisfy the market power screen) (emphasis added); *Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 483 F. Supp. 750, 761 (D. Md. 1980) (defendant did not have requisite market power when it had 20 to 25% share and there were larger producers).  Thus, AA's claim that Travelport violated Sherman Act § 1 should also be dismissed on the pleadings for failure to allege market power.  *See Leegin*, 615 F.3d at 418-19 (to allege a Section 1 claim, "a plaintiff must plausibly allege the defendant's market power"); *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 768-69 (S.D. Miss. 1992) (granting 12(b)(6) dismissal of rule of reason claim because of failure to allege market share sufficient to establish market power); *Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972 (9th Cir. 2008) (granting 12(b)(6) dismissal of rule of reason claim because plaintiff alleged only that defendant was "number one in the industry").

## II.    AA Fails to Allege Facts Establishing a Single-Brand Market

### 1.    The Travelport-Only Market Is Implausible

AA's solution to these problems – particularly the inability to allege monopoly power or substantial market power in an all U.S. travel agency market -- is to contrive what it deems a "relevant product submarket" in which Travelport's share is 100%:  "Travelport provides 100% of the bookings for a large number of corporate customers whose travel agents subscribe to one of Travelport's GDSs."  Compl. at ¶ 3.  This is the "submarket" consisting of Travelport services to travel agencies using Travelport.  Calling this a "submarket" does not excuse AA from market definition pleading standards.  *See Leegin*, 615 F.3d at 418.  Indeed, a leading antitrust treatise has expressly warned against AA's tactic of couching "an overly narrow market designation that exaggerates the defendant's power" by using the "confus[ing]" submarket nomenclature.  Areeda & Hovenkamp, <u>Antitrust Law: An Analysis of Antitrust Principles and Their Application</u> ¶ 533 (3d ed. 2007).

With this product submarket, AA can state with confidence that entry is difficult, given that, by definition, AA's submarket excludes sales to travel agents that chose Travelport's competitors over Travelport.  Just as AA omitted airline direct distribution, which constitutes the majority of U.S. ticket sales, from the "all travel agents" product market, AA omits these sales from the submarket consisting of just Travelport subscribing travel agencies.  Compl. at ¶ 104.  AA also disregarded Sabre and other competing GDSs based on the conclusory allegation that "other providers of airline booking services do not serve as a competitive check" on Travelport services for Travelport travel agents.  *Id*. at ¶ 105; *see also id.* at ¶ 35 ("GDSs are not substitutes for one another"); *id.* at ¶ 41 ("Travelport is not subject to competitive discipline from other providers of booking services to travel agents").  By conveniently ignoring marketplace realities,

AA has managed to define a gerrymandered product market in which no one but Travelport ever has or ever could compete.

Regurgitating antitrust buzz words cannot render AA's antitrust allegations any more viable.  Of course, every company is a monopolist in a product market comprised exclusively of its own sales of its own products to its current customers, and which excludes sales to customers that choose to buy from the company's competitors.  The Court should reject AA's contrived and outcome-determinative Travelport-only product market.

AA's proposed single-brand submarket is flawed for other reasons as well.  In particular, both AA's "submarket" and the broader market (where Travelport is concededly not a monopolist) focus on the provision of services to *travel agents*.  *See, e.g., id*. at ¶ 105 ("The provision of airline booking services *to Travelport subscribers* [*i.e.*, travel agents] is a relevant product submarket.") (emphasis added).  But AA does not allege any harm at all to travel agents; rather it appears to assert that travel agents are *overcompensated* by Travelport and other GDSs.  *Id*. at ¶ 48.

This is internally contradictory.  Any allegation that Travelport has monopoly power over travel agents is contradicted by AA's allegation that travel agents are able to secure supracompetitive prices from Travelport.  If Travelport really had monopoly power over travel agents, it would not be forced to pay them too much.  Indeed, AA completely fails to support any claim that Travelport exercises monopoly power over travel agents.

