# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| AMERICAN AIRLINES, INC.,<br>a Delaware corporation,<br><br>      Plaintiff,<br>vs.<br><br>SABRE, INC., a Delaware corporation;<br>SABRE HOLDINGS CORPORATION, a<br>Delaware corporation and SABRE<br>TRAVEL INTERNATIONAL LTD., a<br>foreign corporation, d/b/a SABRE TRAVEL<br>NETWORK;<br><br>TRAVELPORT LIMITED, a foreign<br>corporation, and TRAVELPORT, LP,<br>a Delaware limited partnership, d/b/a<br>TRAVELPORT;<br><br>and<br><br>ORBITZ WORLDWIDE, LLC, a Delaware<br>limited liability company, d/b/a ORBITZ,<br><br>      Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § §      **Civil Action No. 4:11-cv-00244-Y** |

## DEFENDANT ORBITZ WORLDWIDE, LLC'S REPLY IN SUPPORT
## OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

<strong>Page(s)</strong>

I.      INTRODUCTION ................................................................................................1

II.     ARGUMENT .....................................................................................................3

        A.      American Cannot Plead the Requisite Market Foreclosure to Support a
                Sherman Act Claim Against Orbitz .......................................................3

                1.      The Parties Agree that Any Foreclosure from the SSA is
                        Insufficient. ................................................................................3

                2.      American Cannot Rely on the Cumulative Foreclosure From Every
                        Travelport Subscriber Agreement to Support a Claim Against
                        Orbitz. .........................................................................................4

        B.      The FAC's Claims Against Orbitz Should Be Dismissed for the
                Independent Reason That They Are Precluded Under *Copperweld* .......................7

        C.      The Balance of the FAC's Allegations Relating to Some Vast Conspiracy
                to Monopolize the Distribution of Airline Tickets Fails Under *Twombly* ..............9

III.    CONCLUSION ................................................................................................10

# I.      INTRODUCTION

The issue presented by this motion is whether an agreement between Orbitz and Travelport which, at most, forecloses *three percent* of the pleaded market, is sufficient to state a Sherman Act claim against Orbitz, a single online travel agent.

American's lawsuit is based upon allegedly "unlawful behavior, including by Orbitz, designed to foreclose 'AA Direct Connect' from the market for the provision of airline booking services." (Opp. at 1.)  The First Amended Complaint ("FAC") names Orbitz, alone among thousands of travel agents, because it entered into an alleged exclusive dealing contract with Travelport, the Subscriber Services Agreement (the "SSA"), which supposedly restricted Orbitz from expanding its direct-booking relationship with American.  In its opening brief, Orbitz demonstrated that the antitrust claims against it fail for two independently dispositive reasons: first, the SSA does not foreclose a "substantial" portion of the relevant market (even as pleaded); and second, because the SSA was formed when Orbitz was wholly owned by Travelport, there can be no conspiracy within the meaning of the Sherman Act.

Shown its own judicially noticeable SEC filings, American now concedes that the SSA does not result in adequate foreclosure to state a claim.  American's response to this problem is to recast the FAC to argue that the SSA is part of a broader "web of agreements between [Travelport] and virtually all of its subscribers." (*Id*. at 12.)  That way, American argues, it can add Orbitz's minimal market share to the market share of all other travel agents that have subscriber agreements with Travelport—such that, in aggregate, Travelport's entire alleged 30% market share can be attributed to Orbitz.  This attempt to aggregate the market shares of various "spokes" in a rimless wheel conspiracy fails as a matter of law.  American cannot base claims against Orbitz on other travel agents' market shares absent allegations of a horizontal conspiracy between Orbitz and all other travel agent subscribers to Travelport's GDS.  American does not plead any such conspiracy among travel agents—nor could it, consistent with its Rule 11 obligations.

1

American's other argument, that the FAC pleads a "second agreement" through which Travelport provided "subsequent financial assistance to Orbitz in its dispute with [American]," also cannot save the complaint.  This alleged November 2010 agreement provided compensation from Travelport to its sister company, Orbitz, for revenue losses caused by American's decision to terminate Orbitz's ticketing authority.  American mischaracterizes this agreement in an attempt to sidestep the *Copperweld* barrier to its claims based on the SSA.  It cites the FAC's allegation that this agreement provided for payments "*conditioned only on Orbitz' continued refusal to adopt AA Direct Connect*."  (Opp. at 7.)  But, American attached the actual agreement to its Appendix and the agreement contains no such provision.  Instead, it provides for payments while Orbitz's ticketing authority remained terminated by American.  (*See* American's Appendix in Support of Response in Opposition to Orbitz's Motion to Dismiss, Doc. 94 ("AA APX"), at Tab 3.)  More importantly, because this agreement was formed *after* American chose to terminate Orbitz, it could not result in *any* market foreclosure because Orbitz had no ability to sell tickets for American flights—either directly or otherwise—at that time.

