IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

AMERICAN AIRLINES, INC.          §
                                 §
VS.                              §   CIVIL ACTION NO. 4:11-CV-244-Y
                                 §
TRAVELPORT LIMITED, et al.       §

ORDER REGARDING MOTIONS TO
DISMISS AND MOTION FOR LEAVE TO AMEND

Before the Court are three motions to dismiss: one filed by defendant Orbitz Worldwide, LLC ("Orbitz") (doc. 77); another by defendants Travelport Limited and Travelport, LP (collectively, "Travelport") (doc. 85); and the final one by defendants Sabre Inc., Sabre Holdings Corporation, and Sabre Travel International Limited (collectively, "Sabre") (doc. 97). Also before the Court is the motion for leave to file a second amended complaint (doc. 148) filed by plaintiff American Airlines, Inc. ("American"). After review, the Court will grant Orbitz's motion to dismiss, grant in part and deny in part Travelport's motion to dismiss, grant in part and deny in part Sabre's motion to dismiss, and grant in part and deny in part American's motion for leave.[1]

I. Defendants' Motions to Dismiss

    A. Background

    Plaintiff American Airlines, Inc. ("American"), is a domestic

_____

    [1] Sabre requests oral argument. Because the Court is able to resolve the motions based on the parties' briefing, the Court DENIES this request.

and international airline that logs approximately 3500 departures each day. (Am. Compl. ¶ 19 (doc. 70).) Orbitz operates an online travel agency. (*Id.* ¶ 6.) Travelport and Sabre each operate global distribution systems ("GDSes"). (*Id.* ¶ 2.)

GDSes distribute airline fare, flight, and availability information to travel agents, enabling those travel agents to make reservations and issue tickets to travelers. (*Id.*) Airlines provide their information to GDSes and pay each GDS a booking fee for every reservation that is made through the GDS. (*Id.* ¶ 2, 6.) American pays Travelport and Sabre several million dollars in booking fees every year. (*Id.* ¶ 6.)

Five GDSes operate in the United States. (*Id.* ¶ 3.) Sabre controls the largest, which accounts for more than 60% of all airline ticket sales made by U.S.-based travel agencies. (*Id.*) Travelport controls three GDSes--Galileo, Apollo, and Worldspan-- which collectively account for over 30% of all airline ticket sales made by U.S.-based travel agencies. (*Id.*) The fifth GDS is Amadeus, whose operator is not a party to this lawsuit. (*Id.*) Over the past year, some $7 billion of American's sales were booked through Sabre and more than $2.7 billion were booked through Travelport GDSes. (*Id.*)

GDSes typically enter into long-term subscriber agreements with travel agents. (*Id.* ¶ 35.) Under the usual subscriber agreement, a travel agent receives a portion of a GDS's booking fee

2

when the agent makes a reservation through that GDS.  (*Id.*)  Using a GDS, a travel agent can conduct a single search for airline fare, flight, and availability information and review the search results in a single integrated display.  (*Id.*)  Subscribing to multiple GDSes often means additional costs and expenses for a travel agent by adding layers to the search process, requiring additional training costs, and complicating the travel agent's record-keeping systems.  (*Id.* at ¶ 38.)  Consequently, a travel agency typically subscribes to only a single GDS and uses software applications that interoperate with that GDS.  (*Id.*)

According to American, network airlines are dependent upon travel agencies to sell airline tickets to travelers.  (*Id.* ¶ 29.) Although the airlines sell some tickets directly to consumers through their websites, call centers, and ticket offices, the majority of the airlines' passenger revenues are generated by ticket sales through travel agencies.  (*Id.*)  These travel agencies include both traditional brick-and-mortar agencies and online agencies such as Orbitz.  (*Id.*)  Approximately 51% of American's passenger revenue is generated by sales through brick-and-mortar travel agencies, and approximately 10-15% is generated by sales through online agencies.  (*Id.*)

American further alleges that network airlines are dependent upon travel agents to reach business travelers in particular.  (*Id.* ¶ 30.)  Business travelers account for a disproportionately high

3

share of network airlines' revenues, including American's. (*Id.*) And according to American's complaint, less than 10% of business travel is booked through the internet. (*Id.* ¶ 31.)  Instead, most businesses contract with travel agencies to manage their employees' travel, resulting in virtually exclusive working relationships between business travelers and their travel agents. (*Id.* at ¶ 31.)

American contends that this landscape favors GDSes and disfavors airlines and consumers.  Broadly speaking, American alleges that, because consumers (particularly business travelers) rely heavily on travel agencies to purchase airline tickets, and because those travel agencies, in turn, rely almost exclusively on GDSes to book flights, airlines are dependent upon GDSes to reach travel agents and, ultimately, to sell tickets to consumers. (*Id.* ¶ 2.)  It is American's position that Sabre and Travelport each have monopoly power over American and that each of them has used its monopoly power to exclude competition in the relevant market and submarkets. (*Id.* ¶ 9.)  It is also American's position that Sabre and Travelport, along with Orbitz and other industry participants, "have engaged in a broad and unlawful multi-part anticompetitive scheme." (*Id.*)

This scheme, according to American, includes charging supracompetitive booking fees to airlines, entering into restrictive long-term contracts with travel agents, and imposing various anticompetitive contract terms upon airlines. (*Id.* ¶ 10.)

4

In addition, American alleges that Travelport and Sabre have retaliated against American for its development and implementation of "AA Direct Connect," a method of providing airline information and booking services directly to travel agents without having to go through GDSes. (*Id.* ¶¶ 8-9.) American contends that Travelport and Sabre view AA Direct Connect as a threat to the vitality of the current GDS-dominated landscape. (*Id.*) Sabre's and Travelport's retaliatory actions, American alleges, include doubling American's booking fees on certain types of flight reservations and biasing American's flight information on their displays. (*Id.* ¶¶ 12-13.) Moreover, American alleges that the defendants' retaliatory practices have been directed not only at American, but also certain third-party software developers who have worked with American in developing non-GDS technologies to distribute flight information directly to travel agents. (*Id.* ¶ 13.) The result of the defendants' actions, argues American, ultimately affects United States consumers. (*Id.* ¶ 15.)

