1

<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                          FORT WORTH DIVISION

 3   AMERICAN AIRLINES, INC.,        .  CIVIL ACTION NO.
              Plaintiff,             .   4:11-CV-244-Y
 4                                   .
     V.                              .
 5                                   .
     TRAVELPORT LIMITED, ET AL.,     .  Fort Worth, Texas
 6          Defendants.              .  February 12, 2013
     . . . . . . . . . . . . . . . . .
 7

 8                       TRANSCRIPT OF PROCEEDINGS
             (Hearing on Motion to Enforce Settlement Agreement)
 9                 BEFORE THE HONORABLE TERRY R. MEANS
                      UNITED STATES DISTRICT JUDGE
10

11   APPEARANCES:

12   For Plaintiff American:      MR. R. PAUL YETTER
                                  MS. ANNA G. ROTMAN
13                                Yetter Coleman LLP
                                  909 Fannin Street, Suite 3600
14                                Houston, Texas  77010
                                  (713) 632-8000
15
                                  MR. ROLAND K. JOHNSON
16                                Harris Finley & Bogle
                                  777 Main Street, Suite 3600
17                                Fort Worth, Texas  76102-5341
                                  (817) 870-8700
18
                                  MS. YOLANDA C. GARCIA
19                                Weil Gotshal & Manges
                                  200 Crescent Court, Suite 300
20                                Dallas, Texas  75201
                                  (214) 746-8134
21
     For Defendant Orbitz:        MR. CHRISTOPHER S. YATES
22                                MR. BRENDAN A. MCSHANE
                                  Latham & Watkins LLP
23                                505 Montgomery Street
                                  Suite 2000
24                                San Francisco, California  94111
                                  (415) 391-0600
25
</pre>

2

```
 1    APPEARANCES:  (Cont.)

 2    For Defendant Orbitz:        MR. JOHN J. LITTLE
                                   Little Pedersen Fankhauser LLP
 3                                 901 Main Street, Suite 4110
                                   Dallas, Texas  75202
 4                                 (214) 573-2307

 5    Court Reporter:              MS. ANA P. WARREN
                                   U.S. District Court Reporter
 6                                 501 W. 10th Street, Room 201
                                   Fort Worth, Texas  76102-3637
 7                                 (817) 850-6681

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription.
25
```

U.S. DISTRICT COURT

3

### *P R O C E E D I N G S*

1

2      (Commencing, 10:15 a.m.)

3          THE COURT:  All right.  Before the Court now is case

4  Number 4:11-CV-244-Y, American Airlines versus Travelport,

5  Limited, et al, and we're focusing today on American versus

6  Orbitz Worldwide, LLC.

7      I will inform the parties that I have thoroughly reviewed

8  what you have provided to the Court in the way of motions and

9  responses and appendices, and, therefore, I see no need for a

10  long hearing, and I will entertain objections to the following

11  procedure:

12      An argument of 15 minutes by Orbitz, 20 minutes by

13  American, and then a rebuttal of five minutes by Orbitz, so

14  that you can hit your high points, but I already have a

15  leaning I won't disclose at this point based on what I've

16  read, and I've read it carefully, and I've got the affidavits.

17  I doubt any additional testimony will make any real

18  difference.

19      Any objection to that procedure?

20          MR. YETTER:  None for American, Judge.

21          MR. YATES:  None for Orbitz, Your Honor.

22          THE COURT:  Okay.  Orbitz, you may begin, and please

23  announce who is representing -- who you are and all that.

24          MR. YATES:  Thank you, Your Honor, Christopher Yates,

25  Latham & Watkins, for Orbitz.

4

1    Your Honor, before we get going, I noted that I believe

2    there is a reporter in the courtroom along with some counsel

3    for, I believe, Sabre, a now dismissed party.  The motion and

4    the opposition were filed under seal, and so I think we may

5    need to address that issue as a preliminary matter.

6        MR. YETTER:  We agree, Your Honor.  Because these are

7    confidential settlement discussions and everything was filed

8    under seal, we would ask the Court to seal the courtroom.

9        THE COURT:  What do you think you're going to say

10   here that will be all that revealing, because the Courts have

11   to strain to not clear courtrooms?

12       MR. YATES:  Understood, Your Honor.  We filed our

13   motion on behalf of Orbitz under seal, essentially, as a

14   prophylactic measure.  I have got some slides that I'll

15   probably use.  They do refer to some documents that were

16   produced in discovery.  I probably can omit that and avoid

17   having Your Honor having to seal the courtroom.  So I think we

18   can proceed, and we're willing to proceed --

19       THE COURT:  Well, you can produce those on the

20   document camera.  I can close off the attorney monitors so no

21   one can see it other than the witness and me -- well, there

22   won't even be a witness, probably.  So I would be the only one

23   to see it on my monitor here.

24       MR. YATES:  We'll be fine proceeding that way, Your

25   Honor.

1          THE COURT:  All right.

2          MR. YETTER:  Your Honor, from American's standpoint,

3   because the discussions were confidential between the parties

4   and as settlement discussions inherently are typically, we

5   prefer they not become public, especially with reporters in

6   the courtroom, Your Honor.

7          THE COURT:  I'm going to proceed with an open

8   courtroom.  If we get to a point that's highly sensitive, we

9   may take other measures, but at this point, I don't

10  sufficiently see the need.