In other portions of the Complaint, AA seems to suggest that Travelport has monopoly power in a different—but even narrower—market altogether: the market for *AA's access* to travel agents that subscribe to Travelport.  *Id.* at ¶ 8 ("Travelport has ensured that American and other network airlines that rely on travel agents to distribute tickets are dependent upon

Travelport *to access* the critical group of travel agents that subscribe to Travelport's GDSs.  In this way, Travelport has obtained and maintained monopoly power *over American* and other network airlines.") (emphasis added).  Such allegations would apparently pertain to a different market, whereby each GDS would have monopoly power over each airline that uses travel agents to distribute tickets.  Thus, there would be an AA-Travelport market, a Delta-Travelport market, and a US Airways-Travelport market.  This even more restrictive single-brand market similarly fails the *Kodak* test outlined below.

### 2.   The Complaint Does Not Allege Facts Fitting Within the *Kodak* Exception

A well developed body of law governs the limited exception for pleading "single brand" markets.  Antitrust markets are defined based on reasonable interchangeability of products or services.  "In rare circumstances, a single brand of a product or service can constitute a relevant market for antitrust purposes."  *Leegin*, 615 F.3d at 418 (affirming dismissal of single-brand market on pleadings); *see also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992) (noting that in exceptional instances a single-brand may constitute a product market).  The limited exception arises where a rivalry exists for the sale of follow-on products (such as repair parts, service, or supplies) to consumers who may be "locked in" to a particular brand after initial purchase.  Examples may be ink for use in H-P printers or maintenance services for Whirlpool washers.  In these situations, the potential single-brand product market is not based on the initial products purchased like H-P printers or Whirlpool washers but, rather, the follow-on products sold to consumers who in some situations could be "locked in" to the single brand or single manufacturer after the initial purchase.

In these cases, courts have held that the *Kodak* exception is limited to situations in which customers were unable to evaluate total life cycle costs at the time of initial purchase (e.g., costs of the H-P printer and replacement ink) and were exploited by an unexpected change in practice

after being locked in to a single brand for the follow-on products.  *See, e.g, PSI Repair Servs., Inc. v. Honeywell, Inc.,* 104 F.3d 811, 820 (6th Cir. 1997) ("[T]he change in policy in *Kodak* was the crucial factor in the Court's decision."*); see also Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996) (Kodak's change in policy regarding replacement parts and services was dispositive); *Lee v. Life Ins. Co. of North America*, 23 F.3d 14, 20 (1st Cir. 1994) (allegation that customers were unaware of "lock in" at time of initial purchase is critical to meet *Kodak* exception).[3]  The plaintiff asserting a single-brand market within the *Kodak* exception must establish that the defendant failed to make adequate disclosures at the time of initial purchase, thereby preventing consumers from effective comparison shopping.  This failure may leave consumers "locked in" when purchasing follow-on parts, maintenance, or supplies.

AA has not alleged any product market in which there is competition for follow-on products or services to airlines or travel agents who would face "lock in" following initial purchase or initial contract.  It alleges that the relevant product market is the Travelport GDS, not any follow-on products or services.  Courts reject on the pleadings such single-brand markets that are outside the *Kodak* exception.  In *Leegin*, for example, the Fifth Circuit affirmed dismissal of a single-brand market, emphasizing that the *Kodak* exception "is limited to situations in which consumers are 'locked in' to a specific brand by the nature of the product." 615 F.3d at 418; *see also Continental Orthopedic Appliances, Inc. v. Health Insur. of Greater New York, Inc.*, 994 F. Supp. 133, 141 (E.D. N.Y. 1998) (granting motion on pleadings to dismiss single-brand health insurer market); *Rohlfing v. Manor Care*, 172 F.R.D. 330, 346 (N.D. Ill. 1997) (dismissing single-brand market on pleadings because no alleged facts showing *Kodak-*

---

[3]   *See also* Hovenkamp, Janis & Lemley, IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law § 21.04 (2002 and 2006 Supp.)( "[i]t should…be clear that Kodak-style 'lock-in' occurs when the primary market decision and the 'aftermarket' decision are made at different times.").

type lock in); *Apani Southwest, Inc. v. Coca-Cola Enter., Inc*., 300 F.3d 620, 633 (5th Cir. 2002) (affirming 12(b)(6) dismissal for failure to plead plausible market when plaintiff defined market around sales to a single customer).  This Court should do the same.