At every turn, American's arguments against Orbitz converge on the alleged exclusive dealing provisions in the SSA.  The FAC's fundamental problem is that the 3% market foreclosure from the SSA, an agreement formed when Orbitz was wholly owned by Travelport, cannot support a Sherman Act claim.  That is not something which further amendment can fix.  And, because American cannot in good faith plead any type of horizontal conspiracy among Orbitz and all other travel agent subscribers, the cumulative impact of all Travelport subscriber agreements provides no cover.  Nor can American cure this deficiency by mischaracterizing a subsequent arrangement through which Travelport provided financial assistance to Orbitz, after American chose to terminate its ticketing authority.  Because the FAC cannot state viable antitrust claims against Orbitz as a matter of law, dismissal is warranted.

## II.     ARGUMENT

**A.     American Cannot Plead the Requisite Market Foreclosure to State a Sherman Act Claim Against Orbitz**

1.     The Parties Agree that Any Foreclosure from the SSA is Insufficient.

American contends that Orbitz violated Sections 1 and 2 of the Sherman Act by entering into the SSA, which required it to use Travelport "exclusively" as its GDS provider for North American air travel bookings, and provided "powerful financial incentives" to restrict Orbitz from entering into any new "direct connect" relationships with an airline.  (FAC ¶¶ 69-71.) These allegations purport to allege an "exclusive dealing" arrangement between Orbitz and Travelport.  *See Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 625 (5th Cir. 2002).  An exclusive dealing agreement violates the Sherman Act only if it locks-up or "forecloses" a "substantial" portion of the pleaded market—which, under the case law, is at least 30% or more.  (*See* Orbitz's Brief in Support of its Motion to Dismiss, Doc. 77-1 ("Mot."), at 2, 10-15); *see also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-328 (1961); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984); *Apani*, 300 F.3d at 625; *Star Tobacco, Inc. v. Darilek*, 298 F. Supp. 2d 436 (E.D. Tex. 2003).

The FAC's allegations against Orbitz cannot meet this threshold requirement, because the SSA forecloses, at most, only Orbitz's three percent share of the pleaded market.[1]  Thus, even if the SSA resulted in a complete foreclosure of American's ability to sell tickets directly on Orbitz, the Sherman Act claims fail.  *See Jefferson Parish*, 466 U.S. at 45; *Kidd v. Bass Hotels & Resorts, Inc.*, 136 F. Supp. 2d 965, 969 (E.D. Ark. 2000) ("Since the early 1970's, 'judicial decisions have established a virtual safe harbor for market foreclosures of 20% or less,'" quoting ABA Section of Antitrust Law, *Antitrust Law Developments*, 214 (4th ed. 1997)).

---

[1]    In its SEC Form 10-Q, filed April 20, 2011, American stated:  "On December 21, 2010, American terminated its agreement with Orbitz.  Prior to termination of such agreement, approximately 3% of American's passenger revenue, on an annualized basis, was generated from bookings made via Orbitz."  [OWW APX 5-6 (Document 78)]  As noted in Orbitz's opening brief, the pleaded market is implausible, but Orbitz is entitled to dismissal even accepting that market for purposes of this motion.

Even American concedes that any foreclosure from the SSA, alone, does not meet the threshold under *Jefferson Parish*.  (Opp. at 12) ("And AA does not contend that those provisions violate the Sherman Act because, viewed in isolation, those agreements foreclose competition from alternatives to [Travelport]'s GDSs.")  This is fatal to both of its claims against Orbitz.[2]

> 2.   American Cannot Rely on the Cumulative Foreclosure From Every Travelport Subscriber Agreement to Support a Claim Against Orbitz.