American's first amended complaint (doc. 70) asserts six claims for relief. Its claims one and two are against Sabre and Travelport, respectively, for their alleged "monopolization of the distribution of airline tickets" in violation of section 2 of the Sherman Antitrust Act, 15 U.S.C.A. § 2 (West 2011). (Am. Compl. ¶¶ 128-33.) American's third claim, also brought under section 2, is for "conspiracy to monopolize the distribution of airline

tickets through travel agents," and is directed at Travelport and Orbitz. (Am. Compl. ¶¶ 134-36.) American's fourth claim, which addresses all defendants, alleges that they entered into agreements that unreasonably restrain competition in violation of section 1 of the Sherman Act, 15 U.S.C.A. § 1. (Am. Compl. ¶¶ 137-42.) American's fifth claim is against Travelport for tortious interference "with existing and prospective contractual relationships." (Am. Compl. ¶¶ 143-51.) And similarly, American's sixth and final claim is asserted against Sabre and Travelport for tortious interference "with existing contractual relationships." (Am. Compl. ¶¶ 152-57.) All defendants now seek dismissal of American's amended complaint under Federal Rule of Civil Procedure 12(b)(6).

B. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint that fails "to state a claim upon which relief can be granted." This rule must be interpreted in conjunction with Rule 8(a), which sets forth the requirements for pleading a claim for relief in federal court. Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) (holding that Rule 8(a)'s simplified pleading standard applies to most civil actions). The Court must accept as true all well-pleaded, non-conclusory

allegations in the complaint and liberally construe the complaint in favor of the plaintiff. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).

The plaintiff must, however, plead specific facts, not mere conclusory allegations, to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). Indeed, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," and his "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 555 (2007) (citations omitted). The Court need not credit bare conclusory allegations or "a formulaic recitation of the elements of a cause of action." *Id.* at 1955. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

C.  Analysis of American's Section 2 Claims

"Section 2 of the Sherman Antitrust Act provides a cause of action against 'single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize.'" *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 315 (5th Cir. 2000) (quoting

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993)).[2]
Thus, section 2 denounces three actions: (1) actual monopolization,
(2) attempted monopolization, and (3) conspiracy to monopolize.
*Geddie v. Seaton*, No. 3:06-CV-0895-R, 2006 WL 2263335, at *5 (N.D.
Tex. Aug. 8, 2006) (Buchmeyer, J.) (citing 15 U.S.C.A. § 2; *N.
Miss. Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir.
1986)).   As previously noted, in its first amended complaint
American asserts claims for actual monopolization and conspiracy to
monopolize.

     1.   American's Monopolization Claims

       a.   Relevant Market and Submarkets

"The offense of monopoly under § 2 of the Sherman Act has two
elements: (1) the possession of monopoly power in the relevant
market and (2) the willful acquisition or maintenance of that power
as distinguished from growth or development as a consequence of a
superior product, business acumen, or historic accident." *Alcatel
USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 781 (5th Cir. 1999)
(quoting *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504
U.S. 451, 481 (1992)) (internal quotation marks omitted).   Thus, as

---

    [2]   Section 2 of the Sherman Act reads, in relevant part, as follows:

    Every person who shall monopolize, or attempt to monopolize, or
    combine or conspire with any other person or persons, to monopolize
    any part of the trade or commerce among the several States, or with
    foreign nations, shall be deemed guilty of a felony . . . .

15 U.S.C.A. § 2.

a preliminary matter, "the plaintiff must first establish the relevant product market." *Alcatel*, 166 F.3d at 781 (citation omitted).

"Whether a relevant market has been identified is usually a question of fact . . . ." *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) (citing *Seidenstein v. Nat'l Med. Enters., Inc.*, 769 F.2d 1100, 1106 (5th Cir. 1985)). A proffered relevant market is insufficient as a matter of law, however, "[w]here the plaintiff fails to define [the] market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Id.* (citations omitted).[3]

In the instant case, American defines the relevant product market as "[t]he distribution of airline fare, flight, and availability information and the provision of reservations and ticketing capability to travel agents." (Am Compl. ¶ 117.) The participants in this market ("the Market") include GDSes as well as

---

[3]  "'The cross-elasticity of demand for substitutes' measures consumers' propensity to switch from one product to another, similar product when relative prices change.  Products similar enough that a small relative price change causes consumers to substitute one for another are in the same market." *United Farmers Ass'n, Inc. v. Farmers Ins. Exchange*, 89 F.3d 233, 236 n.3 (5th Cir. 1996) (citations omitted) (internal quotation marks omitted).  Similarly, "'[i]nterchangeability' looks to the use or function of the given product as compared to other products.  Every product that can be substituted for the same use or purpose should be included within a single product market." *Intellective, Inc. v. Mass. Mut. Life. Ins. Co.*, 190 F. Supp. 2d 600, 610 (S.D.N.Y. 2002).

entities like American who seek to provide airline booking services to travel agents. None of the parties challenges that this is a plausible product market.[4]

American also alleges the existence of two relevant submarkets: (1) the provision of airline booking services to Sabre subscribers ("the Sabre submarket") and (2) the provision of airline booking services to Travelport subscribers ("the Travelport submarket"). (Am. Compl. ¶¶ 118-19.) Unlike the Market, Sabre and Travelport do challenge the plausibility of American's proffered submarkets. Sabre and Travelport argue that the submarkets fail to take into account cross-elasticity of demand as well as all reasonably-interchangeable substitutes. Moreover, Sabre and Travelport contend that the circumstances under which a single-brand market may serve as a relevant product market are limited to the type of circumstances present in *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451 (1992)--that is, where consumers are "locked in" to purchasing a particular aftermarket

---

[4] American's amended complaint alleges that "[e]ach country served by American in which Sabre or Travelport accounts for a substantial percentage of airline bookings is a relevant geographic market, including the United States, the United Kingdom, Belgium, and Switzerland." (Am. Compl. ¶ 120.) But in its response to Travelport's motion to dismiss, following a jurisdictional challenge from Travelport, American states that "the [amended complaint]'s allegations with respect to [Travelport]'s market share and conduct in certain foreign markets are not intended to demonstrate that [Travelport] has unlawfully monopolized those markets." (Pl.'s Resp. to Travelport's Mot. to Dismiss 16 (doc. 107).) Instead, says American, "the [amended complaint] alleges that Travelport used its monopoly power in those markets in order to quash [American]'s attempt to introduce competition to [Travelport]'s GDSs *in the United States*." (*Id.* at 16-17.) Thus, American's response clarifies that the geographical scope of its alleged product market and submarkets is limited to the United States.

product because of a lack of reasonably-interchangeable substitutes.