11         MR. YATES:  Thank you, Your Honor.

12     May I approach the clerk with the copies of some of the

13  slides I may use?

14         THE COURT:  Yes, sir.

15         MR. YATES:  Your Honor, thank you for the time today.

16     The essential question before the Court is really one of

17  contract formation.  It's, essentially, a question of, you

18  know, as the Guidry Court put it, whether a contract was

19  formed.  So, essentially, we need to look at whether there was

20  an offer that could be accepted, whether there was acceptance,

21  and whether there is consideration.  Now, that all has to be

22  evaluated against the backdrop of the fact that, as Your Honor

23  knows, Courts incur settlements.  So Your Honor needs to take

24  the fact that these are settlement discussions into

25  consideration when evaluating whether or not a contract was

1    formed.

2       Now, if you turn to the first slide, sir, the inquiry here

3    is governed by two key questions.  Now, American Airlines in

4    their opposition that they filed yesterday afternoon, I

5    believe, they make a lot of argument about American's

6    subjective views, its views now, what it wishes now, but the

7    test that Your Honor needs to apply is an objective one.  It's

8    a simple contract question.  You need to look at the objective

9    evidence.  And so the first question I submit, Your Honor, is

10   whether the parties have objectively manifested an intent to

11   be bound by the terms that are in the term sheets.

12      The second question, Your Honor, is, are the terms

13   sufficiently definite to be specifically enforced?  Now, this

14   analysis has got to be governed by federal law.  That's very

15   clear under the Fifth Circuit's Fulgence case, and if Your

16   Honor wants to look at a case out of the Northern District of

17   Texas, there's the Chen case at 2012 U.S. District Cases

18   168420.

19           THE COURT:  It's a Northern District case?

20           MR. YATES:  Yes.

21           THE COURT:  I didn't see that in your brief.

22           MR. YATES:  It wasn't, Your Honor --

23           THE COURT:  That's fine.  Who was the judge?

24           MR. YATES:  I don't recall the judge.  We'll pull it

25   up and give it to Your Honor in a second.

1        If Your Honor wants to look at another Northern District

2    case, I would encourage you to look at the McCordel (phonetic)

3    case, 2011 U.S. District, Lexis 21839, 2011.  Once again, I'll

4    get you the judge on that.

5        So this question is governed by federal law.  It's an

6    objective inquiry rather than an inquiry that one party

7    subjectively thought or now says, and AA bears the burden of

8    disproving enforceability of this contract.

9        Move to the next slide, Your Honor.  What are the

10   objective manifestations of AA's intent to be bound here?

11       The first thing is American Airlines approached Orbitz

12   about settlement.  They came to us.  The record is

13   unequivocally clear, and it's admitted that American

14   approached Orbitz.  American prepared the first and last

15   written settlement term sheets.  These term sheets are

16   multi-page written documents prepared by one of the largest

17   most prominent law firms in this country.

18       Now, those term sheets, which are written quite detailed,

19   they reflect the terms upon which AA was willing to dismiss

20   Orbitz from this litigation.  And, Your Honor, the essential

21   terms, if you compare the first and last term sheet which were

22   negotiated over a period of a couple of weeks, the essential

23   terms just don't really change.  The essential terms are

24   dismissal, no payment.  That's zero dollars in payment by

25   Orbitz, and just what is Orbitz suppose to do?  What's the

8

1    consideration from Orbitz?

2       There is additional discovery.  The discovery deadlines

3    for document production had closed, and Orbitz agreed to make

4    some additional discovery, and there were mutual releases.

5    Those were the essential terms.  Now, to be sure the parties

6    negotiated the terms, the scope of that discovery, what

7    exactly was going to be produced, that all got resolved.

8       Now, what else -- what's another manifestation of AA's

9    intent to be bound by the term sheet on August 9?  The fact --

10    and AA doesn't dispute this -- the fact that American's

11    counsel at Weil Gotshal, they committed to prepare formal

12    settlement papers.  On August 13, when my colleague,

13    Mr. McShane, spoke with Mr. Pace from the Weil Gotshal firm,

14    what was said?  They reached agreement on the final provision,

15    and what did they do?  We said, do you want us to prepare the

16    formal settlement documents?  They said, don't worry about it.

17    We are already doing so.  So that's American's intent to be

18    bound.

19       If you go to the next slide, sir, American Airlines

20    doesn't dispute that Weil Gotshal was authorized to send the

21    term sheets.  Now, they try to dispute that the Weil Gotshal

22    firm was authorized to make a settlement on behalf of American

23    Airlines, but the law in the Fifth Circuit is very clear for

24    good reason, of course, that attorneys are presumed to have

25    the authority to compromise and settle litigation of their

1    client.  That's the Mid-South Towing case, among other

2    cases.

3        Now, Mr. Wark from American's declaration, I would

4    encourage Your Honor to review it carefully.  What his

5    declaration doesn't do is doesn't deny that the Weil Gotshal

6    firm had authority to send the term sheets, and it also

7    doesn't deny that he had reviewed and approved the term

8    sheets.  So it's very clear from the record before Your Honor

9    that the term sheets, which were negotiated over a period of

10   weeks, that they had been reviewed by American Airlines.