AA does not allege that Travelport failed to disclose its key business practices at the time of an initial contract, resulting in unfair consumer lock in.  Nor does AA allege some unexpected shift in business practice during the life of the contract.  These allegations are essential for the *Kodak* exception and their absence compels dismissal of this Complaint dependent on a single-brand market.

### 3. Bargaining Leverage Allegations Do Not Justify A Single-Brand Market

Instead of facts needed to meet the *Kodak* exception, the Complaint is filled with run-of-the-mill commercial bargaining power allegations.  The allegations that underlie the Travelport-only single-brand market are (1) that Travelport provides access to "a large number" or "critical group" of Travelport agents, Compl. at ¶¶ 1, 3, 35; (2) that AA and other airlines must distribute through Travelport to avoid losing a "significant" number of ticket sales, *id*. at ¶ 35-36; and (3) as a result, AA and other airlines have "little ability" to drop Travelport or "no choice" except to distribute through Travelport.  *Id*. at ¶¶ 35, 105.  Stripped to its core, the Complaint states that Travelport is a valuable distributor and that losing Travelport as a distributor may cause a supplier to lose significant business.  This in turn gives Travelport some degree of bargaining leverage.

Travelport concedes that its distribution services are valuable and does not question why AA and many other airlines use Travelport to distribute tickets.  But it is commonplace in our economy for manufacturers or suppliers to depend upon valued distributors to reach key customers.  Take supermarkets as distributors.  The makers of Cheerios, Corn Flakes, or Lucky Charms could say that each supermarket chain provides access to "a large number" or "critical

group" of customers, that each cereal brand participates in each supermarket chain so as to avoid losing "significant" sales, and that the cereal markers have "little ability" to stop distributing through the supermarket chain.  This in turn gives the supermarket some degree of leverage when negotiating terms of sale with the cereal maker.  Nike or Adidas might say the same things about the leading sporting good retailers.  However, these commonplace bargaining power conditions would not support a Kroger product market or Dick's Sporting Goods product market.

Not surprisingly, courts have rejected single-brand markets based on commonplace bargaining power conditions.  For example, hospitals and pharmacy chains have alleged that each health insurer (such as Blue Cross, Aetna, or Cigna) provides exclusive access to a unique and critical group of patients, that the hospital or pharmacy needs to participate in the health insurer's network to avoid losing significant business, and the health insurer has enormous negotiating leverage as a result.   None of these arguments has sustained a market limited to the services of a single health insurer.

Thus, a retail pharmacy chain could not sustain a single-brand health insurer market (giving the health insurer "100% of this market regardless") despite alleging that the health insurer had "leverage acquired by virtue of its ability to provide . . . access to thousands of potential pharmacy customers," that the insurer's "subscribers constituted a significant portion of [the pharmacy chain's] customer base," and that "participating pharmacies do not drop out of the . . . network."  *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 510, 514 (3rd Cir. 1998).  This does not "fall within *Kodak*'s concept of lock in."  *Id.* at 515; *see also Continental Orthopedic,* 994 F. Supp. at 141 (rejecting single-brand health insurer market); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) ("We reject the plaintiffs' attempt

to limit the relevant market to acute care hospitals used by Humana insureds" where there is no failure to disclose under the *Kodak* exception).

AA's allegations support only the conclusion that this is a commercial dispute between two large companies with varying degrees of bargaining leverage. AA's assertions should not be confused with factual allegations sufficient to show that the defendant maintains a monopolistic market share (i.e., well over 50%) in a relevant product market that is defined by product characteristics and consumer demand in the industry.

### 4. Parroting Outdated Marketplace Descriptions Cannot Justify a Single-Brand Monopolization Case in 2011

To justify a single-brand market, AA relies on anemic allegations of simple bargaining leverage, coupled with quotes from regulatory filings that predate the deregulation of the GDS industry. AA even quotes a district court decision from the 1980s. Compl. at ¶ 88.

Remarkably, it also appears that AA has attempted to pass off as evidence of current market conditions allegations it lifted from a Northwest Airlines Complaint filed in 2004. For example, AA's allegations about how travel agents are the "dominant channel for selling airline tickets," appear to be pulled from observations made nearly a decade ago – an extremely long period in the context of a dynamic high technology business.[4]  The outdated materials quoted throughout the Complaint are business generations away from the current environment where more than half of U.S. ticket sales are made directly by airlines.