Faced with the reality that the only agreement pleaded as to Orbitz, the SSA, cannot support a Sherman Act claim, American recasts the FAC to argue that Travelport "has locked up all of its travel agent subscribers, *including, but not limited to, Orbitz*."  (Opp. at 2, 12 (emphasis in original).)[3]  Then, it argues, because Travelport "controls GDSs that together account for *over 30%* of all airline ticket sales made by U.S.-based travel agencies," its "exclusionary agreements with Orbitz and other [Travelport] subscribers forecloses over 30%" of the pleaded market.  (*Id.*)  In other words, American's Sherman Act claims against Orbitz hinge on being able to impute the aggregate market share of "*all* of [Travelport's] travel agency subscribers" to Orbitz.  (*Id.*)

In its moving papers, Orbitz showed that aggregating foreclosure from Travelport's separate agreements with other travel agents to support a claim against Orbitz was improper.  (Mot. at 13-14.)  Instead, the foreclosure analysis is limited to the individual agreement alleged to be in restraint of trade; here, the SSA.  *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002).  *Dickson* affirmed a Rule 12(b)(6) dismissal of Sherman Act claims against Microsoft

---

2   American's inability to plead sufficient foreclosure precludes both its Section 1 and Section 2 Sherman Act claims against Orbitz.  (*See* Mot. at 15, citing *Tampa Elec.*, 365 U.S. at 327; *Ticketmaster Corp. v. Tickets.com Inc.*, 127 Fed. App'x. 346 (9th Cir. 2005); and *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362, 394-395 (M.D. N.C. 2002).)

3   American also makes passing reference to—and mischaracterizes—a November 2010 agreement between Travelport and Orbitz.  (Opp. at 12.)  This agreement is inapposite.  First, on its face, the agreement relates to payments for losses caused by American's termination of Orbitz's ticketing authority.  (*See* AA APX at Tab 3.)  It was formed *after* American chose to terminate its business relationship with Orbitz.  Thus, by definition, it could not result in any foreclosure, insofar as Orbitz had no ability to book American flights at that time, either directly or through a Travelport GDS.  Indeed, the entire agreement was a result of American's choice to terminate Orbitz's ticketing authority and its advertisement of that fact to the market.  (*See* Mot. at 6-7.)

and two PC manufacturers which entered into supposedly anticompetitive agreements with Microsoft: "the district court correctly determined that it could not consider the cumulative harm of Microsoft's agreements with all OEMs but instead was required to consider—individually—Microsoft's agreements with Compaq and Dell to evaluate each agreement's potential for anticompetitive effects." *Id*.

American tries to distinguish *Dickson* by claiming the FAC "alleges that [Travelport] and its subscribers, including Orbitz, have entered into agreements that have effectively foreclosed virtually all of the market for the provision of airline booking services to [Travelport] subscribers." (Opp. at 12-13.)  Critically, however, American does not—nor could it in good faith—plead the existence of horizontal agreements between Orbitz and the other (unidentified) travel agency subscribers.  The FAC does not allege that Orbitz is a party to any other travel agent's subscriber agreement, that it participated in or otherwise influenced the negotiations or terms of such agreements, or that Orbitz in anyway conspired or agreed with other travel agents to require particular terms or conditions in their various subscriber agreements with Travelport.

American thus purports to plead a "rimless wheel" conspiracy, whereby various defendants enter into separate agreements with a common defendant, but have no connection with one another other than the common defendant's involvement in each transaction.[4]  *See*, *e.g.*, *Precision Assocs. v. Panalpina World Transp.*, 2011 U.S. Dist. LEXIS 51330 (E.D.N.Y. Jan. 4, 2011).  However, in the absence of horizontal conspiracy allegations among the spokes (here, Orbitz and the other travel agents), there is no basis for aggregating the market shares from the separate travel agents' agreements to plead a Sherman Act claim against Orbitz.  *See id.* at *99-

---

[4]  A "rimless wheel" involves a "hub" (here, Travelport) entering into a series of agreements with unrelated "spokes" (here, various travel agents).  Where a horizontal agreement (or "rim") among the spokes exists, the hub and all of the spokes may be jointly liable for the overarching "hub-and-spoke" conspiracy.  *See, e.g.*, *Toys 'R' Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000); *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 733 (D. Md. 2001).  In contrast, as *Dickson* recognized, "[a] rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction."  309 F.3d at 203.