After review, the Court disagrees. First of all, American has described the submarkets in terms of reasonable interchangeability and cross-elasticity of demand. For example, American alleges that airlines cannot afford to forego access to any of the GDSes because each GDS controls access to a critical group of travel agents who, in turn, have access to a discrete set of business travelers. According to American, because the typical travel agent aligns with a particular GDS, and because it is cost-prohibitive for the travel agent to switch to a new GDS, an airline must participate in every GDS or risk losing a crippling amount of sales. American further alleges that, in light of the foregoing, each GDS can, and does, raise its booking fees to supracompetitive levels--without fear of losing revenue from airlines and without regard to the other GDSes' booking fees. In short, American alleges that one GDS is not a substitute for another and that each GDS therefore constitutes a separate submarket. This, in the Court's view, is sufficient to avoid dismissal under Rule 12.

Moreover, the Court is not persuaded that the circumstances present in *Kodak* are the sole circumstances under which a single-brand market may be plausible. The defendant in that case, Eastman Kodak Company ("Kodak"), manufactured and sold complex business machines requiring unique replacement parts. *Kodak*, 504 U.S. at

456-57.  The United States Supreme Court determined that "[b]ecause service and parts for Kodak equipment [were] not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective [was] composed of only those companies that service[d] Kodak machines."  *Id.* at 482. Stated differently, because Kodak equipment-owners were "locked-in" to purchasing Kodak's repair parts and services following their initial purchase of Kodak equipment, the plaintiffs had a triable claim that the Kodak parts and service markets were each relevant markets.  *Id.* at 481-83.

In rejecting Kodak's argument that a single brand could never be a relevant market, the Supreme Court noted that "proper market definition . . . can be determined only after a factual inquiry into the 'commercial realities' faced by consumers."  *Id.* at 482 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)).  And the commercial reality in *Kodak* was that there were no interchangeable substitutes for Kodak equipment parts.  *See id.* The Supreme Court's decision was thus driven by a recognition that market definition is a factual inquiry.  *See id.*  Nowhere in *Kodak* did the Supreme Court state that aftermarkets present the only circumstances under which a single-brand market may be plausible.[5]

---

[5] Earlier in the *Kodak* opinion, the Supreme Court observed that "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Kodak*, 504 U.S. at 466-67. The Supreme Court further observed that it "has preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular facts disclosed by the

To the contrary, the Supreme Court cited a number of its prior cases, some of which did not involve aftermarkets, that "support[ed] the proposition that in some instances one brand of a product can constitute a separate market." *Id.*[6]

In its amended complaint, American alleges facts that, if proven might show, or at least raise a factual dispute as to whether, a GDS's services are not interchangeable with those of

---

record." *Id.* at 467 (citations omitted) (internal quotation marks omitted). Thus, rather than label the Travelport and Sabre submarkets "single-brand markets" and dismissing them on the basis of that label, the Court is of the opinion that it must look to the commercial realities of the airline industry, as depicted in American's complaint.

[6] The Court notes that the instant case is distinguishable from *PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F.3d 412 (5th Cir. 2010), in which the Fifth Circuit affirmed a district court's rejection of the proffered market consisting of defendant's single brand of products. In that case, the Fifth Circuit noted that single-brand markets are appropriate only in "rare circumstances" and, indeed, even seemed to suggest that such circumstances were "limited to situations in which consumers are 'locked in' to a specific brand by the nature of the product." *Leegin*, 615 F.3d at 418. But the court's decision to reject the proffered single-brand market in that case was based on its finding that the plaintiff had failed to plead that there was a "structural barrier to the interchangeability of [the defendant's] products with goods produced by competing manufacturers." *Id.* The court did not reach its decision merely because a single-brand market was involved. *Id.* Here, American has alleged the existence of structural barriers to the interchangeability of the GDSes's respective services, as well as a number of other facts showing that GDSes are not substitutes for one another. Thus, *Leegin* is distinguishable.
    The instant case is also distinguishable from *United Farmers Agents Association v. Farmers Insurance Exchange*, 89 F.3d 233 (5th Cir. 1996), another case in which the Fifth Circuit rejected a proffered single-brand market. In that case, the Fifth Circuit found that the plaintiffs--insurance agents--had not alleged the existence of "a superior or unique insurance product that allow[ed] [defendant Farmers Insurance] to charge consumers more for policies or pay agents less for selling them." *Farmers*, 89 F.3d at 236. The *Farmers* court also found that the plaintiffs had "shown no evidence that new Farmers agents would face significant information or switching costs." *Id.* The court therefore concluded that the plaintiffs "ha[d] failed to give [it] any reason to view the market for electronic access to Farmers policy information as the relevant market." *Id.* In the instant case, by contrast, American has pleaded facts showing that the GDSes have unique power that enables them to charge airlines high booking fees. American has also alleged that the GDSes' power is maintained in part because of the significant switching costs that travel agents face. Thus, *Farmers* is distinguishable from the instant case.

another GDS.  Corroborating those allegations is another alleged fact: that all airlines participate in every GDS.  "The boundaries of . . . a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  *Apani*, 300 F.3d at 626 (quoting *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 980 (5th Cir. 1977)) (internal quotation marks omitted).  Sabre and Travelport may dispute that their travel-agent subscribers are "distinct customers" or that there is "industry or public recognition of [each of their submarkets] as a separate economic entity," but at the Rule 12 stage the Court must construe all factual allegations in favor of American.  *See Apani*, 300 F.3d at 628; *see also Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1348-49 (5th Cir. 1980) ("Relevant market is a question of fact, and findings concerning the market should be overturned on appeal only if clearly erroneous or where there is no evidence to support the finding below." (citation omitted)).

Therefore, because American has pleaded the Sabre and Travelport submarkets in a way that takes into account the rules of interchangeability and cross-elasticity of demand, and given the fact-intensive nature of the relevant-market inquiry, the Court

14

concludes that the Sabre and Travelport submarkets are sufficiently plausible to survive the defendants' challenges under Rule 12. *See In re Air Passenger Computer Reservs. Sys. Antitrust Litig.*, 649 F. Supp. 1443, 1459-60 (C.D. Cal. 1988) (holding that plaintiff-airline had created a dispute of fact as to whether Sabre (then owned by American) was "a separate service market" where the plaintiff-airline had produced "evidence that airlines view[ed] each [GDS] as offering a unique service: access to a particular set of travel agents").

### b.  Monopoly Power

Once a plaintiff alleging monopolization has successfully pleaded the relevant product market, his next hurdle is to plead facts showing that the defendant possesses monopoly power in that market. *See Stewart*, 200 F.3d at 315.  "Monopoly power is understood as 'the power to control price or exclude competition.'" *Id.* (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)).  It is undisputed that Travelport and Sabre possess monopoly power in the Travelport and Sabre submarkets, respectively.  Moreover, Sabre appears to concede, at least for purposes of its motion, that its alleged market share of over 60% of the Market is sufficient market power to support a claim for monopolization under section 2.