11   Mr. Wark doesn't deny that he reviewed them.  Mr. Wark doesn't

12   deny that the Weil Gotshal firm was authorized to send them to

13   Orbitz.

14       And unlike the cases that American cites -- and they cite

15   primarily three cases in their opposition that they sent in

16   yesterday.  The term sheets that American sent say nothing

17   about the need for a further writing or signatures to be

18   enforceable.

19       Now, American spends a lot of time saying that you need a

20   signature in order for there to be an agreement.  That's just

21   not true.  That's fundamental contract law.  There can be an

22   oral offer and acceptance, and here we have got a written term

23   sheet followed by an oral acceptance.

24       Now, the cases that American cites, the Bereman case, for

25   instance, what that case turned on was the fact that, as the

1    Court says, the letter of intent, quote -- and this was in the

2    letter of intent itself -- is not intended to legally bind the

3    parties with respect to the asset purchase.  So that's the

4    Bereman case.  The parties made very clear in the writing that

5    the writing that was being negotiated was not intended to bind

6    the parties.

7        Now, the Ciarmella case, I think, which is out of the

8    Second Circuit, American spends, I think, two pages talking

9    about that case.  And what does that case turn on?  That case

10   turns on the fact that all of the drafts that were exchanged

11   between the parties, quote, "contained language indicating

12   that the settlement would not be effective until executed by

13   all the parties and their attorneys."

14       Now, what about the third case that American cites, the

15   Intersections case?  Now, that case turned on the fact that

16   the term sheet, quote, "explicitly contemplated that they

17   would ultimately be bound only by a written signed formally

18   integrated settlement," end quote.

19       So here you've got a very sophisticated corporate party,

20   American Airlines.  You've got one of the best law firms in

21   the country, Weil Gotshal.  They send us term sheets.  If they

22   wanted those term sheets to be ineffective as a matter of

23   contract law prior to a written signed integrated contract,

24   they could very easily inserted a clause that said so.  They

25   didn't do so.  So the objective evidence before the Court, the

1    objective evidence here is American sends written multi-page

2    term sheets to Orbitz that can be immediately accepted.  They

3    didn't offer in the form of a term sheet and in a manner that

4    could be immediately accepted.  There was no express

5    reservation of any kind of rights.

6        The next question turning to the next slide, Your Honor,

7    is whether the terms in the term sheet are sufficiently

8    definite to be enforced.  Here, Your Honor, we have got

9    detailed written terms more than in many other cases where

10   Courts have enforced settlements based upon an oral offer and

11   acceptance.  If you look at the Theatre Time case, that's a

12   good example of just an oral offer of an amount and

13   acceptance.

14       The discovery obligations are set forth in detail in the

15   term sheets.  The dismissal is very clear.  The dismissal

16   says, quote, "AA shall voluntarily dismiss with prejudice its

17   claims against Orbitz with both sides to bear their own costs

18   after Orbitz has complied with Paragraphs 1 to 5."

19       Paragraphs 1 to 5, that's the settlement.  That's the

20   cooperation, the additional discovery that Orbitz agreed to

21   provide.

22       Now, American spends most of their time in their brief,

23   Your Honor, talking about the release, and they say there is

24   so much left to be done on the release, essentially, that that

25   term was not sufficiently defined.  That's just not true.

1    Again, looking at this objectively, looking at what's on the

2    face of the document, Your Honor, the objective evidence is

3    just flatly to the contrary.  The objective evidence here is

4    that there is a written release.  The scope is detailed, and

5    even though American now says, well, there is so much to be

6    worked out about Travelport, you can look at the language of

7    the release.  Travelport is not mentioned.

8        What does the release say?  The release says, American and

9    Orbitz will execute mutual and general releases of all claims

10   against each other, against each other, including all claims

11   asserted by American or which could have been asserted in the

12   Northern District of Texas litigation and any claims Orbitz

13   may have related to American's notice of termination and

14   termination of Orbitz's ticketing authority in 2010, 2011, or

15   from malicious prosecution or Rule 11 sanctions in connection

16   with American's commencement of the Northern District of Texas

17   litigation.  We've got a really detailed release provision

18   here, Your Honor.  It can be specifically enforced.

19       Now, I would say American's final argument is -- and

20   turning to the next slide, Your Honor -- that the fact that

21   American is in bankruptcy means there cannot have been a

22   settlement here.  Your Honor, I submit that just fundamentally

23   misconstrues the issue.

24       Now, we had very limited time to do some further research

25   on this issue, Your Honor, but we cited two cases on this

1    slide.  I think the Mid United Shipping Company (phonetic)

2    case out of the District of Minnesota puts it best.  What that

3    case says is essentially, look, the fact that there is a need

4    to comply with Bankruptcy Rule 9019, which means a settlement

5    between a bankrupt entity and another litigant needs to

6    receive bankruptcy approval, the fact that there needs to be a

7    settlement doesn't impact the analysis of whether or not there

8    has been an agreement.  Here, of course, there needs to be

9    bankruptcy approval at some point.  Now, the objective

10   evidence here is that American didn't expect that to be any

11   kind of issue.  It's no where in the term sheet that they

12   sent.

13        Now, Orbitz here, Your Honor, stands we're ready, willing,

14   and able to work with American to obtain bankruptcy court

15   approval.  The objective evidence is that both parties

16   represented by experienced counsel negotiated this agreement

17   over the course of multiple weeks.  They consulted with our

18   clients.  That's undisputed, and they reached agreement on the

19   terms to resolve this litigation.