---

[4] *Compare, e.g.*, AA Compl. ¶ 35 *with* Northwest Compl. ¶ 21 ("Travel agents continue to be the dominant channel for distribution of air transportation services, and travel agents continue to rely almost entirely on a single GDS."); AA Compl. ¶ 33 *with* Northwest Compl. ¶ 19 ("Those payments are tied to productivity commitments by travel agencies, *i.e.*, commitments to use the GDS service for a specified volume of bookings, coupled with financial penalties or disincentives if those commitments are not reached."); AA Compl. ¶ 36 *with* Northwest Compl. ¶ 20 ("In theory, an airline could exert countervailing leverage against GDSs, like defendants, by withholding its participation in a particular GDS since, over time, the GDS's services would become less valuable to consumers and thus to travel agents.").

III.    **The Court Lacks Subject Matter Jurisdiction Over the Alleged Switzerland, UK, and Belgium Markets**

AA's quest for an antitrust market where Travelport has a monopolistic share has spanned the globe.  It appears that AA tracked Travelport's alleged share by country around the world and selected three relatively high share countries as geographic markets for an antitrust lawsuit.  The highest is Switzerland, as "Travelport accounted for 55% of all bookings made in Switzerland."  *Id*. at ¶ 106.  Thus, AA is apparently asking this Court to determine whether Travelport has monopolized markets, including single-brand markets, in individual European nations.

Under the Foreign Trade Antitrust Improvements Act ("FTAIA"), a plaintiff relying on foreign conduct must allege facts showing that (1) the foreign conduct amounts to U.S. "import commerce" or (2) the foreign conduct has "a direct, substantial, and reasonably foreseeable" effect on U.S. consumers.  15 U.S.C. § 6a.  Neither condition is present here.

1.    **Foreign Travel Agency Service Is Not U.S. Import Commerce**

The subject matter jurisdiction of U.S. antitrust law may extend to foreign conduct that constitutes import commerce.  For example, U.S. antitrust law may cover a price fixing agreement formed in Germany between two German manufacturers to raise the price of goods those firms import into the United States.  That concerns "import commerce" even though the conduct occurred abroad.

In the seminal industry case, AA itself successfully argued that the business of foreign travel agencies is not import commerce under the FTAIA.  *See Turicentro S.A. v. American Airlines, Inc.*, 303 F.3d 293, 303 (3rd Cir. 2002).  The court ruled that U.S. airlines do not "import" foreign travel agency services for purpose of selling tickets in the United States.  *Id*. The court also rejected the argument that a foreign travel agency's use of a GDS based in the

United States and the agency's receipt of commissions paid by a U.S. GDS transforms these services into import commerce.  *Id*. at 304.

### 2.     Foreign Travel Agency Services Do Not Have a Direct and Substantial U.S. Effect

Alternatively, a plaintiff must allege facts showing that a defendant's foreign "conduct has 'a direct, substantial, and reasonably foreseeable' anticompetitive effect on U.S. commerce, and that the conduct 'gives rise' to a Sherman Act claim."  *Id*. at 304 (quoting FTAIA); *Den Norske Stats Oljeselskap AS v. Heeremac Vof*, 241 F.3d 420, 427 (5th Cir. 2001) (plaintiff failed to show that effect on U.S. commerce in any way "gives rise" to its antitrust claim).  The "geographic effect of the defendants' [foreign] conduct" must be on the competitive process within the United States and it must be direct and substantial.  *Turicentro*, 303 F.3d at 304.

AA's Complaint does not allege that Travelport's conduct in Switzerland, the UK, or Belgium has a direct and substantial anticompetitive effect within the United States.  Rather, AA does just the opposite: It alleges effects in separate and distinct parts of Europe.  There is no alleged world market based on the idea that pricing in one country has direct effects in others. The allegation that Travelport has monopolized markets in Europe is far outside the subject matter jurisdiction of the United States antitrust laws.