100; *Dickson*, 309 F.3d at 203-204 (finding that "a wheel without a rim is not a single conspiracy," and thus the agreements must be evaluated individually); *Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008) (affirming dismissal where plaintiff identified the hub as Anthem and independent insurance agents as spokes, but failed to allege any agreements among the competing agents that could constitute a rim); *Columbus Drywall & Insulation Inc. v. Masco Corp.*, 2009 U.S. Dist. LEXIS 30937, at *56-57 (N.D. Ga. Feb. 9, 2009) (dismissing Sherman Act claims because there was no basis for considering the combined effects of multiple vertical agreements between a large insulation contractor and various fiberglass insulation manufacturers in the absence of concerted action among the individual manufacturers); *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 2008 U.S. Dist. LEXIS 63913, at *52-54 (S.D. W.Va. Aug. 19, 2008) (same); *accord PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 419-420 (5th Cir. 2010) (where there was no allegation of "an agreement among retailers to implement the [retail price maintenance] policy" from their separate agreements with a defendant wholesaler, "there is no wheel and therefore no hub-and-spoke conspiracy, and that allegation was properly dismissed").  An illustration below demonstrates the distinction:



6

In short, American's request that the Court aggregate a rimless hub-and-spoke conspiracy is without support.  Indeed, the sole case American cites, *Omega Envt'l. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-1164 (9th Cir. 1997), provides no authority for its argument.  (Opp. at 13.)  In *Gilbarco*, the Ninth Circuit considered the combined foreclosure of Gilbarco's *own contracts* with various distributors to determine its market share, ultimately finding that a 38% market foreclosure was not sufficient to support a Sherman Act claim.  It did not hold or suggest that an individual distributor (or spoke) in an alleged rimless wheel conspiracy was liable for the cumulative foreclosure of Gilbarco's (the hub) agreements with other, unrelated spokes.

American provides no authority for basing its claims against Orbitz on the aggregated market shares of all other travel agents that have deals with Travelport, when there is no alleged agreement—express, tacit, or otherwise—between or among them.[5]  And as even American concedes, without aggregation the FAC's antitrust claims against Orbitz cannot survive.

**B.     The FAC's Claims Against Orbitz Should Be Dismissed for the Independent Reason That They Are Precluded Under *Copperweld***

Dismissal of the Sherman Act claims against Orbitz is also warranted because Orbitz and Travelport were not separate economic actors when the SSA was formed.  It is axiomatic that a parent and its wholly owned subsidiary are incapable of conspiring as a matter of law.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984); *Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1015 (5th Cir. 1984).  "Indeed, the very notion of an 'agreement' in Sherman Act terms between a parent and a wholly owned subsidiary lacks meaning."

---

[5]     Although the question of whether Travelport may be liable for any cumulative foreclosure from its own agreements with various other travel agencies is not at issue here, it bears noting that even Travelport's entire 30% market share, (*see* FAC at ¶ 3), is on the very fringe of what courts consider sufficient for a Sherman Act claim.  *See, e.g., Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (30-40% minimum foreclosure rate required for violation; "low numbers make dismissal easy"); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (40-50% required); *Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1143 (D. Minn. 1999) ("at least 30 percent to 40 percent" required).

*Copperweld*, 467 U.S. at 771.  Here, it is undisputed that the SSA was entered into when Orbitz was a wholly owned subsidiary of Travelport.  (*See* Mot. at 17 (citing OWW APX 7-37).)

American's response to this dispositive fact is misdirection.  First, it makes the inapposite argument that, "outside the context of wholly owned subsidiaries," the Supreme Court's *American Needle, Inc. v. National Football League* ruling requires a fact-intensive inquiry into the competitive realities of an agreement between separate economic actors.  (Opp. at 5-6.) *American Needle* concerned a joint venture by horizontal competitors to sell their intellectual property.  130 S. Ct. 2201, 2208 (2010).  The NFL teams at issue are not and never were members of a corporate family—much less a parent and wholly owned subsidiary.  The Supreme Court acknowledged this distinction, and *reaffirmed* the *Copperweld* holding applicable here: "Considering it 'perfectly plain that an internal agreement to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police,' we held that a parent corporation and its wholly owned subsidiary 'are incapable of conspiring with each other for purposes of § 1 of the Sherman Act.'"  *Id.* at 2221 (citing, among other cases, *Copperweld*). American's attendant requests for discovery to determine "control," and its reliance on Orbitz's Articles of Incorporation, (*see id.*), are irrelevant because they do not change the fact that the SSA was formed and executed when Orbitz was wholly owned by Travelport.  *See, e.g., Rio Grande Royalty Co. v. Energy Transfer Ptnrs., L.P.*, 2009 U.S. Dist. LEXIS 126696, at *21-23 (S.D. Tex. Mar. 25, 2009) (dismissing Sherman Act claims after finding, through a review of the defendants' corporate relationships, including public SEC filings, that the alleged conspirators were part of a single corporate family during execution of the challenged contracts).