Travelport, on the other hand, contends that its alleged 34% share of the Market is, as a matter of law, too insubstantial to

15

constitute a monopoly.  And after review, the Court agrees.  It is a "widely accepted rule of thumb that while a 90 percent market share definitely is enough to constitute monopolization, 'it is doubtful whether 60 or 64 percent would be enough; and certainly, 33 percent is not.'"  *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984) (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945)). Furthermore, the "Supreme Court cases, as well as cases from [the Fifth Circuit], suggest that absent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization."  *Id.* (collecting cases). "[L]ow market shares, if undisputed, make monopolization an impossibility as a matter of law."  *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 529 (5th Cir. 1982).  Accordingly, American has failed to state a claim against Travelport for monopolization of the Market.

### c.  Exclusionary Conduct

As previously noted, the second element of a monopolization claim is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Alcatel*, 166 F.3d at 781.  In analyzing whether this sort of exclusionary conduct has occurred, courts consider "the proffered business justification for the act.  If the conduct has no rational

16

business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported." *Stearns v. Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999) (citing *Aspen Skiing Co. v. Aspen Highlands*, 472 U.S. 585, 608 (1985)).

In its amended complaint, American alleges that Sabre and Travelport "impose anticompetitive terms and conditions on airlines that participate in their GDSs." (Am. Compl. ¶ 49.) As an example, American points to section 2.1 of the Preferred Fares Amendment ("PFA"), entered into between American and one of Travelport's predecessors-in-interest.[7] The PFA includes a "full-content" provision requiring American to make flight-related content available to Travelport "at levels and amounts that are at least as favorable to [Travelport] as those upon which American makes the same types of [content] available through any other GDS or distribution channel." (Am. Compl. ¶ 52.) According to American, terms like this stifle innovation in the provision of

---

[7] Travelport contends that American's claims are based on the "content parity" provision of the PFA, which was executed in 2006, and are barred by the Sherman Act's four-year statute of limitations. 15 U.S.C.A. § 15b. In response, American insists that its claims based on the PFA are preserved by the continuing-violation theory and that, even if they are not, American can use those allegations as proof that Travelport is liable for monopolization during the limitations period. In the Court's view, the applicable statute of limitations does not bar American's PFA-related allegations. American's monopolization claims are not based heavily on the PFA; rather American simply points to the PFA as an example of what it considers a larger continuing effort by Travelport to exclude competition in the Travelport submarket. Therefore, although ultimately American will only be able to recover damages incurred as a result of acts committed during the limitations period, American may rely on its PFA-related allegations to establish that Travelport is liable for monopolization. *See Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1034-35 (5th Cir. 1977).

booking services because they "prevent participating airlines from encouraging travel agents or consumers to use alternative, less-costly, distribution channels by making certain content available only through those channels." (Am. Compl. ¶ 54.) As another example, American points to a term in one of its contracts with Sabre that allegedly limits its ability to market AA Direct Connect to Sabre subscribers. (Am. Compl. ¶ 61.)

Moreover, American alleges that it is forced to accept the defendants' desired contract terms. For one thing, says American, Sabre and Travelport stagger the expiration dates of their contracts with airlines to place the airlines at a bargaining disadvantage when negotiating over new contract terms. According to American, an airline has less leverage in negotiations when it knows that its competitors have already accepted the GDS's terms in their contracts. Further, American asserts that because it is financially dependent upon Travelport and Sabre for access to their travel agents, it has little choice but to accept the GDSes' desired terms.

In addition to imposing anticompetitive contract terms on airlines, American's amended complaint alleges that Sabre and Travelport include anticompetitive terms in their subscriber agreements with travel agents. These contracts, according to American, are typically long-term--often three years but sometimes longer--and in many cases require the contracting travel agent to

18

align exclusively with the contracting GDS. American alleges that these contracts, when combined with other market realities, make it difficult for travel agents to switch GDSes and for airlines to provide flight information directly to the travel agents.

American also alleges that Sabre and Travelport have taken a number of retaliatory actions against American in response to American's efforts to develop alternative channels of providing booking services. These retaliatory practices include raising certain booking fees and biasing against American's flight and fare content in their displays, which is, according to American, economically irrational. American alleges that display bias is "inconsistent with a competitor seeking to obtain the highest number of bookings." (Am. Compl ¶ 107.)

Sabre's and Travelport's retaliatory practices, American alleges, have been directed at not only American, but also certain third-party software developers who have worked with American in developing non-GDS technologies to distribute flight information directly to travel agents. For example, American alleges that Sabre terminated its developer agreement with Farelogix, a third-party technology provider, as a result of Farelogix's efforts at helping airlines, including American, establish direct connections with travel agents.

Sabre and Travelport contend that these allegations do not describe actions that are offensive to the Sherman Act. Sabre

insists that its contractual arrangements with airlines--specifically its inclusion of most-favored-nation provisions, staggered contract-termination dates, and restrictions on American's promotion of AA Direct Connect--are perfectly kosher under the antitrust laws, as are its contracts with travel agents. While the factfinder may eventually find otherwise, at this stage of the litigation the Court is simply not able to say that the aforementioned allegations are, as a matter of law, insufficient to support a monopolization claim under section 2.[8]

### 2. American's Conspiracy-to-Monopolize Claims

"A conspiracy to monopolize can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *Stewart*, 200 F.3d at 316 (quoting *N. Miss. Commc'ns*, 792 F.2d at 1335) (internal quotation marks omitted). In their motions to dismiss, Travelport and Orbitz collectively challenge elements two and four.

---

[8] Sabre and Travelport also point out that they have no duty to assist competitors. They contend that any refusal on their part to deal with third party providers such as Farelogix is not offensive to the antitrust laws. But the sum of American's allegations is not that Sabre and Travelport have declined to assist competitors; it is that they have taken actions intended to destroy competition in the Market and the relevant submarkets. For example, American alleges that Sabre terminated its developer agreement with Farelogix after Farelogix worked with American on developing AA Direct Connect. According to American, Sabre's actions were intended to stifle innovation and competition in the airline flight-booking industry.

a.   Existence of Combination or Conspiracy

i.   Conspiracy Between Orbitz and Travelport

Under *Copperweld Corporation v. Independence Tube Corporation*, 467 U.S. 752 (1984), and its progeny, a parent and its wholly-owned subsidiary are treated as a single enterprise and are legally incapable of conspiring for purposes of the Sherman Act.[9]  This rule also applies to sibling companies owned by the same parent company.  *See Hood v. Tenneco Tex. Life Ins. Co.*, 739 F.2d 1012, 1015 (5th Cir. 1984).  Orbitz contends that American's conspiracy claim fails because it is based largely on the subscriber service agreement ("SSA"), which was executed when Orbitz was wholly owned by Travelport.  In addition, Orbitz and Travelport argue that, even though Travelport no longer wholly owns Orbitz, they still cannot conspire with one another because they are under common ownership.