20        Now, Your Honor, I'm going to turn now to what I think is

21   really going on here, and this is some of the information that

22   is under seal.  So I'm going to speak a bit elliptically here,

23   Your Honor.  But if you turn to the first slide entitled

24   "What's Really Going On," I submit what's really going on

25   here, Your Honor, is that your courtroom is being used for a

1    commercial purpose.

2        Now, American's Direct Connect Initiative, it's an effort

3    to try to disrupt and reverse the flow of economics.  American

4    spent a lot of time with a consulting group, the Boston

5    Consulting Group, coming up with a strategy, and American

6    targeted Orbitz.  Now, if you look at, why did American target

7    Orbitz --

8            THE COURT:  Well, you're in good company.

9            MR. YATES:  I think so, Your Honor, but I think it's

10   relevant to the question here because, ultimately, at the end

11   of the day, this is a very strange antitrust case.  You have

12   got the far bigger company, this Fortune whatever airline,

13   $25 billion a year in revenue, that is, the plaintiff.  It's

14   going after a much, much smaller company.

15       Why is it doing so?  It's doing so to try to get better

16   commercial terms out of the company.  It's doing so because it

17   thinks -- it thinks -- and it's shown in these slides that

18   follow -- it thinks that it needed to make an example of

19   Orbitz in order to convince the rest of the industry to go

20   along.

21           THE COURT:  Now, how is all this argument suppose to

22   help me decide whether there is a settlement agreement or not?

23           MR. YATES:  Well, Your Honor, I think it goes to -- I

24   think it goes to whether or not there is a settlement because,

25   you know -- and, again, cognizant of the confidentiality

1   protection to some of these documents -- I think it goes to

2   what this case is really all about and why American was

3   willing to let Orbitz out for zero dollars payment.

4       Now, Your Honor, I'll reserve the rest of my time and be

5   happy to spend any further time Your Honor wishes discussing

6   the cases.

7           THE COURT:  Okay.  Now, you're yielding -- let's see

8   here.  I had you to go to 10:45, and it's -- and my watch is

9   off from that one back there.  So you have six minutes

10  remaining.  I'm not inclined to give you that six minutes

11  back.

12          MR. YATES:  Understood, Your Honor.  Thank you.

13          THE COURT:  All right.  Let's hear from American.

14      And it seems to me your best point is that your clients

15  didn't agree, and your clients had to agree.  Your attorneys

16  didn't have the authority to settle without the client

17  approval, possibly, the client's signatures, to which Orbitz

18  would say, I think, well, but that's not the standard.  Your

19  attorneys are presumed to have authority, and the objective

20  evidence would show that there was an agreement, and that

21  shouldn't be overcome by subjective evidence that your clients

22  didn't approve.  I think that's probably one of the biggest

23  points.

24      I'll allow you to point out anything you want to, but if

25  you could focus on that, that would help me.

1          MR. YETTER:  I will, Your Honor.  Paul Yetter for

2     American Airlines.

3        And thank you for allowing us to argue this because it is

4     an important motion, and, Your Honor, I would like to focus on

5     three issues, the issue you just raised, which is lack of

6     authority, whether in this situation either side believes the

7     lawyers alone could settle the case.  Number two, whether,

8     actually, all of the issues had been decided even between the

9     lawyers.  And, number three -- and, actually, number three,

10    Your Honor, I believe -- I'm going to start with number three

11    because I believe it's our strongest argument, is because if

12    we want to look at the objective evidence, the law says that

13    both parties to an agreement make it clear that they are not

14    going to be bound to an agreement until there is something

15    signed, then nothing short of a signed agreement will

16    suffice.

17          THE COURT:  And I read that.  I read your cases.

18    What about where one party indicates that it won't be bound,

19    and the other one doesn't say or indicates it will be bound

20    without the signatures or the approval of the parties?

21          MR. YETTER:  Your Honor, in this situation, I think

22    both sides said it.  And with the Court's permission, we also

23    have a little presentation that I would like to go through to

24    deal with this issue first and then the other two issues that

25    the Court raised.

1       THE COURT:  So your position is that both sides have

2  objectively -- let me back up.  That there is objective

3  evidence that both sides took the position that there was no

4  agreement absent approval from the parties indicated in some

5  concrete way?

6       MR. YETTER:  Indicated in a signed writing.

7  Actually, it's more concrete than --

8       THE COURT:  Even more concrete than I --

9       MR. YETTER:  It is, Your Honor.  It's a signed

10 writing, Your Honor.  Both sides in these discussions made it

11 very clear -- and, frankly, as I will go through in just one

12 minute, the Orbitz lawyers made it very clear that all

13 agreements between -- even between the counsel, certainly,

14 between the lawyers -- had to be in writing, and if I could

15 approach your --

16      THE COURT:  Well, they would say it is in writing.

17 You have got a term sheet going back and forth electronically.

18      MR. YETTER:  There are writings in the air, so to

19 speak, Judge, but the key thing here is that I accept, and

20 that's not in writing, and what counsel said just a minute ago

21 is that that was an oral acceptance to a written offer.

22 That's what they are presenting to the Court, and in this

23 case, every agreement, even between the lawyers, had to be in

24 writing.