### IV.    AA's Failure to Allege Facts Establishing Exclusionary Conduct Also Warrants Dismissal

Another essential element of a monopolization claim under Sherman Act § 2 (Counts 1 and 2) is exclusionary conduct that has produced or is maintaining the illegal monopoly. Likewise, a rule of reason claim under Sherman Act § 1 (Count 3) requires proof that the defendant enjoying substantial market power engaged in exclusionary or anticompetitive acts.

1.     **The Allegations that Travelport Foreclosed Travel Agents or Software Developers Are Deficient**

Even if a 34% share of the alleged U.S. GDS market somehow amounted to monopoly or market power, AA still needs to allege facts establishing that the suppliers or customers foreclosed constitutes a "substantial share of the relevant market." *Tampa Electric. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328-29 (1961); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring) ("Exclusive dealing is an unreasonable restraint of trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.").

AA alleges that Travelport, acting as a monopolist, used multi-year contracts to foreclose access to travel agencies.  Compl. at ¶¶ 53-58.  It also alleges that Travelport foreclosed access to software developers.  *Id*. at ¶¶ 64-76.  *Tampa Electric'*s "substantial share" requirement is intended to ensure that any foreclosure by a company with monopoly power is in fact likely to have the effect of handcuffing competitors, thereby harming consumers.  Control over an insubstantial portion of the supplier or customer base does not establish an antitrust violation.

How much of the alleged travel agency market do Travelport's multi-year contracts cover? According to AA, it reaches "a large number of corporate customers," agencies representing "a significant number of ticket sales," or agencies representing "a discrete, but critical, group of travelers."  *Id*. at ¶¶ 1, 3, 35-36.  We are left to guess whether this "large number" is 5% or 95% of the relevant travel agents market.  As to the software developers Travelport supposedly walled off from AA, the Complaint alleges virtually nothing.  *Id*. at ¶¶ 31, 64, 66, 73-76.  As far as the Complaint reads, this could be 5 of 5, 5 of 50, or 1 of 100 software developers.  *Id.*  There are simply no facts alleged that would allow any assessment of the impact on competition.

17

This is a Complaint in which the alleged monopolist, maintaining either a 34% market share or a fixed 100% share, allegedly exercised its monopoly power by blocking access to customers (travel agents) and unrelated third-parties (software developers) whose relative size and competitive significance is anybody's guess. AA's failure to plead any facts showing foreclosure of a substantial share of the travel agents or software developers as required by *Tampa Electric* is grounds for Rule 12(b)(6) dismissal. *See, e.g., Rick-Mik*, 532 F.3d at 972 ("The complaint alleges nothing about, for example, what percentage of gasoline franchises are [defendant's]. There are no factual allegations regarding the amount of power or control that [defendant] has over prospective franchises."); *Rockbit*, 802 F. Supp. at 1550 (granting 12(b)(6) motion because plaintiff "failed to allege any facts which would indicate the degree of commerce that may have been foreclosed"); *Insignia Systems, Inc. v. News Corp.,* No. 04-4213, 2005 U.S. Dist. LEXIS 42851, at *10-11 (D. Minn. Aug. 25, 2005) ("[A]bsent some indication of the percentage of the local, regional, or national markets that the . . . outlets allegedly under exclusive contract constitute, it is impossible to evaluate the percentage of the market with which . . . competitors are prevented from doing business").

### 2.     The Alleged "Retaliatory" Foreign Pricing Is Irrelevant and Outside the Scope of U.S. Antitrust Law

AA alleges a series of commercial disputes between it and Orbitz Worldwide, LLC ("Orbitz"), Travelport, and third-party Sabre Inc. ("Sabre") without connecting them to any viable antitrust theory. Many of these allegations have nothing to do with Travelport at all. The ones that do involve "retaliatory" actions allegedly taken by Travelport occur "outside the United States." Compl. ¶ 85.