American's second argument is that "Orbitz conveniently ignores" a November 2010 agreement, referenced in a single paragraph of the 165 paragraph FAC, whereby Travelport agreed to compensate Orbitz for business losses caused by American's termination of Orbitz's ticketing authority.  (Opp. at 7-8 (citing FAC ¶ 101).)  Because this second agreement took place after Travelport partially divested its shares in Orbitz, but while Travelport and its affiliates still

owned a majority of Orbitz's stock (*see* Mot. at 18 (citing OWW APX 40-41)), American argues *Copperweld* does not apply and discovery on issues related to "control" is needed.  (Opp. at 7-8.)

Put differently, American now bases its claims on an agreement to offset Orbitz's losses caused by American's own decision to terminate Orbitz.  This strange antitrust theory cannot support a Sherman Act claim.  The November 2010 agreement was formed *after* American terminated its business relationship with Orbitz, at a time when Orbitz had no ability to sell tickets for American flights via Direct Connect, Travelport's GDS or otherwise.  It provides no additional foreclosure of the pleaded market to the SSA; indeed, American foreclosed itself from selling tickets through Orbitz during this time.  Accordingly, this agreement cannot provide American license to subject Orbitz to expensive discovery in support of a legally insufficient claim.

### C.     The Balance of the FAC's Allegations Relating to Some Vast Conspiracy to Monopolize the Distribution of Airline Tickets Fails Under *Twombly*

This antitrust case is primarily directed at GDS operators, Sabre and Travelport. American claims both GDSs are trying to monopolize separate, implausible markets for "[t]he provisions of airline booking services to [their respective] subscribers."  (FAC ¶¶ 68, 117-119.) For that reason, the majority of the FAC contains general allegations about GDS market power, the terms of American's own contracts with Sabre and Travelport, and actions taken by the two GDS operators.  None of these allegations relate to Orbitz, a single online travel agent, or implicate it in any conspiracy.

Despite references to "Orbitz's agreements" to conspire, American's opposition can identify only two bases for its claims against Orbitz:  the SSA and the November 2010 agreement, referenced in a single paragraph of the FAC.  There are no other agreements. Because the pleaded agreements could have resulted in, at most, a *three percent* market foreclosure, they cannot support a Sherman Act claim as a matter of law.  The remaining generalized allegations that Orbitz and other travel agent subscribers "benefit" from booking fees

collected by the GDSs, simply do not meet the pleading standard required to implicate Orbitz in a some vast alleged conspiracy to monopolize the distribution of airline tickets.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (to survive dismissal, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face").

### III.  CONCLUSION

Because the legal defects in American's case are not something which further pleading could address, another amendment is futile.  Accordingly, Orbitz requests that the FAC's Third and Fourth Claims for Relief against it be dismissed without further leave to amend.

DATED:    July 20, 2011

Respectfully submitted,

s/ Christopher S. Yates
Christopher S. Yates (admitted *Pro Hac Vice*)
California State Bar No. 161273
Email:  Chris.Yates@lw.com

Daniel M. Wall (admitted *Pro Hac Vice*)
California State Bar No. 102580
Email:  Dan.Wall@lw.com

Brendan A. McShane (admitted *Pro Hac Vice*)
California State Bar No. 227501
Email:  Brendan.McShane@lw.com

**LATHAM & WATKINS** LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111-6538
Telephone:  (415) 391-0600
Facsimile:  (415) 395-8095

and

John J. Little
Texas State Bar No. 12424230
Email:  jlittle@lpf-law.com
Stephen G. Gleboff
Texas State Bar No. 08024500
Email:  stevegleboff@lpf-law.com
Megan K. Dredla
Texas State Bar No. 24050530
Email:  mdredla@lpf-law.com

**LITTLE PEDERSEN FANKHAUSER** LLP
901 Main Street, Suite 4110
Dallas, TX  75202-3714
Telephone:  (214) 573-2300
Facsimile:  (214) 573-2323

**ATTORNEYS FOR DEFENDANT
ORBITZ WORLDWIDE, LLC**

## <u>CERTIFICATE OF SERVICE</u>

On July 20, 2011, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, Fort Worth Division, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

<u>s/ Christopher S. Yates</u>
Christopher S. Yates