Initially, the Court notes that, as American points out in its response, the SSA is not the only agreement between Travelport and Orbitz challenged in the amended complaint.  American also alleges that Travelport and Orbitz entered into an agreement ("the Orbitz-Travelport compensation agreement") by which "Travelport agreed to pay Orbitz significant monetary consideration to offset any lost profits that resulted from American's termination of Orbitz's

---

[9] Although *Copperweld* birthed this rule in the context of a section 1 claim, the rule covers section 2 conspiracy cases as well.  *See Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*, 17 F. Supp. 2d 649, 657 (E.D. Tex. 1998).  The parties appear to agree on this.

ticketing authority--**conditioned only on Orbitz'[s] continued refusal to adopt AA Direct Connect**." (Am. Compl. ¶ 101.) And it can reasonably be inferred from the amended complaint that Travelport no longer wholly owned Orbitz because, according to the complaint, the Orbitz-Travelport compensation agreement was executed after a "partial divestiture" of Travelport's ownership of Orbitz. (Am Compl. ¶¶ 91, 101.).[10] Orbitz seems to acknowledge as much in its reply, noting that the Orbitz-Travelport compensation agreement "took place after Travelport partially divested its shares in Orbitz, but while Travelport and its affiliates still owned a majority of Orbitz's stock." (Orbitz Reply 8-9.)

Thus, because the Orbitz-Travelport compensation agreement was executed when Travelport did not wholly own Orbitz, the fact that Orbitz was wholly owned by Travelport at the time of the SSA does not dispose of American's conspiracy claims. And although Orbitz and Travelport contend they are currently under common ownership, this is simply not what American alleges. Rather, according to American, Travelport owns a 48% interest in Orbitz. Additionally, American argues that the corporate ownership structure between Orbitz and Travelport is complex and requires additional discovery to fully resolve.

---

[10] Admittedly, it is difficult to discern from American's amended complaint the precise timing of Orbitz's ownership changes. But the Court must draw all reasonable inferences in American's favor. *See Kaiser Aluminum*, 677 F.2d at 1050.

The Court agrees with American that it is American's factual perspective on the Travelport-Orbitz corporate relationship that matters at this stage. The relevant inquiry is thus whether Travelport's 48% ownership of Orbitz precludes the possibility of a conspiracy. And, in the Court's view, it does not. *Copperweld* does not, by its terms, apply to situations involving partially-owned subsidiaries, and neither Orbitz nor Travelport has offered any cases suggesting that it should. *See Free v. Abbott Labs., Inc.*, 176 F.3d 298, 299-300 (5th Cir. 1999). Moreover, American's allegations, broadly viewed, paint a picture of Orbitz and Travelport as "separate economic actors pursuing separate economic interests." *Am. Needle, Inc. v. Nat'l Football League*, 130 S. Ct. 2201, 2212 (2010) (quoting *Copperweld*, 467 U.S. at 769) (internal quotation marks omitted). Therefore, because American's amended complaint alleges the existence of an agreement entered into between Orbitz and Travelport when they were neither wholly owned by one another nor sibling companies, and because American describes those two companies as separate economic actors, the Court concludes that *Copperweld* does not preclude a determination that Orbitz and Travelport can conspire.

### ii. Conspiracy Involving "Unnamed Industry Participants"

American's complaint purports to allege a conspiracy between "Travelport, Orbitz, and other unnamed industry participants," presumably travel agents. (Am. Compl. ¶ 135.) Travelport contends

23

that American's allegations concerning the involvement of unnamed industry participants fall short of plausibility. Similarly, Orbitz contends that American has failed to sufficiently plead Orbitz's involvement in a larger conspiracy beyond its agreements with Travelport.

After review, the Court agrees. First of all, American has not alleged any specific relationships between Orbitz and other travel agents or competitors. Consequently, American has not alleged any horizontal conspiracies involving Orbitz. *See Spectators' Commc'n Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001) (defining a horizontal conspiracy "a conspiracy between competitors," as opposed to "a vertical conspiracy between firms at different levels"). Instead, what American has essentially alleged are discrete vertical conspiracies between Travelport and individual travel agents, such as Orbitz. *See id.; see also Jayco Sys., Inc. v. Savin Business Machines Corp.*, 777 F.2d 306, 317 n.40 ("Vertical agreements are those among persons at different levels of the market structure--i.e., among a manufacturer and its distributors--in contra-distinction to horizontal agreements among competitors at the same level of the market structure--i.e., among manufacturers or distributors." (citation omitted) (internal quotation marks omitted)).

But because a conspiracy necessarily involves an agreement between at least two parties, for each of the vertical conspiracies

to survive a Rule 12 challenge, American must identify at least one other participant, along with Travelport, in each instance. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974 (11th Cir. 1985) (affirming dismissal of Sherman Act conspiracy claim where "the specific participants of the conspiracy [were] not even identified"); *In re Refined Petroleum Prods. Antitrust Litig.*, 649 F. Supp. 2d 572, 580 (S.D. Tex. 2009) ("A conspiracy cannot be formed unless at least two separate persons or corporations reach an agreement or understanding." (quoting Fifth Circuit Pattern Jury Instruction (Civil) § 6.1 (2006))); *see also Fuentes v. South Hills Cardiology*, 946 F.2d 196, 202 (3d Cir. 1991) (determining that "allegations identifying the conspiracy's participants, purpose[,] and motive are sufficient to survive a motion to dismiss"); *Geddie*, 2006 WL 2263335, at *8 (noting that a defendant "cannot engage in a conspiracy by himself"); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 417 (S.D.N.Y. 2003) ("The complaint must identify the co-conspirators, and describe the nature and effects of the alleged conspiracy." (citation omitted) (internal quotation marks omitted))).

For this reason, American's broad allegations of a conspiracy involving unnamed industry participants will not suffice. *See Fort Wayne Telsat v. Entm't & Sports Programming Network*, 753 F. Supp. 109 (S.D.N.Y. 1990) (dismissing Sherman Act claim alleging a conspiracy between defendant ESPN and "certain unnamed cable

operators"). Thus, the only conspiracy that American has properly pleaded involves the Orbitz-Travelport compensation agreement. No other section 2 conspiracies have been properly pleaded.[11]

>    b.   Effect Upon a Substantial Amount of Commerce

Orbitz also contends that American has not pleaded facts showing that Orbitz and Travelport's alleged conspiracy had an effect on a substantial amount of interstate commerce. Orbitz's theory is that the primary tie between itself and Travelport alleged in the amended complaint--the SSA--does not foreclose a sufficient share of the market to support a conspiracy-to-monopolize claim. As the Court has already noted, however, American has adequately pleaded a second agreement between Orbitz and Travelport: the Orbitz-Travelport compensation agreement.