25      THE COURT:  Okay.  Show me.

1            MR. YETTER:  Yes, sir.

2        So, Your Honor, let's skip -- specifically, get to these

3    questions.  Let's skip past Page -- Slide 2, which are the

4    issues that I would like to cover, and go to Slide 3, which is

5    a timeline.  I'm going to focus a little bit more on the

6    timeline, because I think here, Your Honor, all of these

7    cases, while there are some basic principles of law that the

8    Court is very familiar with, all these cases do somewhat turn

9    on the facts, and the facts here we believe on this first

10   issue of whether the parties required a signed agreement, are

11   very clear.

12       So if we look -- even if we just look at the one week or

13   so that the Orbitz motion focuses on between August 10 and

14   August 16, on August 10, this is the day, the Friday, before

15   the alleged agreement on the Monday, August 13, on August 10,

16   what Orbitz counsel said to American's counsel is -- and I'm

17   quoting from the Orbitz e-mail -- is that they wanted to,

18   quote, "discuss and finalize the term sheet."  And American's

19   counsel responded that American, the client, was not

20   available.

21       The same day Orbitz's counsel called American, and in that

22   telephone conversation, said, we need to, quote, "get

23   something signed."  That's in Ms. Zambrano's declaration.

24   There has been no dispute about it.  There is none in

25   counsel's opening remarks.  In fact, what Orbitz's counsel

1  suggested in that phone conversation -- again, this is in the

2  declaration -- is that the lawyers could sign the term sheet.

3  And American's counsel said, no, we're not signing -- number

4  one, we're not signing the term sheet because this is the

5  client's decision.  And, two, we have to have a full

6  settlement agreement before there's a settlement.

7       So, first, Your Honor, the first indication that even in

8  this one week period both sides said, there has to be

9  something signed, is Orbitz, as to the very important topic of

10  settlement, said, we need to get something signed.  That's a

11  quote tHE COURT:  Okay.  Let me stop you just for a second.

12            MR. YETTER:  Yes, sir.

13            THE COURT:  So the first two yellow blocks there on

14  your presentation -- and what page did you call that?

15            MR. YETTER:  That would be Slide 3, Your Honor.

16            THE COURT:  Slide 3, where it says "Timeline"?

17            MR. YETTER:  Yes, sir.

18            THE COURT:  Your point is that the words, quote, "to

19  discuss and finalize the term sheet," close quote, is in an

20  e-mail?

21            MR. YETTER:  That's in an e-mail.

22            THE COURT:  And that the second quotation, quote, "to

23  get something signed," close quote, is not written but was

24  oral but is not contradicted by Orbitz?

25            MR. YETTER:  Correct, Your Honor.

1        THE COURT:  That's your belief.  Okay.

2        MR. YETTER:  And the citations for both of those are

3   in the box.  The first one is Exhibit K to the Orbitz motion.

4   That's the e-mail, and the next one is the Zambrano

5   declaration, which is in the record before the Court, where

6   Orbitz counsel said two things, we need to, quote, "get

7   something signed," close quote.  And, second, what about

8   signing the term sheet?

9        THE COURT:  And who said that, what about signing the

10  term sheet?

11       MR. YETTER:  Orbitz's counsel.  And American's

12  counsel in response said, no, we're not going to sign the term

13  sheet.  This is the client's decision, and we need a full

14  agreement when there's going to be a settlement.

15     And let's skip over the weekend and go to Monday.  This is

16  the day that Orbitz says there was an agreement, an oral

17  acceptance by Orbitz's counsel, to a written offer by

18  American's counsel that they say today is binding.  And, in

19  fact, what we have -- the two boxes, Your Honor, at the top,

20  one is through the declaration.  They talk about the open

21  issues in the term sheet, and American's counsel says they

22  will send a draft agreement, the full draft settlement

23  agreement, later for the parties to consider.

24     Orbitz's counsel, this is an e-mail, Orbitz's counsel

25  says, even looking at the full draft agreement, they wanted to

1    be able to, quote, comment on it.

2        Now, Your Honor, we believe that that's an objective piece

3    of evidence that even though Orbitz's counsel at that point,

4    the day they supposedly reached a settlement, the Orbitz

5    counsel still had open issues that they wanted to comment

6    on.

7        Now, let me point out one thing that is not in the record,

8    and that is any declaration or evidence by Orbitz that there

9    was ever even a conversation that said something like, okay,

10   we have a deal.  All right.  We're now settled.  This is from

11   either side.  This is not Orbitz saying it or American saying

12   it.  There is nothing in the declarations.

13       In fact, the American counsel in their declarations make

14   very clear there was no deal.

15       Let's go to the next day.  The next day says -- so one of

16   the things that Orbitz today says reflects that they believe

17   there's was a deal is that they took some conduct in discovery

18   in reliance on what they now say was the settlement.  And they

19   say, in fact -- one of the things they took in reliance is

20   they stopped going to depositions.  Well, Your Honor, in fact,

21   the day after the alleged agreement to settle, Orbitz went to

22   a deposition.  In fact, not only did they go to a deposition,

23   they presented a witness for a deposition.