One of the main exclusionary acts highlighted in the Complaint is foreign pricing: "Travelport doubled American's booking fees for reservations made *outside the United States*,

and subsequently intentionally misrepresented American's fares in a manner that made them appear more expensive than they actually were *to consumers outside the United States*."  Compl. at ¶ 10 (emphasis added).  Over and over again the Complaint points to this price increase "to consumers outside the United States."  *Id.* at ¶ 42 ("doubling the booking fees for tickets sales made outside the United States"); *id.* at ¶ 85 ("doubling the booking fees charged American for bookings made by travel agents outside the United States"); *id.* at ¶¶ 86-87 (Travelport added a "premium to American's fares" in response to American's "recovery fee . . . for Travelport subscribers who booked American flights from outside the United States"); *id.* at ¶ 111 ("Travelport was able to double American's booking fees in certain regions"); *id.* at ¶ 226 ("Doubling the fees . . . made through Travelport's GDS").

AA's foreign pricing allegations not only fall outside the subject matter jurisdiction of U.S. antitrust law, but they also conflict with AA's market definition allegations.  *See Turicentro*, 303 F.3d at 303.  AA has not alleged a world market where pricing decisions in one country necessarily have a ripple effect in others.  Rather it has alleged distinct national markets based on local conditions.  *Id.* at ¶ 106 ("Because most travelers purchase airline tickets from travel agents located where they work or reside, the provision of airline booking services in one country is not a substitute for the provision of such services in another country.").  Raising the price outside the United States cannot equate to price increases or anticompetitive effects on consumers in the U.S. market, particularly where the price competition as alleged occurs in distinct national markets.

AA's heavy reliance on contradictory, foreign pricing allegations underscores the absence from its Complaint of any factual allegation of increased prices in the United States. Foreign pricing allegations provide no support for the claim that Travelport has monopolized the United States market.

The Complaint's only allegation of a GDS price increase in the United States concerns not Travelport but a third-party who, according to the Complaint, is not even a competitor. *Id*. at ¶¶ 35, 41, 105. AA alleges that in January 2011, Sabre made a decision to raise its prices in the United States. *Id*. at ¶ 91. How does Sabre's U.S. price increase relate to Travelport? There are no allegations of any meeting or discussion – let alone an agreement – between Travelport and Sabre to raise Sabre's U.S. prices. AA makes no allegations that Travelport responded to Sabre's U.S. price increase by raising its own prices in the United States. As AA has enjoyed very significant price cuts under the contracts at issue in this case, it is unable to and has not alleged any U.S. price increases by Travelport.

### 3. The Contractual MFN Allegations Are Time Barred

In its contract with AA, Travelport seeks assurance that it is getting the most current, accurate, and complete airfare content available. That assurance is critical to Travelport's competitiveness because travel agencies depend on full and transparent content to comparison shop and obtain the best price for travelers. To achieve this business objective, Travelport's contract with AA contains a "content parity" or, as AA calls it, a "most-favored nation" ("MFN") clause. *Id*. at ¶¶ 45-46.

AA's Complaint identifies the Travelport contract, quotes the content parity clause, and alleges that this clause improperly restricts AA's ability to offer a la carte content. *Id.* at ¶¶ 46-47. AA challenges the content parity clause in its contract with Travelport as exclusionary, quoting old regulatory filings referring to these types of contract clauses. *Id.* at ¶¶ 51-52. Not only are such clauses ultimately pro-competitive, but they are beyond the applicable statute of limitations. The AA-Travelport contract containing the content parity clause was executed in

2006.  (*See* TP APX 2 at 35).[5]   AA has sat on its hands since 2006 and now seeks treble damages incurred by AA as a result of the content parity clause that it negotiated at arm's length and that resulted in it receiving deep price discounts.  This violates the four-year statute of limitations governing Sherman Act claims.

Under the "continuing conspiracy" exception to the four-year time bar, a plaintiff relying on an outdated event must show fresh, specific, and identifiable anticompetitive acts occurring within the limitations period.  For example, the Fifth Circuit in *Rx.com* dismissed an antitrust claim as time barred when the refusal to deal occurred more than four years ago and the plaintiff failed to show that "[d]efendants reiterated their refusals."  *Rx.com v. Medco Health Solutions, Inc.*, 2009 U.S. App. LEXIS 8469, at *8-9 (5th Cir. Apr. 22, 2009); *see also Imperial Point Colonnades Condominium, Inc. v. Mangurian*, 549 F.2d 1029, 1035 (5th Cir. 1977) ("[A] cause of action will not lie for damages that occur within the four years preceding suit, if those damages result solely from acts committed by the defendant outside the four-year period.").  To the extent AA thought this contract term gave rise to an antitrust violation in 2006, it failed to allege such a claim in a timely manner.