But as a result of either agreement, American loses access to Orbitz--that is all.[12] And American's complaint does not provide

---

[11] In its response brief, American purports to explain "why GDS and their travel agency subscribers, including Orbitz, share a common economic interest in preserving the GDSs' [alleged] monopoly positions." (American's Resp. to Orbitz's Mot. to Dismiss 8.) But American also alleges that Orbitz's agreements with [Travelport] were not in fact rational or part of a competitive business strategy." (*Id.* at 10.) These two statements, in the Court's view, seem to contradict one another. It is unclear to the Court how Orbitz's contracts can accurately reflect a shared economic interest with Travelport and, at the same time, lack any rational justification or connection to Orbitz's business strategy. Thus, even assuming American had adequately alleged an industry-wide conspiracy, the Court is not persuaded that the motive behind such a conspiracy is evident from the amended complaint.

[12] American contends that, for purposes of its conspiracy claims, the Court should aggregate the effects of Travelport's agreements with Orbitz and the effects of Travelport's agreements with other travel-agent subscribers. This argument, however, presumes that American had properly pleaded a conspiracy among Travelport, Orbitz, and its other travel-agent subscribers. And as previously noted, American has not adequately alleged such a conspiracy.

any information concerning what share of the market Orbitz holds, aside from its allegation that Orbitz is the third-largest online travel agency in the United States.  Without more, the Court cannot discern whether the amount of commerce affected by the alleged Orbitz-Travelport conspiracy is substantial.  Given that online travel agencies account for only 10-15% of American's passenger revenue, however, it is reasonable to infer that Orbitz's market share is quite low.  Therefore, in the Court's view, American has failed to plead facts showing that the alleged Orbitz-Travelport conspiracy had an effect on a substantial amount of commerce.  *See Stewart*, 200 F.3d at 315 ("A conspiracy to monopolize can be established only by proof of . . . an effect upon a **substantial** amount of interstate commerce." (quoting *N. Miss. Commc'ns*, 792 F.2d at 1335) (emphasis added)(internal quotation marks omitted)).

D.  Analysis of American's Section 1 Claims

"To establish a § 1 violation, a plaintiff must prove that: (1) the defendants engaged in a conspiracy; (2) that restrained trade; (3) in the relevant market." *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (citing *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir.

---

Moreover, even assuming American had sufficiently pleaded the existence of several discrete vertical conspiracies, the effects of each agreement would have to be considered individually, not in the aggregate.  "Indeed, to hold otherwise would be to suggest that the distinction between a single conspiracy and multiple conspiracies involving a common defendant is one without a difference." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002).

2002)).[13]   In addition, "antitrust plaintiffs must prove they have suffered an injury stemming from the complained-of anti-competitive behavior."  *Stewart*, 200 F.3d at 312 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986)).[14]

But as a threshold matter, courts apply a "market-power screen" to section 1 claims, dismissing claims against defendants who are not alleged to have significant market power.  *See Leegin*, 615 F.3d at 418.  Travelport contends that American has failed to allege that it has sufficient market power in the Market to support a section 1 claim.  Market power and monopoly power, however, are not the same thing.  *See Dimmitt*, 679 F.2d at 529.  And as the United States Court of Appeals for the Fifth Circuit has noted, "[s]ome circuit courts have used 30% as a rough benchmark for the

---

[13]  Section 1 states, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1.

[14]  "Once a plaintiff establishes that a conspiracy occurred, whether it violates § 1 is determined by the application of either the *per se* rule or the rule of reason." *Golden Bridge*, 547 F.3d at 271 (citing *Spectators' Commc'n Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 222-23 (5th Cir. 2001)). Should "the court determine[] that the defendant's conduct 'would always or almost always tend to restrict competition and decrease output,' the restraint is *per se* illegal and no further inquiry occurs." *GoldenBridge*, 547 F.3d at 271 (citing *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)). But "if the conduct is not deemed *per se* unreasonable, the plaintiff will also have to prove that the conduct unreasonably restrains trade in light of actual market forces under the rule of reason." *Golden Bridge*, 547 F.3d at 271 (citing *Leegin*, 551 U.S. at 886). Most cases will require analysis under the rule of reason. *See N. Tex. Specialty Physicians v. F.T.C.*, 528 F.3d 346, 360 (5th Cir. 2008) (noting that the Supreme Court "has analyzed most restraints under the so-called rule of reason" (footnote omitted) (internal quotation marks omitted)).
    American does not allege that the defendants' activities are *per se* illegal under section 1. Moreover, American's complaint pleads only vertical agreements, which are analyzed under the rule of reason. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007).

minimum amount of market power necessary to give rise to a *per se* violation of antitrust law." *Breaux Bros. Farms, Inc. v. Teche Sugar Co., Inc.*, 21 F.3d 83, 87 (5th Cir. 1994).  Although American's section 1 claims do not give rise to *per-se* violations, the Court sees no reason why the 30% threshold would not be sufficient in the context of section 1 rule-of-reason analysis. Thus, the 34% market share that Travelport allegedly holds in the Market is, in the Court's view, sufficient to survive the market-power screen.

Turning to the first element, Travelport and Orbitz contend, as they did with American's section 2 conspiracy-to-monopolize claims, that American has not adequately alleged the existence of a conspiracy.  As the Court previously noted, American has sufficiently pleaded a conspiracy between Orbitz and Travelport in the form of the Orbitz-Travelport compensation agreement, but has not sufficiently pleaded Orbitz's involvement in any broader conspiracy beyond its agreement with Travelport.

With regard to element two, Sabre contends, as it did before, that its contracts with travel agents and airlines are not anticompetitive and thus do not unreasonably restrain trade.  But as the Court previously concluded, it is not prepared to say that Sabre's alleged conduct is not anti-competitive as a matter of

law.[15]  In addition, Sabre, Travelport, and Orbitz all contend that
American has not alleged an unreasonable restraint on trade because
it has not stated that their allegedly anticompetitive agreements
and practices foreclosed a substantial share of the relevant market
and submarkets.[16]  Collectively, the defendants argue that American
must allege some percentage of foreclosure or at least identify the
specific agreements that allegedly restrain trade.