24       On Tuesday, August 14, Orbitz's counsel, one of the

25   counsel here sitting to my left, presented a corporate

1    representative witness, a witness that had nothing to do with

2    the alleged settlement, that had been noticed properly,

3    presented him for a deposition.  Nothing is said on the record

4    about how we're presenting him pursuant to the settlement or

5    we're doing this reserving our rights under the settlement, or

6    anything like that.  So this is a deposition the next day.

7    That's on Tuesday, the 14th.

8        Now, Wednesday, the 15th, Orbitz says they skipped two

9    depositions because they were relying on the settlement.  I'll

10   get to this a little bit more in a minute, Your Honor, but, in

11   fact, Orbitz previously had skipped half of the depositions in

12   the case.  Orbitz, as the Court will remember, is half owned

13   by Travelport.  So Travelport counsel did almost all the

14   questioning in all the depositions.  So the fact that Orbitz

15   today says, well, we skipped a couple of depositions and that

16   shows our great reliance on the settlement, in fact, shows

17   nothing different than Orbitz doing what it had always been

18   doing.

19       And then we move forward one more day on August 16, Orbitz

20   finally says -- this is three days after the alleged

21   settlement -- we have a settlement.  And American's counsel

22   immediately says in an e-mail, no, you don't.

23       Now, Slide 4, Your Honor -- and there is going to be one

24   other timeline that I'm going to focus on, but, briefly, for

25   the law on Slide 4, the law is undisputed -- and I don't

1    believe Orbitz today is taking a different position -- that if

2    both parties contemplate a signed writing, either party can

3    withdraw and decline to continue going forward until there is

4    a signed writing, and we believe that's the law for lots of

5    good reasons, because in certain transactions, parties expect

6    that there will be discussions short of a binding agreement

7    and that no one will preemptively claim that there's an oral

8    deal before there is.  We think that's what the situation is

9    here.

10       Your Honor, if you go to Slide 5, which is the next slide,

11   and at the top it's titled, "Orbitz Demands Written

12   Agreement."  This goes back to the first point that I wanted

13   to make.

14       These are all instances in just the two week period right

15   around the alleged settlement in which Orbitz asked

16   American -- this is Orbitz going to American -- saying we need

17   you to in writing confirm an agreement.  So the first one is

18   on Friday, August 3, and Orbitz -- this is in the record.  In

19   fact, Orbitz put this in the record.  This is an e-mail.

20   Orbitz writes to American and says, we have some deposition

21   dates that are unclear, and we need you to confirm in an

22   e-mail, in other words, in writing, what the dates are.

23       So here is the first one.  This is a discovery agreement.

24   First, we're talking about settling the whole case, but here's

25   the discovery agreement on August 3, and Orbitz says, you need

1    to confirm in writing, which, of course, American then later

2    does.

3        Going forward a week to Friday, August the 10th, this is

4    right before the alleged agreement.  We covered this a minute

5    ago.  Orbitz makes a phone call to American's counsel and

6    says, it's very important to, quote, get something in

7    writing -- I'm sorry, get something signed.  Why don't we sign

8    the term sheet?  American counsel says, no, I don't know what

9    you're talking about.  We're not going to be doing that.

10       Going forward to Monday, August 13 -- and this is the day

11   of the alleged oral settlement agreement.  Orbitz asks

12   American counsel again to confirm in writing that they want a

13   short extension on the discovery deadline.  So the day of the

14   alleged settlement that they say was consummated orally, they

15   go to American and say, we need you to confirm in writing that

16   you're going to give us a two week extension on answering

17   interrogatories and requests for admissions.

18       So we would argue, Your Honor, objectively at that point

19   what counsel is saying is two things.  One, agreements are

20   going to be in writing.  And, two, nothing is final.  Because

21   if, in fact, they are asking for an extension of discovery for

22   two weeks, that's completely inconsistent with taking the

23   position today that they actually had finally settled the case

24   on August 13.

25       Now, let's go forward three more days to Thursday, August

1   the 16th.  So here we have three instances of Orbitz saying to

2   American, we need everything in writing, these agreements in

3   writing.  Now, Thursday, August 16, this is their answer date.

4   The Court had just overruled the motions to dismiss, and

5   Orbitz had to answer, and this is three days after the alleged

6   final binding settlement that Orbitz now proposes, and Orbitz,

7   in fact, is asking American to, quote -- this is an e-mail.

8   It's in the record.  Orbitz presented it -- to, quote,

9   "confirm that American is agreeable to extend its answer date

10  briefly."

11      Again, two things, one, agreements have to be in writing,

12  and, two, nothing is final.  If you're just extending briefly

13  your answer date, obviously, there are still things open and

14  moving around.

15      And, finally, the next day on August the 17th, American

16  writes back in an e-mail -- this is in the record -- that they

17  agree to the extension of the Orbitz answer.

18      The objective evidence very simply, Your Honor, is that

19  Orbitz, focusing on the Orbitz side, asked for every agreement

20  from American to be in writing.  So that's our first point.

21      Going to the next slide again, these are the e-mails, Your

22  Honor, if you want to read them in more detail.  This is one

23  of the last e-mails about extending the answer date for

24  American -- excuse me, for Orbitz to answer American's

25  complaints, and here the Orbitz lawyers are asking, quote, for

1    American to -- whether American is agreeable to extending the

2    time by which Orbitz must respond to the complaint.  And then

3    later the same day, it becomes even more urgent, Orbitz is

4    saying, quote, "Let us know as soon as possible if the draft

5    motion for extension is agreeable."