Having experienced an unsuccessful commercial negotiation thus far in 2011, AA seems willing to dig through its files in an effort to come up with anything that might possibly advance an antitrust lawsuit.  However, AA's MFN allegations are not based on any new fact or event that happened within the limitations period.  All AA is saying is that the contract clause it agreed to in 2006 is anticompetitive and has been since AA signed the contract in 2006.  AA has not alleged a continuing conspiracy with any fresh, new, or different acts.

---

[5] This Court may take judicial notice of contracts referenced in the Complaint.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

### 4. Allegations Regarding "Applications Developers" Do Not State a Cognizable Antitrust Claim

AA expresses outrage that Travelport has restricted access to its proprietary applications programming interfaces to "authorized" applications developers, Compl. at ¶¶ 64-76, as if any company in Travelport's position would just open its gates to every outside software developer regardless of concerns about quality control, system burdens, or free-riding.  AA's attempt to characterize this activity as an antitrust violation defies both the law and common sense.  It is well established that a private company has the right to choose with whom it does business and has no duty to aid competitors.  *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408, 411 (2004).  Devoid of any plausible allegation that Travelport lacks a valid business justification for exercising control over its proprietary technology, AA's Complaint fails to state a claim for an unlawful refusal to deal.  *See id.* at 409-10.

Accordingly, all of AA's antitrust claims (Counts 1-3) should be dismissed for their failure to allege any exclusionary conduct sufficient to give rise to antitrust liability.

## V. AA Has Failed to Allege an Illegal Conspiracy

For the reasons stated above, the conspiracy to monopolize claim (Count 2) should be dismissed for failure to allege a plausible market.   The Court may dismiss this claim for the independent reason that AA has not alleged an illegal agreement or conspiracy.

### 1. Under Common Control, Travelport and Orbitz Are Incapable of an Illegal Conspiracy

The conspiracy alleged here is implausible because it is, in essence, a conspiracy of one. Travelport and Orbitz are controlled by the same majority owner, The Blackstone Group.  Since the Supreme Court's opinion in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984), plaintiffs have been unable to plead this type of a bath tub conspiracy.  *See*

Defendant Orbitz Worldwide LLC's Brief in Support of its Motion to Dismiss Plaintiff's Complaint.

> **2.      The Conspiracy Allegations Concerning "Unnamed Industry Participants" Fail the *Twombly* Standard**

AA charges Travelport with entering into an illegal conspiracy, in violation of federal antitrust law, with "unnamed industry participants."  Compl. at ¶ 116.  It may be that AA cannot identify "unnamed industry participants" because this is the rankest form of speculation and innuendo lacking any grounding in fact.  Alternatively, AA may know the identity of the "unnamed industry participants" and the terms or elements of the alleged illegal conspiracy but has withheld those facts for some tactical reason.  Either way, AA cannot force Travelport to incur huge legal fees and lost management time to defend an antitrust case on this flimsy conspiracy theory.

The conclusory allegation that Travelport entered into a conspiracy with "unnamed industry participants" causing massive consumer harm throughout the United States and Europe is not enough.  The dismissed complaint in *Twombly* "furnishe[d] no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place."  550 U.S. at 563 n. 8.  The lower courts have interpreted the *Twombly* decision as requiring plaintiffs charging conspiracy to assert the "when and where" facts.  *See, e.g., In re Southeastern Milk Antitrust Litig*., 555 F. Supp. 2d 934, 942 (E.D. Tenn. 2008) ("To allege an agreement between antitrust-conspirators, the complaint must allege facts such as a specific time, place, or person involved in the alleged conspiracies to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin.").  The Court should demand more than a bare-bones allegation where even the identity of the conspirators is a mystery.

**VI.      The Airline Deregulation Act Preempts the Tortious Interference Claims**

AA alleges that Travelport tortiously interfered with AA's existing or prospective

contractual relations to provide airfare distribution services to travel agencies (Counts 4 and 5).