The Court agrees.  First, with regard to Sabre, because a
single defendant cannot unilaterally violate section 1, American
must allege that a particular conspiracy involving Sabre and at
least one other entity forecloses a substantial share of the

---

[15]  Sabre also contends that American cannot challenge its own contracts
because American is equally responsible for any antitrust violation that occurs
as a result of its contracts.  In *Perma Life Mufflers, Inc. v. International
Parts Corporation*, 392 U.S. 134, 140 (1968), *overruled on other grounds by
Copperweld*, 467 U.S. at 777, the Supreme Court held that the doctrine of *in pari
delicto* is not a defense to an antitrust action.  The Court, however, left open
the question of whether a plaintiff could be barred from recovering against a
defendant on the basis of the plaintiff's "truly complete involvement and
participation in a monopolistic scheme."  *Perma*, 392 U.S. at 140.
    The first amended complaint, which the Court must take as true, does not
paint the picture of American as a coparticipant in the alleged industry-wide
conspiracy.  Thus, for purposes of this motion, American lacks any "truly
complete involvement [or] participation in a monopolistic scheme," and Sabre
cannot avail itself of the defense of *in pari delicto*.  *Id.*  The implication of
American's lack of involvement in a Sabre-related conspiracy, however, is that
American cannot rely on its own contracts with Sabre to establish a section 1
violation because Sabre cannot be unilaterally liable under section 1.  *See Metro
Ford*, 145 F.3d at 325 ("Independent action is not proscribed [by section 1].").

[16]  As it did with its section 2 conspiracy-to-monopolize claims, American
contends that, for purposes of its section 1 claims, the Court should aggregate
the effects of Travelport's agreements with Orbitz and the effects of
Travelport's agreements with other travel-agent subscribers.  As previously
noted, this argument fails because American has not adequately pleaded a
conspiracy among Travelport, Orbitz, and its other travel-agent subscribers and
because the effects of each alleged vertical agreement between Travelport and
each of its  subscribers must be considered individually, not in the aggregate.
*See supra* note 12.

market.  *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) ("[T]he competition foreclosed by the contract must be found to constitute a substantial share of the relevant market."); *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, (5th Cir. 1998) ("Independent action is not proscribed.  Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of a combination or agreement. Thus, the distinction between independent action and joint action is fundamental in antitrust jurisprudence, and a claim will not exist in the absence of the latter." (footnotes omitted) (internal quotation marks omitted)).

Although American's complaint describes the various types of agreements that Sabre allegedly enters into with its travel-agent subscribers,[17] American does not identify any particular agreement that it is challenging under section 1.  Nor does it identify the specific travel agents involved with Sabre or what types of agreements the travel agents have entered into.  Without information of this nature, the Court cannot assess whether a

---

[17]  For example, American alleges that "[b]oth Sabre and Travelport enter into long term contracts with travel agents, typically three years but sometimes longer.  Most of these contracts include some type of provision that either requires or provides financial incentives for the travel agents to use one GDS exclusively, or nearly exclusively."  (Am. Compl. ¶ 63.)  In addition, elsewhere American alleges that "[s]ome agreements between the GDSs and their subscribers contain an express provision that requires the travel agent to use one GDS exclusively, either for all its bookings or for bookings at particular locations or for particular corporate customers."  (*Id.* ¶ 65.)

substantial share of the market has been foreclosed.[18]

The Court, after all, cannot conclude that a substantial share of the Market or Sabre submarket has been foreclosed simply by considering the level of foreclosure that would result from a broad conspiracy involving Sabre and all its travel agents.  American has not alleged any relationships among Sabre's travel agents, aside from conclusory allegations such as this one:  "Sabre, Travelport, Orbitz, and other industry participants have, in fact, stood 'shoulder to shoulder' in punishing American for promoting the use of technology that could disrupt their monopolistic distribution system." (Am. Compl. ¶ 88.)  Instead, American has essentially pleaded several discrete conspiracies, each of which involves Sabre and an unnamed travel agent.  And without identifying the specific travel agents involved, or at least providing some information about the travel agents' agreements with Sabre, American cannot successfully aver that a substantial share of the market has been foreclosed with each conspiracy.[19]

---

[18]  To illustrate, consider a scenario in which "Travel Agency A" has a market share of 3% and "Travel Agency B" has a market share of 45%.  A conspiracy involving Sabre and Travel Agency A would not foreclose a substantial share of the market, whereas a conspiracy between Sabre and Travel Agency B likely would.

[19]  The Court notes that American's failure to identify Sabre's coconspirators and to point to a specific agreement involving Sabre not only means that American has failed to plead foreclosure of a substantial share of the market (element two), it also means that American has failed to adequately allege a conspiracy involving Sabre in the first place (element one).  The Court did not address this in its discussion of element one (i.e., the existence of a conspiracy), however, because Sabre did not raise it.  Morever, in evaluating whether substantial foreclosure has occurred, the Court cannot aggregate the effects of Sabre's agreements with its travel agents for the reasons set forth

With regard to the Orbitz-Travelport conspiracy, the Court concludes that just as American failed to plead facts indicating whether the conspiracy affected a substantial amount of commerce, it likewise has failed to allege facts indicating that a substantial share of the market has been foreclosed. *See Stitt Spark Plug Co. v. Champion Spark Plug Co.*, 840 F.2d 1253 (5th Cir. 1988) ("[Plaintiff] did not prove the extent of its foreclosure from the replacement market; [Plaintiff] offered no comparison between the number of distribution outlets available and the number of those foreclosed. Without more, no reasonable jury could have concluded that [Defendant]'s efforts foreclosed a 'substantial share of the relevant market.'" (citing *Tampa*, 365 U.S. at 328-29)); *see also Apani*, 300 F.3d at 625 (To show exclusive dealing, "a plaintiff must show that the competition foreclosed by the arrangement constitutes a substantial share of the relevant market. That is, the opportunities for other traders to enter into or remain in that market must be significantly limited." (citations omitted) (internal quotation marks omitted)). And, once again, considering that it is alleged that online travel agencies only account for 10-15% of American's revenues, it is reasonable to infer that whatever share of the market that the Orbitz-Travelport conspiracy is alleged to foreclose is insubstantial.

E.   Analysis American's State-Law Claims

in footnote 12.  *See supra* note 12.