6        So here Orbitz objectively is telling American it's very

7    important that agreements get in writing.

8        Now, moving to Slide 7.  We think there are other relevant

9    factors that reflect that there is no agreement here in

10   addition to the fact that there is no signed writing, which we

11   believe Orbitz concedes, and that is that American says over

12   and over again, this was a client decision, and the client,

13   American Airlines, had never made the decision.  They said

14   that in writing.  They said that over the phone.

15       Number two, despite what Orbitz says to the Court today,

16   they have not performed any obligation under the term sheet.

17   What Orbitz is now actually proposing to the Court is that

18   they would like to perform and they're willing to perform, but

19   they haven't given any documents.  They haven't given any

20   witnesses, at least not yet for depositions, they haven't done

21   any performance at all.

22       Number three, we believe there are key open issues under

23   the agreement.  Now, the fact is that American, like any good

24   plaintiff, is looking -- has always looked to streamline this

25   case.  It's a big complicated case.  We believe, without

1   getting into the details, there are a number of travel agents

2   like Orbitz that were involved in what we believe to be an

3   illegal conspiracy with the GDS's, Travelport and Sabre.

4   American did not sue most all of the travel agents except for

5   Orbitz.

6       So the reality here, Your Honor, is like any good

7   plaintiff, what we have been trying to do and what we've been

8   open to do in good faith is discuss a resolution that we think

9   would streamline this case.  We haven't been willing to simply

10  give up, and Orbitz has not been willing to give the sort of

11  cooperation that we believe would be helpful to our case,

12  ultimately, against who we believe are the core defendants,

13  the GDS's, now, only Travelport.

14      So the fact is, right now, at the time on August 13, there

15  were still important -- even in that framework of cooperation,

16  there were important open issues.  Three issues, number one,

17  exactly what was Orbitz suppose to do?  Orbitz today wants to

18  say, they orally agreed to the term sheet.  Well, by way of

19  example, one of the issues in the term sheet is how many

20  custodians will Orbitz search for documents for.  American had

21  asked for 14.  Orbitz had said 10.  That issue was still open.

22      Number two -- and Orbitz doesn't reflect any e-mail or any

23  declaration that says to the contrary.

24      Number two, the issue of the release is a very complicated

25  issue.  As I said, Orbitz is half owned by Travelport.

1   Releasing Orbitz could have significant repercussions if it

2   wasn't done in a careful way.  So the release, as the Court is

3   fully aware, in any complicated corporate litigation,

4   especially with intertwining ownership, is a very big issue.

5   Without getting into any of the details by way of example --

6   and this is in the record for the Court -- in settling with

7   Sabre, Your Honor, the release took up four separate

8   single-spaced paragraphs over the course of about a page.  It

9   was a very complicated release.

10       Likewise, the treatment in bankruptcy court, a very

11   complicated issue.  Again, analogizing to the Sabre

12   settlement, it took up a full page, single-spaced, just for

13   the terms of the bankruptcy process.

14       And, lastly, Your Honor, this is not a small case.  I

15   don't think any counsel would say that it is, and I would be

16   surprised that counsel and Orbitz hasn't taken the position

17   that, as a matter of custom, that complicated civil antitrust

18   litigations like this case is resolved and settled by oral

19   deals.  That is not -- that's a factor we believe weighs in

20   favor of there being no agreement.

21       So moving to Slide 8 --

22            THE COURT:  You have just one minute remaining.

23            MR. YETTER:  Well, then I made this point, Your

24   Honor.  Slide 8 reflects there were 19 -- 18 depositions.

25   Orbitz absolutely skipped nine of them.  Never even showed up.

1    They showed up telephonically for about five of them and asked

2    no questions, and, finally, they asked questions in four of

3    them, four out of 18.  In fact, Travelport, its large owner,

4    did all the questions.

5        Moving to Slide 9 reflects more evidence that there was no

6    oral agreement.

7        Slide 11, one last point, Your Honor -- and this is the

8    issue of authority.  What the Mid-South case says, Your Honor,

9    is that while lawyers in federal court are presumed to have

10   authority, that is rebuttable, and there has been no

11   contradiction, we believe, to American's evidence that these

12   lawyers alone had no authority -- both the lawyers have said

13   this and the client -- had no authority to settle this case on

14   the basis of the term sheet or orally or on any other grounds

15   that was not specifically agreed by the client and that this

16   settlement -- this purported settlement was not agreed.

17       Your Honor, I appreciate the time very much.  Unless you

18   have any questions, I believe my time is up.

19           THE COURT:  No.

20           MR. YETTER:  Thank you, Your Honor.

21           THE COURT:  Thank you.

22       All right.  Five minutes.

23           MR. YATES:  Thank you, Your Honor.  I don't think

24   I'll use all my time but just a few points.

25       We certainly do dispute Ms. Zambrano's statement that

1    there was some kind of repeated advice to Orbitz that there

2    needed to be a signed writing.  We got American's opposition

3    when we were on the plane coming out here, and we haven't had

4    time to put it in a reply, but we certainly do dispute that.

5         But, Your Honor, that's why what matters is the objective

6    evidence.  What matters is not the post-hoc attorney

7    declaration, sort of a he said/she said kind of stuff.  What

8    matters is what's in the term sheet.  And Mr. Yetter in his

9    slides, he -- Slide, I think it's 3 -- excuse me, Slide 4, he

10   cites the Bereman case.  Once again, Your Honor, the Bereman

11   case and all the other cases cited by AA support us.  In that

12   case, as in all the other cases cited by AA, what did the

13   parties who were negotiating the term sheet do objectively to

14   preserve their ability to only be bound by a signed writing?

15   They included the language in the term sheet that said that.

16        American Airlines, one of the largest companies in this

17   country, very sophisticated company, Weil Gotshal, one of the

18   best law firms in this country, what did they do?  They didn't

19   put that in there.

20        Your Honor, what matters here is objectively there was an

21   offer in a term sheet that had no exceptions.  It didn't say

22   we're only going to be bound if there's a signed writing, and

23   there was an acceptance.  That's what matters here.

24        Now, on the issue of authority, Your Honor, the Mid-South

25   case talks about a party like American being estopped from

1   denying authority.  And why is that true here?  If you look at

2   Ms. Zambrano's declaration, she doesn't dispute that she

3   discussed the term sheet with her client.  Mr. Pace doesn't

4   dispute that he discussed the term sheet with his client.

5   Mr. Wark doesn't dispute that he reviewed and approved the

6   term sheets.

7        It's very clear -- and, frankly, I don't know what am I

8   suppose to do.  Am I suppose to take a court reporter to every

9   discussion with opposing counsel now?  I mean, is that what

10  this is coming to, that you have to do that?  I have to get an

11  affidavit saying, give me an affidavit, Weil Gotshal, that

12  tells me that you have got authority.  Authority is presumed

13  here, and American is estopped to deny that it's not.

14       How did Orbitz act in reliance?  We certainly told them we

15  weren't going to depositions.  Did we go to every deposition

16  in this case?  Absolutely not.  My client is a smaller client.

17  I'm trying to save some money for that client.  I don't have

18  an army of lawyers like American here.  I'm trying to save

19  money for my client.  I pick and choose which depositions to

20  go to.

21       One of the depositions that week was a very important

22  deposition to my client.  We purposely chose and we advised

23  American's counsel that we were not going because we had

24  reached an agreement.

25       What else did we do?  We shut down work by our expert.

1    What else did we we do?  We began running the search terms,

2    and we had contract attorneys begin with viewing the documents

3    that were called back by those search terms because those were

4    things that were called for by the term sheet and needed to be

5    done by August 31.  It was a very, very tight time window here

6    to get things done.

7         Now, what's the writing?  The writing here is the term

8    sheet.  The term sheet was negotiated over the course of two

9    weeks.  On August 9, American sent Orbitz a term sheet that

10   could be immediately accepted.  It was accepted.  That's the

11   writing.  That's the offer.  That's the acceptance here.

12        Now, Mr. Yetter made a big deal about discovery deadlines

13   and answered deadlines.  The reality here, Your Honor, is

14   until we had a dismissal, which is set forth in the term

15   sheet, the writing, until we had a dismissal, we had to

16   account for those current deadlines.  We had to get them

17   pushed off.  That's what you do.

18             THE COURT:  One minute.

19             MR. YATES:  I close with this, Your Honor.  What's

20   the objective manifestation there was an agreement from the

21   American side?  And American doesn't deny this.  In fact, I

22   think Mr. Pace says this in his declaration.  The objective

23   manifestation that there was an agreement here is that

24   American Airlines offered to prepare and said it was already

25   preparing the final settlement documentation.  If there was

```
 1    all this dispute over the number of custodians -- and there

 2    wasn't.  That was resolved on the 10th, and Ms. Zambrano

 3    doesn't deny otherwise -- if there was all this dispute over

 4    that, over the scope of the release -- and, again, I covered

 5    the release in my slide.  The release is very detailed, very

 6    clear.  If there was all that dispute, why did American commit

 7    to preparing and sending us the final settlement

 8    documentation?

 9        And just on the complicated case point, once again, Your

10    Honor, this was a zero dollar payment settlement by Orbitz.

11    Thank you, Your Honor.

12            THE COURT:  Thank you to both sides.

13        (Brief pause in proceedings)

14            THE COURT:  We should have a decision for you before

15    the week is out and let it go at that.

16        Anything further?

17            MR. YETTER:  Your Honor, a bit of a housekeeping

18    matter.  I don't think either side has objected to the proffer

19    of the affidavits, but to the extent that it's needed, we move

20    them into evidence for the Court's consideration on this

21    issue.

22            THE COURT:  You're moving into evidence what?

23            MR. YETTER:  The declarations and affidavits, Your

24    Honor.

25            THE COURT:  Oh, they are in.  Both sides are in for
```

1     purposes of this.

2               MR. YETTER:  Other than that, nothing else from

3     American.  Thank you, Your Honor.

4               MR. YATES:  Thank you, Your Honor.

5               THE COURT:  We'll be in recess until further call.

6          (End of proceedings, 11:00 a.m.)

7

8                              -oOo-

9

10

11

12

13

14

15

16

17

18

19

20                          CERTIFICATE

21       I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter, and
22    that the transcript was prepared by me and under my
      supervision.

23
      s/  Ana P. Warren                      February 21, 2012
24    Ana P. Warren, CSR #2302                      Date
      U.S. District Court Reporter
25                              -oOo-