Compl. at ¶¶ 124-26, 132-34.  Travelport's interference with AA' own air distribution services

allegedly violates the Texas Deceptive Trade Practices Act and creates tort liability under Texas

law.  *Id*. at ¶ 126(d).

The Airline Deregulation Act preempts state law claims "related to a price, route, or

service of an air carrier."  49 U.S.C. § 41713(b)(1).  Interpreting this federal law, the Fifth

Circuit drew a distinction between claims for physical injury from claims relating to "the

business of transportation as well as the schedules" or "the economic factors that go into the

provision of the . . . passenger's fare, including flight frequency and timing.'"  *Hodges v. Delta

Airlines, Inc*., 44 F.3d 334, 337 (5th Cir. 1995) (quoting Civil Aviation Board).  In the Fifth

Circuit case, Mrs. Hodges suffered injury when a fellow passenger opened an overhead

compartment and dislodged a case of rum.  *Id*. at 335.  The Airline Deregulation Act did not

preempt her negligence claim for physical injury.  *Id*. at 338.

Applying *Hodges*, this Court held that the Airline Deregulation Act preempts state law

claims relating to GDS services: "Here, plaintiff's complaints arising out of the SABRE CRS are

clearly based on the defendants' reservation practices and therefore have a connection with

defendants' 'services.'"  *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, No. 96-CV-2068-BC,

1997 U.S. Dist. LEXIS 21119 at *21 (N.D. Tex. Dec. 2, 1997), *aff'd*, 139 F.3d 899 (5th Cir.

1998), *vacated on other grounds*, 283 F.3d 282 (5th Cir. 2002).  Other courts have ruled that the

Airline Deregulation Act preempts claims under state law relating to GDS or airfare booking

services.  *See Galileo Int'l v. Ryanair*, No. 01 C 2210, 2002 U.S. Dist. LEXIS 3317 at *14 (N.D.

Ill. Feb. 21, 2002) (finding that GDS services are "services" under the Act and thus claim under

24

state law for overcharges for bookings is preempted); *Manassas Travel, Inc. v. Worldspan, L.P.*, Case No. 2:07-CV-701-TC, 2008 U.S. Dist. LEXIS 35217 at *6 (D. Utah Apr. 30, 2008) (applying ADA preemption to claims against GDS); *Frontier Airlines, Inc. v. United Airlines*, 758 F. Supp. 1399, 1402 (D. Col. 1989) (claim under state unfair competition law that airline improperly marketed GDS services is preempted).

AA's claim that a GDS interfered with an airline's own airfare distribution is "related to a price, route, or service of an air carrier" and thus falls well within the Airline Deregulation Act's preemption clause. Both tortious interference counts (Counts 4-5) must be dismissed.

Dated:   May 25, 2011

Respectfully submitted,

*/s/ Walker C. Friedman*
Walker C. Friedman

Michael L. Weiner
michael.weiner@dechert.com
**DECHERT LLP**
1095 Avenue of the Americas
New York, New York 10036-6797
212.698.3608
212.698.3599(Fax)

Mike Cowie
mike.cowie@dechert.com
Craig Falls
craig.falls@dechert.com
**DECHERT LLP**
1775 I Street, NW
Washington, D.C. 20006-2401
202.261.3300
202.261.3333 (Fax)

Walker C. Friedman
State Bar No. 07472500
wcf@fsclaw.com
Christian D. Tucker
State Bar No. 00795690
tucker@fsclaw.com

**FRIEDMAN, SUDER & COOKE, P.C.**
Tindall Square Warehouse No. 1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
817.334.0400
817.334.0401 (Fax)

John T. Schriver
JTSchriver@duanemorris.com
Paul E. Chronis
pechronis@duanemorris.com
**DUANE MORRIS LLP**
Suite 3700
190 South LaSalle Street
Chicago, Illinois 60603-3433
312.499.6700
312.499.6701 (Fax)

**ATTORNEYS FOR DEFENDANTS
TRAVELPORT LIMITED and
TRAVELPORT, LP**


## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of May, 2011, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, Fort Worth Division, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.


/s/ Walker C. Friedman
Walker C. Friedman