Sabre and Travelport contend that American's claims for tortious interference with existing and prospective contractual relationships are preempted by the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b)(1).[20]   The ADA provides that, with limited exceptions, a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation."   49 U.S.C.A. § 41713(b)(1).   The Supreme Court has explained that "[t]he scope of ADA preemption is a question of statutory intent." *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)).   The Supreme Court has, likewise, "held that the phrase 'relating to rates, routes, or services' in the ADA [is] 'deliberately expansive' and preempt[s] any 'state enforcement action having a

---

[20]  To state a claim "for tortious interference with an existing contract, a plaintiff must demonstrate '(1) the existence of a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damage and (4) actual damage or loss occurred.'" *Stewart*, 200 F.3d at 316 (quoting *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 394 (5th Cir. 1996)).   Similarly, to state a claim for tortious interference with prospective contract or business relationships, a plaintiff must allege facts showing:

> (1) a reasonable probability that the parties would have entered into a contractual relationship, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff, (3) the defendant lacked privilege or justification to do the act, and (4) actual harm or damage resulted from the defendant's interference.

*Id.* (quoting *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 659 (Tex. App.--Corpus Christi 1991, writ denied)) (internal quotation marks omitted).

connection with or reference to airline rates, routes, or services.'" *Id.* (quoting *Morales*, 504 U.S. at 384).

However, "the ADA's preemption clause does not shelter airlines [or GDSes] from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." *Id.* at 287 (quoting *Am. Airlines v. Wolens*, 513 U.S. 219, 228 (1995)). Thus, "[t]he ADA does not preempt 'state-law-based court adjudication of routine breach-of-contract claims' so long as there is 'no enlargement or enhancement of the contract based on state laws or policies external to the agreement.'" *Id.* (quoting *Wolens*, 513 U.S. at 228). Nor is the ADA concerned with "displacing state tort law." *Id.* (quoting *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 340 (5th Cir. 1995) (en banc)).

In the Court's view, the ADA preempts American's claims for tortious interference with existing and prospective contractual relationships. First, American's claims "relate to" the defendants' rates and services and have "a significant relationship to the economic aspects of the airline industry." *Id.* Second, American is seeking to enforce state-created standards, not "self-assumed contractual obligations." *Id.* at 289.

Like the plaintiff in *Lyn-Lea Travel Corporation v. American Airlines, Inc.*, 283 F.3d 282 (5th Cir. 2002), American "is seeking the application of Texas common law in a way that would regulate

35

[Sabre's and Travelport]'s pricing policies [i.e., booking fees], commission structure [i.e., sharing booking fees with travel agents], and reservation practices [i.e., biasing American's flights in their displays]." *Id.* at 287 (footnote omitted).  In *Lyn-Lea*, the plaintiff had asserted a claim for tortious interference with business relationships, alleging that the defendant "intentionally interfered with its business relationships with four customers and an employee, luring the customers away with discounted fares." *Id.*  The Fifth Circuit determined that the "business relations claim [was] plainly preempted because it involve[d] [the defendant]'s prices and services to customers." *Id.* at 287-88.  Similarly, the Court holds that American's state-law claims are preempted.

F.  Disposition of the Motions to Dismiss

Based on the foregoing, the Court GRANTS Orbitz's motion to dismiss, GRANTS in part and DENIES in part Travelport's motion to dismiss, and GRANTS in part and DENIES in part Sabre's motion to dismiss.  The following claims, as pleaded in American's first amended complaint, should be dismissed:

(1)  all claims against **Orbitz**;

(2)  American's claims against **Travelport** for monopolization of the Market, conspiracy to monopolize in violation of section 2 of the Sherman Act, unreasonably restraining competition in violation of section 1 of that act, and

36

tortious interference with existing and prospective contractual relationships; and

(3) American's claims against **Sabre** for unreasonably restraining competition in violation of section 1 of the Sherman Act and tortious interference with existing contractual relationships.

To be clear, this leaves the following claims: (1) monopolization by Travelport in the Travelport submarket, (2) monopolization by Sabre in the Sabre submarket, and (3) monopolization by Sabre in the Market.


## II. American's Motion for Leave to Amend

After the defendants' motions to dismiss American's amended complaint became ripe for review, and subsequent to the Court's consideration of those motions, American filed its motion for leave to file a second amended complaint. In its proposed second amended complaint, American's objectives appear to be four-fold. First, American seeks to add new allegations in support of its existing claims, based on recently-discovered information. Second, American seeks to add three new claims: (1) a section 1 claim against Sabre and Travelport for entering into an alleged anticompetitive agreement together; (2) another section 1 claim against Sabre, Travelport, and "numerous travel agencies" based on an alleged group boycott; and (3) a section 1 claim against Orbitz and

Travelport for allegedly entering into an agreement to allocate customers.  Third, American seeks to include Sabre in its section 2 conspiracy claim, which was previously asserted against only Travelport and Orbitz.  Fourth, and finally, American seeks to drop its state-law tortious-interference claims.

Under Federal Rule of Civil Procedure 15(a)(2), a "court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  There are five factors the Court must consider when determining "whether to grant a party leave to amend a complaint: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by previous amendments, (4) undue prejudice to the opposing party, and (5) futility of the amendment." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003)).

As an initial matter, the Court notes that American's fourth objective--dropping its state-law tortious-interference claims--is a moot point, given the Court's decision to dismiss those claims. Additionally, with regard to American's second objective, the Court is persuaded that American's three new claims should be allowed. In so allowing, the Court is not concluding that these claims are plausible and sufficient to survive a Rule 12(b)(6) challenge.  The Court is merely concluding that these claims are not patently futile.  Along these same lines, the Court is satisfied that

38

American's proposed change to its section 2 monopolization claim--adding Sabre--is permissible in light of Rule 15.  Likewise, the Court is persuaded that American should be allowed to include its newly-discovered allegations in support of its existing claims, as there does not appear to have been bad faith or undue delay on American's part.

There is one claim in the proposed second amended complaint, however, that, in the Court's view, should not be allowed to go forward:  American's claim that Sabre's and Travelport's agreements with participating airlines and travel-agent subscribers unreasonably restrain competition in violation of section 1 of the Sherman Act.  Allowing amendment of this claim, which is designated as count four in both American's first amended complaint and its proposed second amended complaint, would prove futile, as American does not remedy the deficiencies noted in Part I.D. of this order in its proposed second amended complaint.

Therefore, the Court GRANTS in part and DENIES in part American's motion for leave to amend.  American is thus GRANTED leave to file its proposed second amended complaint no later than December 5, 2011,  except that its fourth claim for relief should be stricken.


III.  Conclusion

In light of the foregoing, American's state-law tortious-

interference claims, as well as American's claim that Sabre's and Travelport's agreements with participating airlines and travel-agent subscribers unreasonably restrain trade in violation of section 1 of the Sherman Act, are hereby DISMISSED WITH PREJUDICE.

SIGNED November 21, 2011.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE